**LITE DePALMA GREENBERG & RIVAS, LLC**
Joseph J. DePalma
Susan D. Pontoriero
Two Gateway Center, 12th Floor
Newark, NJ  07102-5003
Telephone:  (973) 623-3000
Facsimile: (973) 623-0858

*Liaison Counsel for Plaintiffs*

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

*DOCUMENT ELECTRONICALLY FILED*

| | |
|---|---|
| In re PAR PHARMACEUTICAL SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) | Master File No.<br>　 2:06-cv-03226-PGS-RJH<br><br>**CLASS ACTION**<br><br>**LEAD PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT** |
| This Document Relates To:<br><br>　　ALL ACTIONS. | | |

Lead Plaintiffs Snow Capital Investment Partners and WR Capital Management, LP ("Lead Plaintiffs" or "Plaintiffs") allege the following based upon the investigation of Plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Par Pharmaceutical Companies, Inc. ("Par" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, interviews with former employees of Par, and media reports about the Company, and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of purchasers of the securities of Par between July 23, 2001, and July 5, 2006, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      This case concerns accounting fraud.  As detailed herein, throughout the Class Period, Par issued numerous materially false and misleading, statements regarding the Company's financial performance and prospects.   Specifically, Defendants repeatedly highlighted the Company's "record" financial results and strong financial performance, which purportedly "exceeded [analysts'] estimates."  As Par has now admitted, throughout the Class Period, the Company's reported financial statements materially overstated assets, revenues, and net income and materially understated accounts receivable reserves due to a failure to timely recognize customer credits and uncollectible customer deductions.  Defendants further misled investors by falsely stating that such reserves for returns of products were based on a monthly review and analysis of actual product returns and other information related to Par's reserves estimates.  Par's lack of a functioning system of internal controls also led to a failure to timely write-down the value of impaired inventory. As a result of the

foregoing, Par's Class Period financial reports were materially false and misleading and not prepared in accordance with Generally Accepted Accounting Principles ("GAAP").

3.     The truth began to emerge on July 5, 2006, when Par issued a press release announcing that it would be restating its financial statements for fiscal years 2004, 2005 and the first quarter of 2006 to correct for "an understatement of accounts receivable reserves which resulted primarily from delays in recognizing customer credits and uncollectible customer deductions." The Company reported that the effect of the restatement over reported periods would be $55 million, that the Company would also write down $15 million in inventory and that its prior financial statements "should not be relied upon."

4.     In response to this announcement, the price of Par common stock dropped from $18.25 per share to $13.47 per share on extremely heavy trading volume.

5.     On July 24, 2006, the Company disclosed that it had been informed on July 7, 2006, that the SEC had commenced an investigation concerning Par's announcement of July 5, 2006.

6.     On September 26, 2006, Defendant Scott Tariff, at the Board's request, resigned his positions at the Company.

7.     On December 14, 2006, Par announced that the restatement had expanded to include periods prior to 2004 and would require the Company to reduce previously reported revenues and earnings by at least $84 million through the first quarter of fiscal 2006.

8.     On March 13, 2007, Par filed an amended Annual Report on its Form 10-K for fiscal year 2005 which included restated financial statements for 2001, 2002, 2003, 2004 and 2005 (the "Amended 2005 10-K").[1] The amended 10-K revealed that Par had understated accounts receivable

---

[1] The Company has not yet filed restated financial statements for the first quarter of 2006.

reserves by more than $80 million and overvalued its inventories by more than $5 million.  The following table illustrates the magnitude of the restatement periods:

| *Net Earnings Overstatement by Year:* | | | | *Cumulative Restatement Adjustments:* | |
|---|---|---|---|---|---|
| *Year* | *$ Thousands* | *%* | | *Description:* | *$ Millions* |
| *Pre-2001* | *$2,322* | *n/a* | | *Manipulation of receivable Reserves* | *80,845.0* |
| *2001* | *6,051* | *13%* | | *Inventory write-offs* | *5,629.0* |
| *2002* | *(1,108)* | *1%* | | *Sales cut-off* | *321.0* |
| *2003* | *15,949* | *15%* | | *Other accounting adjustments* | *(1,340.0)* |
| *2004* | *21,688* | *286%* | | *Total pre-tax earnings adj.* | *$85,455.0* |
| *2005* | *7,059* | *85%* | | *Related tax adjustments* | *33,494.0* |
| *Total* | *$51,961* | | | *Cumulative net earnings adj.* | *$51,961.0* |

9.      Prior to the disclosure of the truth about Par's improper accounting practices, certain of the  Individual Defendants and other senior Par executives and insiders sold 1,660,875 shares of their personally-held Par common stock to the unsuspecting investing public, garnering more than $67.3 million in illicit proceeds.  In addition, Par registered for sale to the public more than 13 million shares of stock acquired by institutional investors in a private placement and issued $200 million of convertible debt securities to the public.

**JURISDICTION AND VENUE**

10.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b), and many of the acts and practices complained of herein occurred in substantial part in this District.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

14.     By Court Order, dated November 15, 2006, Snow Capital Investment Partners and WR Capital Management were appointed Lead Plaintiff to represent the Class.  As set forth in its certification previously filed with the Court, Lead Plaintiffs purchased the common stock of Par during the Class Period and suffered substantial damages as a result of the wrongful acts of Defendants, as alleged herein.

15.     Defendant Par is a Delaware corporation which maintains executive offices in this District.[2]  Par engages in the manufacture and distribution of generic and branded drugs in the United States.

16.     (a)     Defendant Kenneth I. Sawyer ("Sawyer") was Chairman of the Board, Chief Executive Officer and President of the Company until his retirement in July 2003.

        (b)     Defendant Scott Tarriff ("Tarriff") was Par's President and Chief Executive Officer since September 2003.  From January 1998 to September 2003, Tarriff was Executive Vice

_____

[2] On or about June 24, 2003, Par changed its state of incorporation from New Jersey to Delaware.

President of the Company.  Tariff was forced to resign by Par's Board of Directors in September 2006 following the "discovery" of accounting improprieties requiring the multi-year restatement of the Company's financial statements.

(c)     Defendant Dennis J. O'Connor ("O'Connor") was Par's Vice President and Chief Financial Officer beginning in 1996.  O'Connor resigned as Par's CFO in March 2006, just four months prior to the "discovery" of accounting improprieties requiring the multi-year restatement of the Company's financial statements.

(d)     Defendant Mark Auerbach ("Auerbach") was a member of Par's board beginning in 1990 until September 2003 when he was appointed Executive Chairman of the Board. Auerbach was forced to resign by Par's Board of Directors in September 2006 following the "discovery" of accounting improprieties requiring the multi-year restatement of the Company's financial statements.

(e)     Defendants Sawyer, Tariff, O'Connor and Auerbach are collectively referred to herein as the "Individual Defendants."

17.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

18.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the

narrowly defined group of Defendants identified above.  Each of the above officers of Par, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

19.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly-traded securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with Par, each of the Individual

Defendants had access to the adverse undisclosed information about Par's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Par and its business issued or adopted by the Company materially false and misleading.

21.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each of the Individual Defendants was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

22.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Par common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Par's business, operations, management and the intrinsic value of Par common stock; and (ii) caused Plaintiff and other members of the Class to purchase Par common stock at artificially inflated prices.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

23.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Par during the Class Period and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times,

members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

24.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Par common shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Par or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

25.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

26.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Par; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

28.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### SUBSTANTIVE ALLEGATIONS

### The Company and its Business

29.     Defendant Par engages in the manufacture and distribution of generic and branded drugs in the United States.  During the Class Period, Par marketed more than 110 generic drugs consisting of prescription and over the counter products in oral dosage form such as tablets, caplets, and two-piece hard-shell capsules, as well as in the semi-solid form of a cream.  Its generic versions of drugs include antidepressants Paxil and Prozac.

30.     The Company's Class Period revenues were derived from a narrow customer base comprised of large drug wholesalers that accounted for hundreds of millions of dollars of sales.  In 2001, Cardinal Health, Inc ("Cardinal") and McKesson Drug Co. ("McKesson") accounted for 23% or $59.8 million of Par's reported net sales.  In 2002, Cardinal and McKesson accounted for 33% or $124.2 million of Par's reported net sales.  In 2003 Cardinal, McKesson and AmerisourceBergen Corporation ("Amerisource") accounted for 41% or $249.9 million of Par's reported net sales.  In 2004, Cardinal, McKesson and Amerisource accounted for 41% or $256.9 million of Par's reported net sales.  In 2005, Cardinal, McKesson and Amerisource accounted for 34% or $140.1 million of Par's reported net sales.

### Par's Financial Reporting During the Class Period
### Was Materially False and Misleading and Violated GAAP

31.     At all relevant times during the Class Period, Par represented that its financial statements were presented in conformity with GAAP.[3]  These representations were materially false and misleading because, as it has now admitted, Par's financial reporting was materially misstated and violated numerous provisions of GAAP during the Class Period.

32.     During July 2006, Par announced that, as a result of "accounting errors," its financial statements for the periods 2004 through the first quarter of 2006 "should no longer be relied upon." Later, when it filed the Amended 2005 10-K with the SEC in March 2007, Par admitted that its financial statements from 2001, at a minimum, were materially misstated.  In fact, Par has now admitted that its accumulated earnings from its inception through March 31, 2006, were materially overstated.  As a result of the foregoing, the Company's financial reporting is being investigated by the SEC.

33.     During the Class Period, Defendants caused or allowed Par to issue statements that failed to disclose or misstated the fact that: (i) the Company's financial statements violated GAAP in numerous respects; (ii) the Company's reported financial results were grossly overstated; and (iii) despite representations to the contrary in reports filed with the SEC, the Company's internal and disclosure controls were materially deficient and not operating effectively.

_____

[3] GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.  Generally Accepted Auditing Standard §AU 411.02.  Regulation S-X [17 C.F.R. §210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.  Additionally, Regulation S-X requires that interim financial statements must also comply with GAAP.  [17 C.F.R. 210.01-01.]

**Par's Admission that its Financial Reporting During
the Class Period Was Materially False and Misleading**

34.     Par's admission that its financial reporting during the Class Period was materially

misstated began on July 5, 2006, when Par issued a press release which stated:

> On June 29, 2006, the Audit Committee of the Board of Directors of the Company
> (the "Audit Committee") concluded that, due to accounting errors, the Consolidated
> Financial Statements included in the Company's Annual Reports on Form 10-K for
> the years ended December 31, 2004 and December 31, 2005, and in the Company's
> Quarterly Report on Form 10-Q for the quarter ended April 2, 2006, including
> Management's Report on Internal Controls over Financial Reporting, will need to be
> restated and, accordingly, should no longer be relied upon.

35.     Upon this news, which raised questions about the integrity of the Company's

financial reporting during the Class Period, the price of Par's stock declined significantly, falling

from $18.25 per share to $13.47 per share on heavy trading volume.

36.     On December 14, 2006, Par admitted that its accounting malfeasance was not limited

to a single issue; rather, Par acknowledged that it violated numerous provisions of GAAP over a

several year period, stating in pertinent part as follows:

> On December 8, 2006, the Audit Committee of the Board of Directors of the
> Company (the "Audit Committee") concluded that, due to accounting errors, the
> Consolidated Financial Statements included in the Company's Annual Reports on
> Form 10-K for the fiscal year ended December 31, 2003 and prior periods, and in the
> Company's Quarterly Reports on Form 10-Q for the fiscal quarters of 2003 and prior
> periods should no longer be relied upon.
>
> As previously disclosed, on July 5, 2006, the Company announced that it would
> restate its consolidated financial statements for fiscal years 2004 and 2005 and the
> first quarter of 2006, and delay filing its Quarterly Report on Form 10-Q for the
> quarter ended July 2, 2006.  At that time, the Audit Committee had determined,
> based on its preliminary understanding and inquiries that the restatement was
> required due to an understatement of accounts receivable reserves resulting primarily
> from delays in recognizing customer credits and uncollectible customer deductions
> and from a write-off of inventory.  As part of the review of its accounts receivable
> reserves, the Company has also determined that its reserves for future product
> returns, chargebacks and rebates contained errors resulting in the understatement of
> its accounts receivable reserves in prior periods, including periods prior to fiscal year
> 2004.  The Company now expects that the restatement adjustments to its accounts
> receivable reserves will have the cumulative effect of reducing its product revenues
> by approximately $84 million through April 1, 2006.  In addition, inventory write-

downs resulted from the Company's determination that sales demand for certain products was less than the available inventory on hand and from inventory valuation errors related to recorded inventory amounts that were more than the actual quantities held. Also, the Company had not historically adjusted inventory and cost of sales for manufacturing variances. The write-down for these inventory valuation issues is expected to have the cumulative effect of increasing cost of goods sold by approximately $9 million through April 1, 2006.

The Company also determined that there were certain accounting errors in addition to those discussed above relating to the accounting for a lease acquired in a business combination, accounting for the Company's investment in a joint venture, and other items. The cumulative effect of these specific restatement adjustments is expected to increase the Company's before tax profits by approximately $2 million through April 1, 2006.

37.     Then, when it filed the Amended 2005 10-K with the SEC in March 2007, Par

disclosed that its Class Period financial statements were materially misstated by the following

improper accounting practices:

Accounts Receivable Reserves and Revenues

Par restated its Class Period financial statements to correct errors in accounting for customer credits and for the utilization of improper methodologies to estimate reserves for chargebacks, rebates, product returns and other accounts receivable reserves.[4]

Inventory Valuation and Existence

Par restated its Class Period financial statements to correct errors in accounting for inventory and cost of goods sold. The inventory corrections were associated with the accounting of excess inventory and from the identification of recorded inventory amounts for which no underlying product existed. In addition, Par failed to historically adjust inventory and cost of sales for manufacturing variances.

Investment in Joint Venture

_____

[4] Pursuant to U.S. GAAP, in Financial Accounting Standards Board's ("FASB") Statement of Financial Accounting Standard ("SFAS") No. 154, erroneous financial statements are to be restated, while corrections of accounting estimates are to be reflected in current and/or future financial statements. Accordingly, Par has now admitted that its improper accounting for reserves was not due to benign misjudgments in the process of estimating the amount of its reserves.

Par restated its Class Period financial statements to correct its failure to record in its reported operating results its share of losses from a joint venture.

Leases

Par restated its Class Period financial statements to correct its improper accounting for a capital lease as an operating lease which misstated its fixed assets, liabilities, intangible assets and goodwill.

Revenues

Par restated its Class Period financial statements to correct its reported revenue, cost of sales, accounts receivable, inventory and payables as a result of transactions being recorded in the wrong accounting period.  The Company also deferred the recognition of revenue, gross margin, and net income it improperly recorded when Par's customer had a right to return the "sold" product.

Accounts Payable and R&D

Par restated its Class Period financial statements to correct its failure to timely record research and development expenses conducted by third parties on the Company's behalf and the amounts due such third parties.

Other Financial Misstatements

- Par restated its Class Period financial statements to correct its presentation of available for sale securities and related unrealized gains and losses thereon.

- The Company restated its Class Period financial statements to correct customer credits reported in its accounts receivable and accounts payable.

- Par restated its Class Period financial statements to correct the reporting of interest expense and interest income.  In addition, the Company corrected its reporting of interest expense which improperly failed to include debt issuance cost amortization.

- Par restated its Class Period financial statements to correct its improper reporting of product and licensing and royalty related revenues.

- Par has restated its Class Period financial statements to correct its improper reporting of intangible asset impairment.

- Par has restated its Class Period financial statements to correct its improper reporting of operating cash flows.

- Par restated Class Period financial statements to correct its improper reporting of sales to major customers.

38.     As a result of a myriad of financial reporting improprieties admitted to above, Par has now restated its annual Class Period financial statements.  In addition, Par has concluded that its interim financial statements during the Class Period "should not be relied upon," were materially misstated, and were presented in violation of GAAP and the SEC's accounting rules and regulations. In failing to file financial statements with the SEC which conformed to GAAP, defendants repeatedly disseminated financial statements for Par that materially inflated the Company's operating performance during the Class Period.

**Par's Admission that Its Financial Misstatements
During the Class Period Were Material**

39.     Par has now concluded that the above noted financial reporting improprieties materially misstated its financial statements prior to and during the Class Period.[5]  As a result, Par has restated its 2003, 2004 and 2005 year end financial statements and has indicated that its financial reporting prior to 2003 was also materially misstated.  In fact, ***Par has now admitted that its accumulated earnings, that is, the cumulative amount of its net income from inception through December 31, 2002, were overstated by approximately 8%.***[6]

40.     Concerning its 2003, 2004 and 2005 annual financial statements, Par has now concluded that:

- 2003 gross profit was overstated by approximately 11%;

- 2003 operating income was overstated by approximately 14%;

---

[5] By restating its Class Period financial statements, Par has made the determination that such financial statements were materially misstated because GAAP, in SFAS No. 154, provides that only materially misstated financial statements need be retroactively restated.

[6] While Par has admitted that its financial results prior to 2003 were materially inflated, it has not provided a complete set of restated financial statements for periods prior to 2003.  The Company has, however, indicated that its originally reported 2001 operating and net income were overstated by approximately 15% and 13%, respectively.

- 2003 net income was overstated by approximately 15%;

- 2004 gross profit was overstated by more than 17%;

- 2004 operating income was overstated by more than 188%;

- 2004 pre-tax income was overstated by approximately 230%;

- the 2004 reported net profit of $29.3 million was actually a net loss of $16.6 million;

- 2005 gross profit was overstated by more than 13%;

- 2005 operating income was overstated by more than 139%;

- 2005 pre-tax income was overstated by more than 194%; and

- 2005 net loss was understated by approximately 46%.

41.    In addition, Par has also admitted that its 2006 first quarter financial statements and its interim financial statements filed on Form 10-Q during the Class Period were also materially misstated.

42.    Par's material financial misstatements during the Class Period did not end with its completely distorted income statements.  For example, the following financial metrics were materially misstated in Par's year end 2004 and 2005 balance sheets and statement of cash flows:

- Net accounts receivable at December 31, 2004 were overstated by more than 115%;

- Total current assets at December 31, 2004 were overstated by more than 13%;

- Total assets at December 31, 2004 were overstated by approximately 8%;

- Retained earnings at December 31, 2004 were overstated by more than 21%;

- Shareholders' equity at December 31, 2004 was overstated by more than 12%;

- Net accounts receivable at December 31, 2005 were overstated by more than 130%;

- Total current assets at December 31, 2005 were overstated by approximately 13%;

- Total assets at December 31, 2005 were overstated by approximately 7%;

- Retained earnings at December 31, 2005 were overstated by approximately 27%;

- Shareholders' equity at December 31, 2005 was overstated by approximately 14%;

- Cash flow from operations during 2004 was overstated by approximately 20%; and

- Cash flow from operations during 2005 was overstated by more than 18%.

43.     As a result of the number of and the amount by which Par's financial statement line items have now been amended, the financial statements issued to investors during the Class Period bear little resemblance to the Company depicted in Par's restated Class Period financial statements.

**Par's Financial Misstatements Were the
Result of Intentional or Reckless Conduct**

44.     Evidencing the defendants' intent to misstate the Company's financial reporting during the Class Period, Par has now disclosed that:

- Its Audit Committee hired independent counsel to conduct an investigation into the Company's financial reporting;

- The Audit Committee convened its investigation on or about the time Defendant O'Connor "resigned" his position at CFO;

- Par's financial reporting "errors" were discovered only weeks after Gerald Marino's appointment as Par's Chief Financial Officer and the hiring of new financial staff members;

- Par has restated a multitude of financial statement line items and has admitted that its operating results were materially inflated prior to and during the Class Period due to a host of accounting improprieties occurring over a multi-year period;

- Despite representations to the contrary, numerous material deficiencies in Par's system of internal control existed during the Class Period;

- After the Audit Committee commenced its internal investigation, the Company's Board of Directors requested that Tarriff resign; and

- The Company is now being investigated by the Unites States Securities and Exchange Commission.

45.     Indeed, the duration and magnitude of Par's financial misstatements and the multiplicity of Par's improper accounting practices, coupled with the above executive management "resignations," internal control deficiencies and SEC investigation is indicative of fraudulent

financial reporting and not of innocent record keeping mistakes.  These undisputed facts portray an ongoing pattern of financial misconduct which was designed to, and did, materially inflate the Company's operating results and enterprise value during the Class Period.

46.    While Par has not made a general admission about management's knowledge of the above misstatements when made, it has, with respect to the understatement of accounts receivable reserves resulting from delays in processing customer credits and uncollectible customer deductions, stated that its Audit Committee investigation found no evidence indicating such misconduct was "anything but inadvertent."[7]

47.    Based on Par's concentration of sales to just three large wholesale customers it is apparent that Par's failure to record reserves for accounts receivable from these customers was not inadvertent.  According to a former accounts receivable representative employed by Par from 2003 to 2006, Confidential Informant 1 ("CI 1"), three of Par's largest wholesaler customers, Cardinal, McKesson and Amerisource, made payments to Par only sporadically because they had large credits ranging in individual amounts from hundreds of thousands to millions of dollars.  During one period of about a year, Cardinal only made one payment to Par, according to CI 1.

48.    In addition, CI 1 confirmed that Cardinal was taking credit for returns outside of Par's normal procedure.  Par's procedure for issuing credits for returns involved the customer submitting the request and Par approving it.  Cardinal, however, took credit for some returns before Par had approved them.  CI 1 did not know who told Cardinal they could do this, or approved the credits, but because it was outside of normal procedures it further delayed proper record-keeping in accounts receivable according to CI 1.

---

[7] During the Class Period, Par's year end financial statements falsely disclosed "[t]he Company regularly reviews the information related to these [accounts receivable reserve] estimates and adjusts its reserves accordingly, if and when actual experience differs from previous estimates."

49.     CI 1 confirmed that Par's largest wholesale customers were Cardinal, McKesson and Amerisource.  Throughout the time CI 1 worked at Par, these three customers regularly had large amounts of credits, in the hundreds of thousands and even millions of dollars.  When these three customers had credits, they did not make payments to Par; they simply utilized their available credits to satisfy their obligations for products purchased from Par.  A Cardinal representative once told CI 1, "When we go in the black with you, we'll pay."  CI 1 and other accounts receivable representatives did not often call Cardinal, McKesson and Amerisource because there was no point in doing so.  It was a common situation during 2003 to 2006 that these three customers had credits and consequently only sporadically made payments to Par.  CI 1 recalled that Cardinal, in particular, only made a payment about every six to eight months, and CI 1 recalled that there was a period of about 12 months during which Cardinal only made one payment.  Like Cardinal, McKesson and Amerisource did not pay regularly because they often had large credits.

50.     Another former Par employee further confirmed that Par's improper accounting for accounts receivable was not due to inadvertent error.  Confidential Informant 2 ("CI 2"), who was employed at Par from November 2002 to December 2004 as the Associate Director of Information Systems, was responsible for and supervised the creation of an automated "gross-to-net" application to replace the Excel spreadsheets that Par utilized in calculating its accounts receivable reserves.  CI 2 reported to Lisa Pepe ("Pepe"), who reported to Joe Schott ("Schott"), the Vice President of Information Systems, who, in turn, reported to Defendant O'Connor.

51.     The gross-to-net application was to serve as an automated replacement for a series of Excel spreadsheets that Par had been using to calculate net revenue from gross sales revenue before CI 2 came to Par in late 2002; Par was still using Excel spreadsheets when CI 2 was terminated in December 2004.  There was one spreadsheet for each month and a line for each product.  The spreadsheets used a "rather sophisticated algorithm" to incorporate the terms of the contracts that Par

had with its customers, including wholesalers like Cardinal, McKesson and Amerisource, as well as various retailers.  The algorithm adjusted gross revenue down to net revenue by calculating the effects of charge-backs, rebates, discounts, credits and shelf stock.  "Shelf stock" refers to credits for price reductions by Par as applied to products already in wholesalers' warehouses and on retailers' shelves.  The Excel spreadsheets were updated daily by a computerized feed of information from Par's customers that included what the customers were ordering, and what the customers had in stock.  CI 2 knew this because of his responsibility for developing the gross-to-net application.

52.     CI 2 described the Excel spreadsheets as "totally not locked down," meaning that though the spreadsheets had password protection, there were no controls on how they could be changed.  Specifically, the figures or algorithms could be manually adjusted and there would be no obvious record of who changed them, how, or why.

53.     One recurring manual adjustment to the Excel spreadsheets was known as "price protection."  CI 2 knew about this adjustment because of his responsibility for developing the gross-to-net application.  A "price protection" adjustment was done at the end of each month.  It was an adjustment of aggregate sales using a combination of history and experience to come up with a "guesstimate" of how much revenue those sales would actually produce.  CI 2 stated that the only people who had the access and knowledge to make "price protection" or other manual adjustments were Pepe and Schott.  Schott reported to Defendant Dennis O'Connor.  The Excel spreadsheets were stored on Schott's network drive.

54.     The new gross-to-net application incorporated the terms of Par's customer contracts.  CI 2 thought the application needed to incorporate the price protection adjustment as well.  So CI 2 asked Pepe and Schott to explain price protection.  Pepe and Schott told CI 2 that price protection was based on experience and market knowledge and that CI 2 should not be concerned with it.

55.     The original go-live date for the gross-to-net application was July 2004.  Par ran the gross-to-net application in parallel with the Excel spreadsheets from about July 2004 to December 2004, when CI 2 was terminated.  The net revenue numbers that the automated gross-to-net application produced did not match the manually adjusted Excel spreadsheet numbers.  In fact, the new application consistently indicated that Par needed to increase its accounts receivable reserves during the months tested.  CI 2 recalled that an input of $100 in gross revenue to the gross-to-net application produced a net revenue figure of about $50, while the Excel spreadsheets were producing a figure of about $55.  That is, Par's net revenue figures produced by the manually adjusted Excel spreadsheets indicated that Par's net revenues were about 5% to 10% higher than the figures produced by the new, automated gross-to-net application.

56.     CI 2 believed that the gross-to-net application was accurate.  CI 2 attempted to reconcile the two systems.  CI 2 had his developers check and recheck the math and programming on the new gross-to-net application and spent six months troubleshooting and addressing issues with his manager, Lisa Pepe.

57.     In December 2004, CI 2 was "called on the carpet" by his superiors Pepe and Schott and terminated.  Pepe and Schott were unhappy with the gross-to-net application and held CI 2 responsible.  CI 2 believed their main concern was the discrepancy between the Excel spreadsheet and gross-to-net application net revenue figures – CI 2 was terminated shortly after the six month test period of the gross-to-net application because the Company was unhappy with the numbers it generated.

58.     CI 2 did not know whether Par or its executives deliberately used manual adjustments to the Excel spreadsheet system to inflate Par's net revenues, but he acknowledged that it was possible.  CI 2 speculated that it would be easy to cover shortfalls in a future quarter if, using the

Excel spreadsheets, Par had inflated revenues in a current quarter.  Par could simply adjust a cell for sales of a popular new drug to produce higher net revenue.

59.    In addition, it was CI 2's understanding that at the end of a quarter, the Company's computer servers were altered to allow transaction dates of sale to be modified.  This deliberate act was intended to, and did, inflate Par's reported revenues during the Class Period.  Par has admitted that it restated its financial statements, in part, to correct "certain sales cut-off errors that resulted in certain receivables [and related sales] being recorded in the wrong period."

60.    Now, Par has admitted that "[t]he accounts receivable reserves and related revenue errors resulted, in part,  from the utilization of methodologies that did not contemplate all necessary components to estimate reserves that impacted the accuracy of recorded amounts for chargebacks, rebates, product returns and other accounts receivable reserves."

61.    The above admissions and former employee representations depict a pattern and practice of intentional and/or reckless financial reporting misconduct by Par's senior management during the Class Period.  In fact, the individual defendants brazenly touted the Company's financial performance while they were engaged in the on-going inflation of the Company's operating results during the Class Period.  As noted in the SEC's Staff Accounting Bulletin "SAB" No. 99:

> the staff believes that a registrant and the auditors of its financial statements should not assume that even small intentional misstatements in financial statements, for example those pursuant to actions to "manage" earnings, are immaterial.  While the intent of management does not render a misstatement material, it may provide significant evidence of materiality.  The evidence may be particularly compelling where management has intentionally misstated items in the financial statements to "manage" reported earnings.  In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements.  The staff believes that investors generally would regard as significant a management practice to over-or under-state earnings up to an amount just short of a percentage threshold in order to "manage" earnings.  Investors presumably also would regard as significant an accounting practice that, in essence, rendered all earnings figures subject to a management-directed margin of misstatement.  [Footnotes deleted, emphasis added.]

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE CLASS PERIOD

62.     On or about July 23, 2001, Par issued a press release announcing its financial results for the second quarter ended June 30, 2001.  For the quarter, the Company reported net income of $2,385,000, or $.08 per diluted share, including net sales of $29,297,000.  For the six months ended June 30, 2001, Par reported net income of $4,062,000, or $.13 per diluted share, including net sales of $55,001,000.  The Company also reported working capital was $27,265,000 at June 30, 2001.  Defendant Sawyer commented on Par's financial results stating in pertinent part as follows:

> With our fifth consecutive profitable quarter, we feel *a base line of results has been established* for the Company in which we can overlay the expectations of products in our development pipeline as incremental growth.  [Emphasis added]

63.     On or about August 14, 2001, Par filed its Form 10-Q for the quarter ended June 30, 2001, with the SEC which was signed by Defendants Sawyer and O'Connor and confirmed the Company's previously announced financial results (the "Second Quarter 2001 10-Q").  The Second Quarter 2001 10-Q reported that Par's accounts receivable net of allowances were $29,653,000 and that inventories were $22,884,000.  The Second Quarter 2001 10-Q further represented that the financial statements contained therein included "all adjustments" necessary for a "fair presentation" of the Company's financial position stating in pertinent part as follows:

> The accompanying consolidated financial statements at June 30, 2001 and for the six-month and three-month periods ended June 30, 2001 and July 1, 2000 are unaudited; however, in the opinion of the Company's management, such statements include all adjustments (consisting of normal recurring accruals) necessary to present a fair statement of the information presented therein.  The balance sheet at December 31, 2000 was derived from the Company's audited financial statements at such date.

64.     The statements referenced above in ¶¶62-63 were each materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts:

(a)     that Par was materially overstating its financial performance by failing to properly reserve for customer credits and uncollectible accounts.  During the Class Period, Par overstated its net sales, pre-tax income and accounts receivable by at least $80 million;

(b)     that Par was failing to timely write-down the value of impaired inventory. During the Class Period, Par overstated the value of its inventory by at least $5 million;

(c)     that Par's Class Period financial statements were materially false and misleading and not prepared in accordance with GAAP as detailed in ¶¶137-153;

(d)     that Par had insufficient resources with the appropriate level of expertise and inadequate management oversight in its accounting and finance organizations to ensure appropriate application of GAAP, particularly in the areas of accounts receivable reserves, and inventory valuation;

(e)     that Par had inadequate design of controls to provide reasonable assurance that valid customer deductions were identified and accurately recorded in a timely manner and to determine that inventory was accurately valued;

(f)     that Par had inadequate controls over estimating reserves for chargebacks, rebates, product returns and excess inventory, including inadequate design of the methodology, inadequate development of the assumptions and corroboration of inputs used; and

(g)     based on the foregoing, Defendant Sawyer's statement that Par's financial results established a "base line" for the Company's current and future profitability and growth prospects lacked any reasonable basis at all times.

65.     On or about September 5, 2001, Merck KGaA ("Merck") and certain of its affiliates sold their entire holdings of 13,634,012 shares of Par common stock, representing approximately 43% of the Company's total number of outstanding shares, to certain institutional investors in a private placement.  The private placement was converted to a public offering when Par registered the

shares on Form S-3 registration statement, signed by Defendants Sawyer and O'Connor, filed with

the SEC on or about August 24, 2001, amended on or about September 5, 2001 (the "Merck

Offering").  The Prospectus, which forms a part of the registration statement, filed in connection

with the Merck Offering became effective September 6, 2001 and incorporated by reference, among

other things, Par's annual report on Form 10-K for the fiscal year ended December 31, 2000 (the

"2000 10-K"); Par's quarterly report on Form 10-Q for the quarter ended March 31, 2001("First

Quarter 2001 10-Q"); and Par's Second Quarter 2001 10-Q alleged herein to be materially false and

misleading.

66.     The 2000 10-K described Par's accounting policies and procedures related to sales

allowances reserves stating in pertinent part as follows:

> The Company recognizes revenue at the time product is shipped and it provides for returns and allowances based upon actual subsequent allowances and historical trends.

*        *        *

> ***The accounts receivable amounts are net of provisions for customer rebates and chargebacks***.  Customer rebates are price reductions generally given to customers as an incentive to increase sales volume.  Chargebacks are price adjustments generated from the differential between the invoice or list price and a separate price agreed to in a contract with a customer.

[Emphasis added.]

67.     The statements referenced above in ¶¶65-66 were each materially false and

misleading for the reasons stated at ¶64.

68.     On or about October 25, 2001, under the headline, "Pharmaceutical Resources, Inc.[8]

Announces Record Third-Quarter Sales and Earnings," Par issued a press release announcing its

financial results for the third quarter ended September 29, 2001.  For the quarter, the Company

---

[8] The Company changed its name to "Par Pharmaceutical Companies Inc." in May 27, 2004.

reported net income of $26,850,000, or $.83 per diluted share, including net sales of $99,724,000. The Company also reported working capital was $80,947,000 at September 29, 2001. Defendant Sawyer commented on Par's financial results stating in pertinent part as follows:

> It is extremely gratifying to achieve the type of results our company posted in the most recent quarter. ***The third quarter represents not only our sixth consecutive profitable quarter, but our most successful one ever***. The success we now enjoy is testament to the vision of our management team and the dedication and persistence of all our employees. It has been made possible, in large part, by our ability to secure rights to a string of first-to-file products. We believe that ***the Company's current momentum is sustainable***. [Emphasis added]

69.     On or about November 13, 2001, Par filed its Form 10-Q for the quarter ended September 29, 2001, with the SEC which was signed by Defendants Sawyer and O'Connor and confirmed the Company's previously announced financial results (the "Third Quarter 2001 10-Q"). The Third Quarter 2001 10-Q reported that Par's accounts receivable net of allowances were $84,683,000 and that inventories were $23,973,000. The Third Quarter 2001 10-Q further represented that the financial statements contained therein included "all adjustments" necessary for a "fair presentation" of the Company's financial position stating in pertinent part as follows:

> The accompanying consolidated financial statements at September 29, 2001 and for the six-month and three-month periods ended September 29, 2001 and September 30, 2000 are unaudited; however, in the opinion of the Company's management, such statements include all adjustments (consisting of normal recurring accruals) necessary to present a fair statement of the information presented therein. The balance sheet at December 31, 2000 was derived from the Company's audited financial statements at such date.

70.     The statements referenced above in ¶¶66-67 were each materially false and misleading when made for the reasons stated in ¶64.

71.     On or about January 25, 2002, Par filed a universal shelf registration with the SEC covering the issuance of up to $110,000,000 of common stock, preferred stock and warrants. The registration statement on Form S-3 was signed by signed by Defendants Sawyer, O'Connor and Auerbach, among others (the "Shelf Registration"). The Shelf Registration incorporated by

reference Par's 2000 10-K; First Quarter 2001 10-Q; Second Quarter 2001 10-Q; and Third Quarter

200110-Q alleged to be materially false and misleading herein.[9]

72.     On or about February 19, 2001, the Company announced that in response to

comments received from the SEC regarding the Company's accounting for a 1998 distribution

agreement with Merck, the Company would restate its financial results for the periods 1999 through

2000.  With the filing of the Par's annual report on Form 10-K for the year ended December 31,

2001, the Company reported that Par's 2000 net loss originally reported as $929,000 was understated

by more than 77% or $722,000.  The Company's 1999 net loss reported as $1,774,000 was

understated by more than 40%.

73.     On or about April 1, 2002, Par issued a press release announcing its financial results

for the fourth quarter and year ended December 31, 2001.  For the quarter, the Company reported net

income of $16,490,000, or $.50 per diluted share, including net sales of $88,110,000.  For the full

year, Par reported net income of $53,922,000 or $1.68 per share on net sales of $271,035,000.  The

Company also reported working capital was $102,867,000 at December 31, 2001.   Defendant

Sawyer commented on Par's financial results stating in pertinent part as follows:

> ***We have just completed the most successful year in our history, having achieved
> record sales and earnings.***  This year's accomplishments include our two most
> successful new product launches ever, megestrol oral suspension and fluoxetine.  We
> continued to expand a product pipeline that now has more than 50 drug candidates
> either awaiting approval or in development.  ***And to support our aggressive growth
> strategies, we have built an efficient and effective organization that is poised for
> continued success.***  [Emphasis added]

Defendant Tarriff commented on Par's ability to "sustain growth through 2003," stating in pertinent

part as follows:

---

[9] In response to SEC staff comments Par "revised" its third quarter 2001 financial results and filed an
amended Third Quarter 200110-Q on January 25, 2001.

*Last year was, unquestionably, a very rewarding one for PRI, its employees and its shareholders*.  Our attention now is clearly focused on making 2002 and 2003 highly successful years as well.  We expect the strong performance of megestrol oral suspension to continue well into the second quarter.  Our financial performance will also benefit from an important legal settlement with Bristol-Myers Squibb in which Par acquired five branded products.  Additionally, we look forward to significant contributions from key products, such as flecainide and omeprazole, *that will help sustain growth through 2003*.  [Emphasis added]

74.     On that same day, Par filed its annual report on Form 10-K for the year ended December 31, 2001, with the SEC which was signed by Defendants Sawyer, O'Connor and Auerbach, among others, and confirmed the Company's previously announced financial results (the "2001 10-K").  The 2001 10-K reported that Par's accounts receivable net of allowances were $38,009,000 and that inventories were $31,458,000.  The 2001 10-K described the Company's accounting policies and procedures for sales reserves relating to "price protection," "shelf-stock adjustments," "product returns," "price rebates," and "chargebacks," stating in pertinent part as follows:

The Company records charges (reductions of revenue) to accrue [. . .] amount[s] for specific product sales that will be subject to price protection based on the Company's estimate of customer inventory levels and market prices[. . .] Customers are permitted to return unused product, after approval from the Company, [. . .] Additionally, certain customers are eligible for price rebates, offered as an incentive to increase sales volume, on the basis of the volume of purchases of a product over a specified period which generally ranges from one to three months, and certain customers are credited with chargebacks on the basis of their resales to end-use customers, such as HMO's, which have contracted with the Company for quantity discounts.  In each instance the Company has the historical experience and access to other information, including the total demand for each drug the Company manufactures, the Company's market share, the recent or pending introduction of new drugs, the inventory practices of the Company's customers and the resales by its customers to end-users having contracts with the Company, necessary to reasonably estimate the amount of such returns or allowances, and records reserves for such returns or allowances at the time of sale.  [Emphasis added]

With respect to the Par's accounts receivable, the 2001 10-K stated in pertinent part:

The accounts receivable amounts for fiscal years 2001 and 2002 are net of provisions for customer rebates of $14,081,000 and $2,667,000 and chargebacks of $41,830,000 and $9,477,000, respectively.  Customer rebates are price reductions generally given to customers as an incentive to increase sales volume.  This incentive is based on a

customer's volume of purchases during an applicable monthly, quarterly or annual period.  Chargebacks are price adjustments given to the wholesale customer for product it resells to specific healthcare providers on the basis of prices negotiated between the Company and the provider.

*      *      *

The accounts receivable allowances include price adjustments that consist of cash discounts, sales promotions and price protection or shelf-stock adjustments.  [. . .] In the Company's experience, the amount by which the price of a drug may decline at the end of an exclusivity period will depend in part on the number of additional generic manufacturers that introduce and market a comparable product.   The Company estimates the amount by which prices will decline based on its monitoring of the number and status of FDA applications and tentative approvals and its historical experience with other drugs for which the Company had market exclusivity.  The Company estimates the amount of shelf stock that will remain at the end of an exclusivity period based on both its knowledge of the inventory practices for wholesalers and retail distributors and conversations it has with its major customers.  Using these factors, the Company estimates the total price protection credit it will have to issue at the end of an exclusivity period.  The Company records charges (reductions of sales) to accrue this amount for specific product sales that will be subject to price protection based on the Company's estimate of customer inventory levels and market prices at the end of the exclusivity period.  As a result, the Company will be required to credit customers for price protection based on the quantity of that inventory and the decrease in a particular products market price at the end of the exclusivity period.  [Emphasis added]

In addition the 2001 10-K represented that Par's financial statements were prepared in conformity with GAAP, stating in pertinent part as follows:

The consolidated financial statements are prepared in conformity with accounting principles generally accepted in the United States.  [. . .] The Company is not aware of reasonably likely events or circumstances that would result in different amounts being reported that would have a material impact on results of operations or financial condition.

75.     The statements referenced above in ¶¶73-74 were each materially false and misleading when made for the reasons stated in ¶64.  In addition the statements in ¶¶73-74 were materially false and misleading and failed to disclose:

(a)     that Par's 2001 net sales were actually $260,164,000 and not $271,035,000 as originally reported, an overstatement of $10,871,000 or 4% due to Defendants' knowing or reckless misstatement of the Company's accounts receivable reserves;

(b)     that Par's 2001 net income was actually $47,871,000 and not $53,922,000 as originally reported, an overstatement of $6,051,000 or 13%;

(c)     that Par's working capital at December 31, 2001 was actually $94,695,000 and not $102,867,000 as originally reported, an overstatement of $8,172,000 or 9% primarily due to the overstatement of Par's accounts receivable and inventory assets; and

(d)     that based on the foregoing, Defendants Sawyer's and Tariff's statements that Par "achieved record sales and earnings" lacked any reasonable basis at all times.

76.     On or about April 25, 2002, Par issued a press release announcing its financial results for the first quarter ended March 31, 2002.  For the quarter, the Company reported net income of $20,760,000, or $.08 per diluted share, on net sales of $80,508,000.  The Company also reported working capital was $108,609,000 at March 31, 2002.  Defendant Tarriff commented on Par's financial results stating in pertinent part as follows:

> Sales growth in the first quarter was achieved across-the-board.  The continued success of new products such as megestrol oral suspension and fluoxetine was clearly in line with our expectations.  It was, however, equally satisfying to see such impressive growth in our underlying base business. ***Almost a month into the second quarter, we are very encouraged by the continued strength of our business across our product portfolio.  Based on our performance to date, we now expect to exceed analysts' current consensus earnings estimates for the second quarter***. [Emphasis added]

77.     On or about May 15, 2002, Par filed its Form 10-Q for the quarter ended March 31, 2001, with the SEC which was signed by Defendants Sawyer and O'Connor and confirmed the Company's previously announced financial results (the "First Quarter 2002 10-Q").  The First Quarter 2002 10-Q reported that Par's accounts receivable net of allowances were $17,834,000 and that inventories were $44,304,000.  The First Quarter 2002 10-Q also described the Company's accounting policies and procedures for sales reserves relating to "price protection," "shelf-stock adjustments," "product returns," "price rebates," and "chargebacks," stating in pertinent part as follows:

The accounts receivable amounts at March 31, 2002 and December 31, 2001 are net of provisions for customer rebates of $8,121,000 and $14,081,000, and chargebacks of $54,786,000 and $41,830,000, respectively. Customer rebates are price reductions generally given to customers as an incentive to increase sales volume. This incentive is based on a customer's volume of purchases during an applicable monthly, quarterly or annual period. Chargebacks are price adjustments given to the wholesale customer for product it resells to specific healthcare providers on the basis of prices negotiated between the Company and the provider.

\*      \*      \*

The accounts receivable allowances include price adjustments that consist of cash discounts, sales promotions and price protection or shelf-stock adjustments. [. . .] The Company estimates the amount by which prices will decline by monitoring the number and status of U.S. Food and Drug Administration ("FDA") applications and tentative approvals and its historical experience with other drugs for which the Company had market exclusivity. The Company estimates the amount of shelf stock that will remain at the end of an exclusivity period based on both its knowledge of the inventory practices for wholesalers and retail distributors and conversations it has with its major customers. Using these factors, the Company estimates the total price protection credit it will have to issue at the end of an exclusivity period. The Company records charges (reductions of sales) to accrue this amount for specific product sales that will be subject to price protection based on the Company's estimate of customer inventory levels and market prices at the end of the exclusivity period.

78.     The First Quarter 2002 10-Q further represented that the financial statements contained therein included "all adjustments" necessary for a "fair presentation" of the Company's financial position stating in pertinent part as follows:

The accompanying consolidated financial statements at March 31, 2002 and for the three-month periods ended March 31, 2002 and March 31, 2001 are unaudited; however, in the opinion of the Company's management, such statements include all adjustments (consisting of normal recurring accruals) necessary to present a fair statement of the information presented therein. The consolidated balance sheet at December 31, 2001 was derived from the Company's audited consolidated financial statements at such date.

79.     On or about July 25, 2002, Par issued a press release announcing its financial results for the second quarter ended June 30, 2002. For the quarter, the Company reported net income of $20,380,000, or $.62 per diluted share, on net sales of $101,755,000. Defendant Tarriff commented on Par's financial results stating in pertinent part as follows:

We are well on our way toward achieving the most successful year in our Company's history. The explosive growth in revenues has been powered both by key products and the outstanding performance of our core product portfolio. Almost a month into the current quarter, our business continues to perform well across the board. As a result, we now expect to exceed analysts' current consensus earnings estimates for the third quarter and for the full year of 2002.

80.     On or about August 14, 2002, Par filed its Form 10-Q for the quarter ended June 30, 2002, with the SEC which was signed by Defendants Sawyer and O'Connor and confirmed the Company's previously announced financial results (the "Second Quarter 2002 10-Q"). The Second Quarter 2002 10-Q reported that Par's accounts receivable net of allowances were $56,980,000 and that inventories were $46,017,000. The Second Quarter 2002 10-Q also described the Company's accounting policies and procedures for sales reserves relating to "price protection," "shelf-stock adjustments," "product returns," "price rebates," and "chargebacks," stating in pertinent part as follows:

> The accounts receivable amounts at June 30, 2002 and December 31, 2001 are net of provisions for customer rebates of $13,259,000 and $14,081,000, and chargebacks of $104,218,000 and $41,830,000, respectively. Customer rebates are price reductions generally given to customers as an incentive to increase sales volume. This incentive is based on a customer's volume of purchases during an applicable monthly, quarterly or annual period. Chargebacks are price adjustments given to the wholesale customer for product it resells to specific healthcare providers on the basis of prices negotiated between the Company and the provider.

81.     The Second Quarter 2002 10-Q further represented that the financial statements contained therein included "all adjustments" necessary for a "fair presentation" of the Company's financial position stating in pertinent part as follows:

> The accompanying consolidated financial statements at June 30, 2002 and for the six-month and three-month periods ended June 30, 2002 and 2001 are unaudited; however, in the opinion of the Company's management, such statements include all adjustments (consisting of normal recurring accruals) necessary to present a fair statement of the information presented therein. The consolidated balance sheet at December 31, 2001 was derived from the Company's audited consolidated financial statements at such date.

The Second Quarter 2002 10-Q also included Sarbanes-Oxley certifications signed by Defendants Sawyer and O'Connor.  In their respective certifications, Sawyer and O'Connor represented, among other things, that "based on my knowledge this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading. . . ."

82.     On or about October 24, 2002, Par issued a press release announcing its financial results for the third quarter ended September 30, 2002.  For the quarter, the Company reported net income of $19,643,000, or $.59 per diluted share, on net sales of $100,237,000.  The Company also reported working capital was $115,218,000 at September 29, 2001.  Defendant Tarriff commented on Par's financial results stating in pertinent part as follows:

> Despite a difficult comparison with prior year, this quarter was perhaps our Company's finest, as our base business grew substantially.  Although megestrol and fluoxetine continued to perform well, the rapid sales growth throughout our base business effectively reduced the Company's reliance on each of these key products.  Through the first six months of this year, megestrol and fluoxetine represented approximately 55 percent of PRX's total revenues, but by third quarter, their contribution was 33 percent of revenues.  Clearly, ***it was the substantial growth of our core product portfolio that permitted PRX to significantly exceed all earnings estimates for the third quarter.***  [Emphasis added]

83.     On or about November 14, 2002, Par filed its Form 10-Q for the quarter ended September 30, 2002, with the SEC which was signed by Defendants Sawyer and O'Connor and confirmed the Company's previously announced financial results (the "Third Quarter 2002 10-Q").  The Third Quarter 2002 10-Q reported that Par's accounts receivable net of allowances were $64,880,000 and that inventories were $48,217,000.  The Third Quarter 2002 10-Q also described the Company's accounting policies and procedures for sales reserves relating to "price protection," "shelf-stock adjustments," "product returns," "price rebates," and "chargebacks," stating in pertinent part as follows:

> The accounts receivable amounts above at September 30, 2002 and December 31, 2001 are net of provisions for customer rebates of $17,822,000 and $14,081,000, and

chargebacks of $102,195,000 and $41,830,000, respectively. Customer rebates are price reductions generally given to customers as an incentive to increase sales volume. This incentive is based on a customer's volume of purchases made during an applicable monthly, quarterly or annual period. Chargebacks are price adjustments given to the wholesale customer for product it resells to specific healthcare providers on the basis of prices negotiated between the Company and the provider.

84.     The Third Quarter 2002 10-Q further represented that the financial statements contained therein included "all adjustments" necessary for a "fair presentation" of the Company's financial position stating in pertinent part as follows:

> The accompanying consolidated financial statements at September 30, 2002 and for the nine-month and three-month periods ended September 30, 2002 and September 29, 2001 are unaudited; however, in the opinion of the Company's management, such consolidated statements include all adjustments (consisting of normal recurring accruals) necessary to present a fair statement of the information presented therein. The consolidated balance sheet at December 31, 2001 was derived from the Company's audited consolidated financial statements at such date.

The Third Quarter 2002 10-Q also included Sarbanes-Oxley certifications signed by Defendants Sawyer and O'Connor. In their respective certifications, Sawyer and O'Connor represented, among other things, that "based on my knowledge this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading. . . ."

85.     On or about February 27, 2003, Par issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2002. For the quarter, the Company reported net income of $18,671,000, or $.56 per diluted share on net sales of $99,103,000. For the full year, Par reported net income of $79,454,000 or $2.40 per share on net sales of $381,603,000. Defendant Tarriff commented on Par's financial results stating in pertinent part as follows:

> Thanks to the hard work of our dedicated employees, 2002 represents a second consecutive record year for our Company. ***Once again, we have exceeded all earnings estimates for both the quarter and the year.*** While 2002 may have been our most successful year ever, we are confident that PRX's best days are yet to come. [Emphasis added]

86.     On or about March 28, 2003 Par filed its annual report on Form 10-K for the year ended December 31, 2002, with the SEC which was signed by Defendants Sawyer, O'Connor and Auerbach, among others, and confirmed the Company's previously announced financial results (the "2002 10-K").  The 2002 10-K reported that Par's accounts receivable net of allowances were $54,263,000 and that inventories were $51,591,000.  The 2002 10-K described the Company's accounting policies and procedures for sales reserves relating to "price protection," "shelf-stock adjustments," "product returns," "price rebates," and "chargebacks," stating in pertinent part as follows:

> At the time product is shipped and title passes to its customers, the Company recognizes revenue and simultaneously records an estimate for sales returns, chargebacks, rebates, price protection adjustments or other sales allowances, as a reduction in revenue, with a corresponding adjustment to the accounts receivable reserves.  Customers are permitted to return unused product, after approval from the Company, up to 180 days before and one year after the expiration date for the product's lot.  Additionally, certain customers are eligible for price rebates, offered as an incentive to increase sales volume, on the basis of the volume of purchases of a product over a specified period which generally ranges from one to three months, and certain customers are credited with chargebacks on the basis of their resales to end-use customers, such as HMO's, which have contracts with the Company.  The Company also generally offers price protection, also known as shelf-stock adjustments, with respect to sales of new generic drugs for which it has a market exclusivity period.

> *        *        *

> The Company records charges (reductions of revenue) to accrue this amount for specific product sales that will be subject to price protection based on the Company's estimate of customer inventory levels and market prices at the expiration of the exclusivity period.  In each of these instances, ***the Company has the historical experience and access to other information, including the total demand for each drug the Company manufactures, the Company's market share, recent or pending introduction of new drugs, inventory practices of the Company's customers and the resales by its customers to end-users having contracts with the Company, necessary to reasonably estimate the amount of such returns or allowances, and records reserves for such returns or allowances at the time of sale.***[Emphasis added]

In addition, the 2002 10-K represented that Par's financial statements were prepared in conformity with GAAP, stating in pertinent part as follows:

> The consolidated financial statements are prepared in conformity with accounting principles generally accepted in the United States. [. . .] The Company is not aware of reasonably likely events or circumstances that would result in different amounts being reported that would have a material impact on results of operations or financial condition.

The 2002 10-K also included Sarbanes-Oxley certifications signed by Defendants Sawyer and O'Connor. In their respective certifications, Sawyer and O'Connor represented, among other things, that "based on my knowledge this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading. . . ."

87.     The statements referenced above in ¶¶76-86 were each materially false and misleading when made for the reasons stated in ¶64. In addition the statements in ¶¶76-86 were materially false and misleading and failed to disclose:

(a)     that Par's 2002 net sales were actually $376,371,000 and not $378,229,000 as originally reported, an overstatement of $1,858,000 or 0.4% due to Defendants' knowing or reckless misstatement of the Company's accounts receivable reserves;

(b)     that Par's 2002 net income was actually $80,562,000 and not $79,454,000 as originally reported, an understatement of $1,108,000 or 1%;

(c)     that Par's working capital at December 31, 2002 was actually $129,116,000 and not $136,305,000 as originally reported, an overstatement of $7,189,000 or 6% primarily due to the overstatement of Par's accounts receivable and inventory assets; and

(d)     based on the foregoing, Defendant Tariff's statement that Par "exceeded all earnings estimates for both the quarter and the year" lacked any reasonable basis at all times.

88.     On or about April 23, 2003, Par issued a press release announcing its financial results for the first quarter ended March 30, 2003. For the quarter, the Company reported net income of $22,433,000, or $.67 per diluted share, on net sales of $106,412,000. The Company also reported

working capital was $157,636,000 at March 30, 2003.  Defendant Tarriff commented on Par's

financial results stating in pertinent part as follows:

> We are off to a great start in 2003 and we currently believe this year will be our most
> successful ever.  Our impressive first-quarter performance reflects the continuing
> strength of our base business, along with the success of omeprazole.  Importantly, we
> were able to achieve these exceptional financial results while continuing to invest
> heavily in research and development.

89.     On or about May 14, 2003, Par filed its Form 10-Q for the quarter ended March 30,

2003, with the SEC which was signed by Defendants Sawyer and O'Connor and confirmed the

Company's previously announced financial results (the "First Quarter 2003 10-Q").  The First

Quarter 2003 10-Q reported that Par's accounts receivable net of allowances were $72,177,000 and

that inventories were $51,397,000.  The First Quarter 2003 10-Q also described the Company's

accounting policies and procedures for sales reserves relating to "price protection," "shelf-stock

adjustments," "product returns," "price rebates," and "chargebacks," stating in pertinent part as

follows:

> The gross accounts receivable amounts above at March 30, 2003 and December 31,
> 2002 are net of provisions for customer rebates of $18,478 and $13,610, and
> chargebacks of $57,866 and $63,141, respectively.  Customer rebates are price
> reductions generally given to customers as an incentive to increase sales volume.
> Rebates are generally based on a customer's volume of purchases made during an
> applicable monthly, quarterly or annual period.  Chargebacks are price adjustments
> given to a wholesale customer for product it resells to specific healthcare providers
> on the basis of prices negotiated between the Company and the provider.  [Numbers
> is thousands.]

> The accounts receivable allowances include provisions for doubtful accounts, returns
> and price adjustments.  Price adjustments include cash discounts, sales promotions
> and shelf-stock adjustments.

> *     *     *

> Shelf-stock adjustments are typically given to a customer when the Company lowers
> its invoice pricing and provides a credit for the difference between the old invoice
> price and the new invoice price for the inventory the customer has on hand at the
> time of the price reduction.

90.     The First Quarter 2003 10-Q further represented that the financial statements contained therein included "all adjustments" necessary for a "fair presentation" of the Company's financial position stating in pertinent part as follows:

> The accompanying consolidated financial statements at March 30, 2003 and for the three-month periods ended March 30, 2003 and March 31, 2002 are unaudited; however, in the opinion of the Company's management, such statements include all adjustments (consisting of normal recurring accruals) necessary to present a fair statement of the information presented therein. The consolidated balance sheet at December 31, 2002 was derived from the Company's audited consolidated financial statements at such date.

The First Quarter 2003 10-Q also included Sarbanes-Oxley certifications signed by Defendants Sawyer and O'Connor. In their respective certifications, Sawyer and O'Connor represented, among other things, that "based on my knowledge this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading. . . ."

91.     On or about July 24, 2003, Par issued a press release announcing its financial results for the second quarter ended June 29, 2003. For the quarter, the Company reported net income of $23,146,000 or $.68 per diluted share on net sales of $108,801,000. Defendant Tarriff commented on Par's financial results stating in pertinent part as follows:

> We are well on our way toward achieving the most successful year in our Company's history. The explosive growth in revenues has been powered both by key products and the outstanding performance of our core product portfolio. Almost a month into the current quarter, our business continues to perform well across the board. As a result, we now expect to exceed analysts' current consensus earnings estimates for the third quarter and for the full year of 2002. [Emphasis added]

92.     On or about August 11, 2003, Par filed its Form 10-Q for the quarter ended June 29, 2003, with the SEC which was signed by Defendants Tarriff and O'Connor and confirmed the Company's previously announced financial results (the "Second Quarter 2003 10-Q"). The Second Quarter 2003 10-Q reported that Par's accounts receivable net of allowances were $99,140,000 and that inventories were $57,576,000. The Second Quarter 2003 10-Q also described the Company's

accounting policies and procedures for sales reserves relating to "price protection," "shelf-stock adjustments," "product returns," "price rebates," and "chargebacks," stating in pertinent part as follows:

> The trade accounts receivable amounts presented above at June 29, 2003 and December 31, 2002 are net of provisions for customer rebates of $25,161 and $13,610, and for chargebacks of $67,667 and $63,141, respectively. Customer rebates are price reductions generally given to customers as an incentive to increase sales volume. Rebates are generally based on a customer's volume of purchases made during an applicable monthly, quarterly or annual period. Chargebacks are price adjustments provided to wholesale customers for product it resells to specific healthcare providers on the basis of prices negotiated between the Company and the provider. [Amounts in thousands]

> The accounts receivable allowances include provisions for doubtful accounts, returns and price adjustments. Price adjustments include cash discounts, sales promotions and shelf-stock adjustments.

93.   The Second Quarter 2003 10-Q further represented that the financial statements contained therein included "all adjustments" necessary for a "fair presentation" of the Company's financial position stating in pertinent part as follows:

> The accompanying consolidated financial statements at June 29, 2003 and for the six-month and three-month periods ended June 29, 2003 and June 30, 2002, respectively, are unaudited; however, in the opinion of the Company's management, such statements include all adjustments (consisting of normal recurring accruals) necessary to provide a fair statement of the information presented therein. The consolidated balance sheet at December 31, 2002 was derived from the Company's audited consolidated financial statements at such date.

The Second Quarter 2003 10-Q also included Sarbanes-Oxley certifications signed by Defendants Tarriff and O'Connor. In their respective certifications, Tarriff and O'Connor represented, among other things, that "based on my knowledge this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading. . . ."

94.   On or about October 23, 2003, Par issued a press release announcing its financial results for the third quarter ended September 28, 2003. For the quarter, the Company reported net

income of $38,742,000, or $1.11 per diluted share, on net sales of $214,933,000. Defendant Tarriff

commented on Par's financial results stating in pertinent part as follows:

> We have achieved the most successful quarter in our Company's history.
> Furthermore, 2003 now represents the most successful year in PRX's history as well.
> ***Through only nine months, we have already established annual records for both
> sales and earnings, ensuring a third consecutive record year for our Company.***
> [Emphasis added]

95.     On or about November 12, 2003, Par filed its Form 10-Q for the quarter ended

September 28, 2003, with the SEC which was signed by Defendants Tarriff and O'Connor and

confirmed the Company's previously announced financial results (the "Third Quarter 2003 10-Q").

The Third Quarter 2003 10-Q reported that Par's accounts receivable net of allowances were

$176,893,000 and that inventories were $58,542,000. The Third Quarter 2003 10-Q also described

the Company's accounting policies and procedures for sales reserves relating to "price protection,"

"shelf-stock adjustments," "product returns," "price rebates," and "chargebacks," stating in pertinent

part as follows:

> The trade accounts receivable amounts presented above at September 28, 2003 and
> December 31, 2002 are net of provisions for customer rebates of $26,068 and
> $13,610, and for chargebacks of $80,263 and $63,141, respectively. The increases
> are primarily due to the Company's introduction of paroxetine, the generic version of
> GlaxoSmithKline's ("GSK") Paxil(R), in the United States in September 2003
> through a distribution agreement with GSK. Customer rebates are price reductions
> generally given to customers as an incentive to increase sales volume. Rebates are
> generally based on a customer's volume of purchases made during an applicable
> monthly, quarterly or annual period. Chargebacks are price adjustments provided to
> wholesale customers for product they resell to specific healthcare providers on the
> basis of prices negotiated between the Company and the providers. [Amounts in
> thousands]

> The accounts receivable allowances include provisions for doubtful accounts, returns
> and price adjustments. Price adjustments include cash discounts, sales promotions
> and shelf-stock adjustments.

96.     The Third Quarter 2003 10-Q further represented that the financial statements

contained therein included "all adjustments" necessary for a "fair presentation" of the Company's

financial position stating in pertinent part as follows:

The accompanying consolidated financial statements at September 28, 2003 and for the nine-month and three-month periods ended September 28, 2003 and September 30, 2002, respectively, are unaudited; however, in the opinion of the Company's management, such statements include all adjustments (consisting only of normal recurring accruals) necessary to provide a fair statement of the information presented therein. The consolidated balance sheet at December 31, 2002 was derived from the Company's audited consolidated financial statements at such date.

The Third Quarter 2003 10-Q also included Sarbanes-Oxley certifications signed by Defendants Tarriff and O'Connor. In their respective certifications, Tarriff and O'Connor represented, among other things, that "based on my knowledge this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading. . . ."

97.     On or about February 26, 2004, Par issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2003. For the quarter, the Company reported net income of $38,212,000, or $1.08 per diluted share, on net sales of $221,605,000. For the full year, Par reported net income of $124,797,000 or $3.60 per share on net sales of $646,023,000. Defendant Tarriff commented on Par's financial results stating in pertinent part as follows:

> *2003 represented our Company's third consecutive record year of sales and earnings growth.* To help sustain our rapid growth, we invested $25 million in research and development -- also a record for PRX. This year's accomplishments resulted solely from the hard work of our dedicated employees. Through their efforts, PRX is now the sixth largest generic drug company in the United States based on sales.
>
> We look forward to achieving many more significant milestones in 2004, including the submission of our first NDA. *We fully expect our growth to continue* and that 2004 will become our fourth consecutive record year. [Emphasis added]

98.     On or about March 15, 2004 Par filed its annual report on Form 10-K for the year ended December 31, 2003, with the SEC which was signed by Defendants Tarriff, O'Connor and Auerbach, among others, and confirmed the Company's previously announced financial results (the "2003 10-K"). The 2003 10-K reported that Par's accounts receivable net of allowances were

$157,707,000 and that inventories were $66,713,000.  The 2003 10-K described the Company's

accounting policies and procedures for sales reserves relating to "price protection," "shelf-stock

adjustments," "product returns," "price rebates," and "chargebacks," stating in pertinent part as

follows:

> The Company recognizes revenues for product sales when title and risk of loss pass
> to its customers, and simultaneously records estimates for sales returns, chargebacks,
> rebates, shelf-stock or price protection adjustments or other sales allowances, as a
> reduction in revenues, with a corresponding adjustment to the accounts receivable
> allowances.  Customers are permitted to return unused product, after approval from
> the Company, up to 180 days before and one year after the expiration date for the
> product's lot.  Additionally, certain customers are eligible for price rebates, offered
> as an incentive to increase sales volume, on the basis of the volume of purchases of a
> product over a specified period which generally ranges from one to three months, and
> certain customers are credited with chargebacks on the basis of their resales to end-
> use customers, such as HMOs, which have contracts with the Company.  The
> Company also generally offers price protection for sales of new generic drugs for
> which it has a market exclusivity period.

*       *       *

> The Company records charges (reductions of revenue) to accrue this amount for
> specific product sales that will be subject to price protection based on the Company's
> estimate of customer inventory levels and market prices at the expiration of the
> exclusivity period. ***In each of the instances described above, the Company has the
> historical experience and access to other information, including the total demand
> for each drug the Company manufactures, the Company's market share, recent or
> pending introduction of new drugs, inventory practices of the Company's
> customers and the resales by its customers to end-users having contracts with the
> Company, necessary to reasonably estimate the amount of such sales allowances
> and returns, and records reserves for such sales allowances and returns at the time
> of sale.*** [Emphasis added]

In addition, the 2003 10-K represented that Par's financial statements were prepared in conformity

with GAAP, stating in pertinent part as follows:

> The consolidated financial statements are prepared in conformity with accounting
> principles generally accepted in the United States. [. . .] The Company is not aware
> of reasonably likely events or circumstances that would result in different amounts
> being reported that would have a material impact on results of operations or financial
> condition.

133271 v1

The 2003 10-K also included Sarbanes-Oxley certifications signed by Defendants Tarriff and O'Connor.  In their respective certifications, Tarriff and O'Connor represented, among other things, that "based on my knowledge this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading. . . ."

99.     The statements referenced above in ¶¶88-98 were each materially false and misleading when made for the reasons stated in ¶64.  In addition the statements in ¶¶88-98 were materially false and misleading and failed to disclose:

(a)     that Par's 2003 net sales were actually $609,534,000 and not $643,795,000 as originally reported, an overstatement of $34,261,000 or 6% due to Defendants' knowing or reckless misstatement of the Company's accounts receivable reserves;

(b)     that Par's 2003 net income was actually $106,584,000 and not $122,533,000 as originally reported, an overstatement of $15,949,000 or 15%;

(c)     that Par's working capital at December 31, 2003 was actually $433,378,000 and not $459,802,000 as originally reported, an overstatement of $26,424,000 or 6% primarily due to the overstatement of Par's accounts receivable and inventory assets; and

(d)     based on the foregoing, Defendant Tariff's statements concerning Par's "record year of sales and earnings growth" lacked a reasonable basis at relevant times.

100.    On or about April 29, 2004, Par issued a press release announcing its financial results for the first quarter ended April 4, 2004.  For the quarter, the Company reported net income of $30,206,000 or $0.85 per diluted share on net sales of $211,039,000.  Defendant Tarriff commented on Par's financial results stating in pertinent part as follows:

> In 2004, we have taken steps to broaden, diversify and bring more visibility to our product portfolio . . . Through our acquisition of Kali, we will now file substantially more ANDAs and launch many more new products over the next few years than would have otherwise been possible.  We will file our first NDA in the next few months and have already secured another potential NDA submission for 2005.  We

remain committed to making 2004 a very successful year and *I can say with confidence that our Company has never been stronger*.  [Emphasis added]

101.    On or about May 14, 2004, Par filed its Form 10-Q for the quarter ended April 4, 2004, with the SEC which was signed by Defendants Tarriff and O'Connor and confirmed the previously announced financial results (the "First Quarter 2004 10-Q").  The First Quarter 2004 10-Q reported that Par's accounts receivable net of allowances were $168,948,000 and that inventories were $78,434,000.  The First Quarter 2004 10-Q described the Company's accounting policies and procedures for sales reserves relating to "price protection," "shelf-stock adjustments," "product returns," "price rebates," and "chargebacks," stating in pertinent part as follows:

> The trade accounts receivable amounts presented above at April 4, 2004 and December 31, 2003 are net of provisions for customer rebates of $22,530 and $23,793, and of chargebacks of $72,286 and $75,598, respectively.  Customer rebates are price reductions generally given to customers as an incentive to increase sales volume.  Rebates are generally based on a customer's volume of purchases made during an applicable monthly, quarterly or annual period.  Chargebacks are price adjustments provided to wholesale customers for product that they resell to specific healthcare providers on the basis of prices negotiated between the Company and the providers.  [Amounts in thousands]
>
> The accounts receivable allowances include provisions for doubtful accounts, returns and price adjustments and allowances.  Price adjustments include cash discounts, sales promotions and shelf-stock adjustments.

102.    The First Quarter 2004 10-Q further represented that the financial statements contained therein included "all adjustments" necessary for a "fair presentation" of the Company's financial position stating in pertinent part as follows:

> The accompanying consolidated financial statements at April 4, 2004 and for the three-month periods ended April 4, 2004 and March 30, 2003 are unaudited; in the opinion of the Company's management, however, such statements include all adjustments (consisting only of normal recurring accruals) necessary to present fairly the information presented therein.  The consolidated balance sheet at December 31, 2003 was derived from the Company's audited consolidated financial statements at such date.

The First Quarter 2004 10-Q also included Sarbanes-Oxley certifications signed by Defendants Tarriff and O'Connor.  In their respective certifications, Tarriff and O'Connor represented, among

other things, that "based on my knowledge this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading. . . ."

103.    On or about July 28, 2004, Par issued a press release announcing its financial results for the second quarter ended July 4, 2004.  For the quarter, the Company reported net income of $29,860,000 or $0.85 per diluted share on net sales of $211,060,000.  Defendant Tarriff commented on Par's financial results stating in pertinent part as follows:

> Par's second quarter benefited from the strong performance of our base business and new product introductions. . . .  Importantly, sales of megestrol acetate oral suspension stabilized in the quarter and we expect megestrol to continue to be a significant contributor to our future performance.  As we look forward to building a new Megace® franchise in 2005, it is encouraging to see that new prescriptions for the category reached a two-year high in July.  In addition to the recently submitted NDA for our advanced formulation of megestrol, Par has 38 regulatory filings currently awaiting FDA approval.  This represents a record total for Par and includes 14 ANDAs and 1 NDA already submitted this year by Par, its partners, and Kali.  With the acquisition of Kali complete, our company has simply never been stronger.

104.    On or about August 13, 2004, Par filed its Form 10-Q for the quarter ended June 30, 2004, with the SEC which was signed by the Defendants Tarriff and O'Connor and confirmed the previously announced financial results (the "Second Quarter 2004 10-Q").  The Second Quarter 2004 10-Q reported that Par's accounts receivable net of allowances were $178,578,000 and that inventories were $73,713,000.  The Second Quarter 2004 10-Q also described the Company's accounting policies and procedures for sales reserves relating to "price protection," "shelf-stock adjustments," "product returns," "price rebates," and "chargebacks," stating in pertinent part as follows:

> The trade accounts receivable amounts presented above at July 4, 2004 and December 31, 2003 are net of provisions for customer rebates of $18,883 and $23,793, and of chargebacks of $143,919 and $75,598, respectively.  Customer rebates are price reductions generally given to customers as an incentive to increase sales volume.  Rebates are generally based on a customer's volume of purchases made during an applicable monthly, quarterly or annual period.  Chargebacks are price adjustments provided to wholesale customers for product that they resell to

specific healthcare providers on the basis of prices negotiated between the Company
and the providers.  [Amounts in thousands]

*     *     *

The accounts receivable allowances include provisions for doubtful accounts, returns
and price adjustments and allowances.  Price adjustments include cash discounts,
sales promotions and shelf-stock adjustments.

105.    The Second Quarter 2004 10-Q further represented that the financial statements

contained therein included "all adjustments" necessary for a "fair presentation" of the Company's

financial position stating in pertinent part as follows:

> The accompanying consolidated financial statements at July 4, 2004 and for
> the six-month and three-month periods ended July 4, 2004 and June 29, 2003 are
> unaudited; in the opinion of the Company's management, however, such statements
> include all adjustments (consisting only of normal recurring accruals) necessary to
> present fairly the information  presented therein.  The consolidated balance sheet at
> December 31, 2003 was derived from the Company's audited consolidated financial
> statements at such date.

The Second Quarter 2004 10-Q also included Sarbanes-Oxley certifications signed by Defendants

Tarriff and O'Connor.  In their respective certifications, Tarriff and O'Connor represented, among

other things, that "based on my knowledge this report does not contain any untrue statement of

material fact or omit to state a material fact necessary to make the statements made . . . not

misleading. . . ."

106.    On October 24, 2004, Par issued a press release announcing its financial results for

the third quarter ended October 3, 2004.  For the quarter, the Company reported a net loss of

$35,085,000 or $1.03 per diluted share on net sales of $151,566,000.  Excluding certain one-time

charges resulting from the write-off of research and development costs, Par reported comparative net

income for the quarter of $16,155,000 or $.48 per diluted share.  Defendant Tarriff commented on

Par's comparative financial results stating in pertinent part as follows:

> Par's comparative third-quarter results reflect the impact of last year's launch
> of paroxetine, and this year's significant increase in R&D . . .  However, our base
> business growth was impressive and our megestrol franchise remained stable.  Our

increased investment in R&D demonstrates our commitment to building a company that can sustain growth for years to come.  Par expects to introduce as many as two dozen new products between now and the end of 2005.  Among these, we are especially excited about our new Megace® product, which will potentially represent Par's first entrant into the branded pharmaceutical arena.

107.    On or about November 12, 2004, Par filed its Form 10-Q for the quarter ended October 3, 2004, with the SEC which was signed by Defendants Tariff and O'Connor and confirmed the previously announced financial results (the "Third Quarter 2004 10-Q").  The Third Quarter 2004 10-Q reported that Par's accounts receivable net of allowances were $156,229,000 and that inventories were $82,499,000.  The Second Quarter 2004 10-Q also described the Company's accounting policies and procedures for sales reserves relating to "price protection," "shelf-stock adjustments," "product returns," "price rebates," and "chargebacks," stating in pertinent part as follows:

> The trade accounts receivable amounts presented above at October 3, 2004 and December 31, 2003 are net of provisions for customer rebates of $15,034 and $23,793, and of chargebacks of $85,197 and $75,598, respectively.  Customer rebates are price reductions generally given to customers as an incentive to increase sales volume.  Rebates are generally based on a customer's volume of purchases made during an applicable monthly, quarterly or annual period.  The lower rebate reserve at October 3, 2004 compared to December 31, 2003 was primarily attributable to lower pricing on paroxetine, the generic version of GlaxoSmithKline's ("GSK's") Paxil(R).  Chargebacks are price adjustments provided to wholesale customers for product that they resell to specific healthcare providers on the basis of prices negotiated between the Company and the providers.  [Amounts in thousands]
>
> *     *     *
>
> The accounts receivable allowances include provisions for doubtful accounts, returns and price adjustments and allowances.  Price adjustments include cash discounts, sales promotions and shelf-stock adjustments.

108.    The Third Quarter 2004 10-Q further represented that the financial statements contained therein included "all adjustments" necessary for a "fair presentation" of the Company's financial position stating in pertinent part as follows:

> The accompanying consolidated financial statements at October 3, 2004 and for the nine-month and three-month periods ended October 3, 2004 and September

133271 v1                                    - 46 -

28, 2003, respectively, are unaudited; in the opinion of the Company's management, however, such statements include all adjustments (consisting of only normal recurring accruals) necessary to present fairly the information presented therein. The consolidated balance sheet data at December 31, 2003 was derived from the Company's audited consolidated financial statements at such date.

The Third Quarter 2004 10-Q also included Sarbanes-Oxley certifications signed by Defendants Tariff and O'Connor. In their respective certifications, Tariff and O'Connor represented, among other things, that "based on my knowledge this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading. . . ."

109.    On or about February 24, 2005, Par issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2004. For the quarter, the Company reported net income of $4,265,000 or $0.12 per diluted share on net sales of $112,760,000. For the year, Par reported net income of $29,246,000 million or $.84 per diluted share on net sales of $687,570,000. Defendant Tarriff commented on Par's financial results stating in pertinent part as follows:

> Although 2004 was a challenging year for Par, our company has never been stronger or better positioned for sustainable growth . . . In 2004, Par more than tripled the scale of its research and development (R&D) organization through the acquisition of Kali Laboratories. Between Par and its partners, we filed 32 Abbreviated New Drug Applications (ANDAs) and now have more than 50 products awaiting regulatory approval - - a record for our company. Importantly, Par also filed its first New Drug Application (NDA). We look forward to introducing the advanced formulation of Megace®, our first branded pharmaceutical product, as soon as June or July. In 2005, Par expects to introduce 20 or more new products. Assuming timely regulatory approvals, we are comfortable with the current consensus earnings estimate for 2005.

110.    On or about March 16, 2005, Par filed its annual report on Form 10-K for the year ended December 31, 2004, with the SEC which was signed by Defendants Tarriff, O'Connor and Auerbach, among others, and confirmed the Company's previously announced financial results (the "2004 10-K"). The 2004 10-K reported that Par's accounts receivable net of allowances were

$149,107,000 and that inventories were $86,835,000.  The 2004 10-K described the Company's

accounting policies and procedures for sales reserves relating to "price protection," "shelf-stock

adjustments," "product returns," "price rebates," and "chargebacks," stating in pertinent part as

follows:

> The Company recognizes revenues for product sales when title and risk of loss pass
> to its customers, and simultaneously records estimates for sales allowances, the most
> significant of which are described in Note 4 - Accounts Receivable and include
> rebates, chargebacks, returns, price adjustments and other sales allowances, as
> reductions to gross revenues, with corresponding adjustments to the accounts
> receivable allowances.  The Company has the historical experience and access to
> other information, including rebate agreements with each customer, resales by its
> customers to end-users having contracts with the Company, the total demand for
> each drug that the Company manufactures or distributes, its market share, recent or
> pending new drug introductions, and inventory practices of the Company's
> customers, it believes is necessary to reasonably estimate the amount of such sales
> allowances.  Some of the assumptions used for certain of the Company's estimates
> are based on information received from third parties, such as customer inventories at
> a particular point in time and market data, or other market factors beyond the
> Company's control.  The Company regularly reviews all information related to these
> estimates and adjusts its reserves accordingly if and when actual experience differs
> from previous estimates.

> \*      \*      \*

> At the time the Company recognizes revenues for product sales, it simultaneously
> records estimates for sales allowances, the most significant of which are described
> below and include rebates, chargebacks, returns, price adjustments and other sales
> allowances, as reductions to gross revenues, with corresponding adjustments to the
> accounts receivable allowances.

> \*      \*      \*

> Price adjustments include terms discounts, sales promotions and shelf-stock
> adjustments.  Term discounts are given to customers that pay within a specific period
> of time.  The Company may conduct sales or trade show promotions where
> additional discounts may be given on a new product or certain existing products as an
> added incentive to stock the Company's products or for the customer to substitute
> the Company's products for competing products.  The Company may, from time to time,
> also provide price and/or volume incentives on new products that have multiple
> competitors and/or on existing products that confront new competition in order to
> secure or maintain a certain market share.  The Company does not provide incentives
> designed to increase shipments to its customers that it believes would result in out-
> of-the-ordinary course of business inventory for them.

In addition, the 2004 10-K represented that Par's financial statements were prepared in conformity with GAAP, stating in pertinent part as follows:

> The consolidated financial statements are prepared in conformity with accounting principles generally accepted in the United States. [. . .] The Company is not aware of reasonably likely events or circumstances that would result in different amounts being reported that would have a material impact on results of operations or financial condition.

The 2004 10-K also included Sarbanes-Oxley certifications signed by Defendants Tarriff and O'Connor. In their respective certifications, Tarriff and O'Connor represented, among other things, that "based on my knowledge this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading. . . ."

111.   The statements referenced above in ¶¶100-110 were each materially false and misleading when made for the reasons stated in ¶64. In addition the statements in ¶¶100-110 were materially false and misleading and failed to disclose:

(a)   that Par's 2004 net sales were actually $626,477,000 and not $686,661,000 as originally reported, an overstatement of $60,184,000 or 10% due to Defendants' knowing or reckless misstatement of the Company's accounts receivable reserves;

(b)   that Par's 2004 net income was actually $7,558,000 and not $29,246,000 as originally reported, an overstatement of $21,688,000 or 287%;

(c)   that Par's working capital at December 31, 2004 was actually $292,833,000 and not $339,238,000 as originally reported, an overstatement of $46,405,000 or 16% primarily due to the overstatement of Par's accounts receivable and inventory assets; and

(d)   based on the foregoing, Defendant Tariff's statements that Par "has never been stronger or better positioned for sustainable growth" lacked any reasonable basis at all times.

112.   On or about April 28, 2005, Par issued a press release announcing its financial results for the first quarter ended April 3, 2005. For the quarter, the Company reported net income of

$1,977,000 or $0.06 per diluted share on sales of $91,088,000.  Defendant Tarriff commented on the results stating in pertinent part as follows:

> Par's first-quarter performance reflects, in part, the considerable investment necessary to build a new branded specialty pharmaceutical business . . .  The quarter was also impacted by regulatory delays, and continued erosion of older generic products in advance of our transition to new ones.  Fortunately, that transition began last week with the introduction of our generic version of Ultracet®.  We can now look forward to acceleration in earnings beginning in the second quarter.

113.    On or about May 13, 2005, Par filed its Form 10-Q for the quarter ended April 3, 2005, with the SEC which was signed by Defendants Tarriff and O'Connor and confirmed the previously announced financial results (the "First Quarter 2005 10-Q").  The First Quarter 2005 10-Q reported that Par's accounts receivable net of allowances were $152,063,000 and that inventories were $100,822,000.  The First Quarter 2005 10-Q described the Company's accounting policies and procedures for sales reserves relating to "price protection," "shelf-stock adjustments," "product returns," "price rebates," and "chargebacks," stating in pertinent part as follows:

> At the time the Company recognizes revenues for product sales, it simultaneously records estimates for sales allowances, the most significant of which are described below and include rebates, chargebacks, returns, price adjustments and other sales allowances, as reductions to gross revenues, with corresponding adjustments to the accounts receivable allowances.
>
> Customer rebates are price reductions that generally are provided to customers as an incentive for them to continue to carry the Company's products or to substitute the Company's products for competing products to be sold through the customers' distribution channels.  This incentive is generally based on a customer's volume of purchases made during an applicable monthly, quarterly or annual period.
>
> Chargebacks are given to the wholesale customer for product that it resells to specific healthcare providers on the basis of prices negotiated between the Company and the providers.  Chargeback credits are issued to wholesalers for the difference between the Company's invoice price and the contract price through which the wholesaler resells the product.

114.    The First Quarter 2005 10-Q further represented that the financial statements contained therein included "all adjustments" necessary for a "fair presentation" of the Company's financial position stating in pertinent part as follows:

The accompanying consolidated financial statements at April 3, 2005 and for the three-month periods ended April 3, 2005 and April 4, 2004 are unaudited; in the opinion of the Company's management, however, such statements include all adjustments (consisting only of normal recurring accruals) necessary to present fairly the information presented therein.  The consolidated balance sheet at December 31, 2004 was derived from the Company's audited consolidated financial statements at such date.

The First Quarter 2005 10-Q also included Sarbanes-Oxley certifications signed by Defendants Tarriff and O'Connor.  In their respective certifications, Tarriff and O'Connor represented, among other things, that "based on my knowledge this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading. . . ."

115.   On or about July 28, 2005, Par issued a press release announcing its financial results for second quarter of 2005, the period ending July 3, 2005.  For the quarter, the Company reported a net loss of $621,000 or $.02 per diluted share on net sales of $116,727,000.  Excluding one-time charges resulting from an investment impairment Par reported comparative net income of $4,596,000 million or $0.13 per diluted share.  Defendant Tarriff commented on Par's comparative financial results stating in pertinent part as follows:

In the second quarter, Par invested almost $15 million, and more than $26 million through the first six months, to build a new branded pharmaceutical business. . . .  And while the quarter's results reflect this substantial investment, the improved performance of our generic business should not be overlooked.  Specifically, the April launch of our generic version of Ultracet® has exceeded most expectations. Following this month's approval and introduction of Megace® ES, Par's first branded pharmaceutical product, we believe that the dilutive impact of building our new branded business is now behind us.

116.   On or about August 12, 2005, Par filed its Form 10-Q for the quarter ended July 3, 2005, with the SEC which was signed by Defendants Tarriff and O'Connor and confirmed the previously announced financial results (the "Second Quarter 2005 10-Q").  The Second Quarter 2005 10-Q reported that Par's accounts receivable net of allowances were $189,143,000 and that inventories were $101,793,000.  The Second Quarter 2005 10-Q described the Company's

accounting policies and procedures for sales reserves relating to "price protection," "shelf-stock adjustments," "product returns," "price rebates," and "chargebacks," stating in pertinent part as follows:

> At the time the Company recognizes revenues for product sales, it simultaneously records estimates for sales allowances, the most significant of which are described below and include rebates, chargebacks, returns, price adjustments and other sales allowances, as reductions to its gross revenues, with corresponding adjustments to the accounts receivable allowances.

> Customer rebates are price reductions that are provided to customers generally as an incentive for them to continue to carry the Company's products or to substitute the Company's products for competing products to be sold through the customers' distribution channels.  This incentive is based generally on a customer's volume of purchases made during an applicable monthly, quarterly or annual period.

> Chargebacks are provided to the wholesale customer for product that it resells to specific healthcare providers on the basis of prices negotiated between the Company and the providers.  Chargeback credits are issued to wholesalers for the difference between the Company's invoice price and the contract price through which the wholesaler resells the product.

117.    The Second Quarter 2005 10-Q further represented that the financial statements contained therein included "all adjustments" necessary for a "fair presentation" of the Company's financial position stating in pertinent part as follows:

> The accompanying consolidated financial statements at July 3, 2005 and for the six-month and three-month periods ended July 3, 2005 and July 4, 2004 are unaudited; in the opinion of the Company's management, however, such statements include all adjustments necessary to present fairly the information presented therein. The consolidated balance sheet at December 31, 2004 was derived from the Company's audited consolidated financial statements at such date.

The Second Quarter 2005 10-Q also included Sarbanes-Oxley certifications signed by Defendants Tarriff and O'Connor.  In their respective certifications, Tarriff and O'Connor represented, among other things, that "based on my knowledge this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading. . . ."

118.    On or about October 27, 2005, Par issued a press release announcing its financial results for third quarter ended October 2, 2005.  For the quarter, the Company reported net income of $25,280,000 or $.74 per diluted share on net sales of $118,257,000.  Excluding certain one-time gains and losses, Par reported comparative net income of $9,955,000 or $0.29 per diluted share. Defendant Tarriff commented on Par's comparative financial results stating in pertinent part as follows:

> The third quarter benefited from the introduction of Megace ES and an improving gross margin. . . .  Contributing to this improvement were new, internally-developed products such as Megace ES and Par's generic version of Ultracet®. Par's financial performance, year-to-date, reflects the considerable investment necessary to build a branded pharmaceutical business.  However, with the successful launch of Megace ES now underway, Par has passed an important milestone.  We believe that the Megace ES launch will ultimately be viewed as the transforming event that established Par as a successful specialty pharmaceutical company.

119.    On or about November 15, 2005, Par filed its Form 10-Q for the quarter ended October 2, 2005, with the SEC which was signed by Defendants Tarriff and O'Connor and confirmed the previously announced financial results (the "Third Quarter 2005 10-Q").  The Third Quarter 2005 10-Q reported that Par's accounts receivable net of allowances were $196,714,000 and that inventories were $99,812,000.   The Third Quarter 2005 10-Q described the Company's accounting policies and procedures for sales reserves relating to "price protection," "shelf-stock adjustments," "product returns," "price rebates," and "chargebacks," stating in pertinent part as follows:

> At the time that the Company recognizes revenues for product sales, it simultaneously records estimates for sales allowances, the most significant of which are described below and include rebates, chargebacks, returns, price adjustments and other sales allowances, as reductions to its gross revenues, with corresponding adjustments to the accounts receivable allowances.

> Customer rebates are price reductions that are provided to customers generally as an incentive for them to continue to carry the Company's products or to substitute the Company's products for competing products to be sold through the customers' distribution channels.  This incentive is based generally on a customer's volume of purchases made during an applicable monthly, quarterly or annual period.

Chargebacks are provided to the wholesale customer for product that it resells to specific healthcare providers on the basis of prices negotiated between the Company and the providers.  Chargeback credits are issued to wholesalers for the difference between the Company's invoice price and the contract price at which the wholesaler resells the product.

120.    The Third Quarter 2005 10-Q further represented that the financial statements contained therein included "all adjustments" necessary for a "fair presentation" of the Company's financial position stating in pertinent part as follows:

> The accompanying consolidated financial statements at October 2, 2005 and for the nine month and three month periods ended October 2, 2005 and October 3, 2004 are unaudited; in the opinion of the Company's management, however, such statements include all adjustments necessary to present fairly the information presented therein.  The consolidated balance sheet at December 31, 2004 was derived from the Company's audited consolidated financial statements at such date.

The Third Quarter 2005 10-Q also included Sarbanes-Oxley certifications signed by Defendants Tarriff and O'Connor.  In their respective certifications, Tarriff and O'Connor represented, among other things, that "based on my knowledge this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading. . . ."

121.    On or about February 28, 2006, Par issued a press release announcing its financial results for fourth quarter and year ended December 31, 2005.  For the quarter Par reported a net loss of $34,886,000 or $1.02 per diluted share on net sales of $99,631,000.  For the year, the Company reported a net loss of $8,250,000 or $.24 per diluted share.  Excluding certain one-time gains and losses, Par reported comparative net loss for the quarter of $4,087,000 or $0.12 per diluted share, and for the year comparative net income of $12,566,000 or $0.36 per share.  Defendant Tarriff commented on Par's comparative financial results stating in pertinent part as follows:

> 2005 was the year Par began, in earnest, its transition from a generic to a specialty pharmaceutical company.  Our results for 2005 reflect the substantial increase in investment that was necessary to affect this transition.  Our results also reflect strategic actions taken in preparation for a significantly improved financial

performance in 2006.  This year, we look forward to a rapid expansion in sales, while growth in spending moderates.

122.    On or about March 15, 2006, Par filed its annual report on Form 10-K for the year ended December 31, 2005, with the SEC which was signed by Defendants Tarriff, O'Connor and Auerbach, among others, and confirmed the Company's previously announced financial results (the "2005 10-K").  The 2005 10-K reported that Par's accounts receivable net of allowances were $143,608,000 and that inventories were $100,945,000.  The 2005 10-K described the Company's accounting policies and procedures for sales reserves relating to "price protection," "shelf-stock adjustments," "product returns," "price rebates," and "chargebacks," stating in pertinent part as follows:

> The Company recognizes revenues for product sales when title and risk of loss pass to its customers and collectibility is reasonably assured.  Included in the Company's recognition of revenues are estimated provisions for sales allowances, the most significant of which include rebates, chargebacks, returns, price adjustments and other sales allowances, recorded as reductions to gross revenues, with corresponding adjustments to the accounts receivable reserves and allowances [. . .] In addition, the Company records estimates for rebates paid under federal and state government Medicaid drug reimbursement programs as reductions to gross revenues, with corresponding adjustments to accrued liabilities.  The Company has the experience and access to relevant information that it believes are necessary to reasonably estimate the amounts of such deductions from gross revenues.  Some of the assumptions used by the Company for certain of its estimates are based on information received from third parties, such as customers' inventories at a particular point in time and market data, or other market factors beyond the Company's control.  The estimates that are most critical to the Company's establishment of these reserves, and therefore would have the largest impact if these estimates were not accurate, are its estimates of non-contract sales volumes, average contract pricing, customer inventories and return volumes.  The Company regularly reviews the information related to these estimates and adjusts its reserves accordingly, if and when actual experience differs from previous estimates.

> *        *        *

> At the time that the Company recognizes revenues for product sales, it simultaneously records estimates for sales allowances, the most significant of which are described below and include rebates, chargebacks, returns, price adjustments and other sales allowances, as reductions to its gross revenues, with corresponding adjustments to the accounts receivable reserves and allowances.

*       *       *

Price adjustments include shelf-stock adjustments, including those for price protection, cost differentials and pricing errors.  Shelf-stock adjustments are typically provided to a customer when the Company lowers its invoice pricing and provides the customer with a credit for the difference between the old and new invoice prices for the inventory that the customer has on hand at the time of the price reduction.  In providing for shelf-stock adjustments, the Company considers market data, including the potential number of companies with competing products and projected launch dates, estimated or actual inventory levels of the customers at the time of a price change and estimated or actual price changes of the affected products.

*       *       *

[T]he Company has the experience and access to relevant information that it believes are necessary to reasonably estimate the amounts of such deductions from gross revenues.  Some of the assumptions used by the Company for certain of its estimates are based on information received from third parties, such as customers' inventories at a particular point in time and market data, or other market factors beyond the Company's control.  The estimates that are most critical to the establishment of these reserves, and therefore would have the largest impact if these estimates were not accurate, are estimates related to non-contract sales volumes, average contract pricing, customer inventories and return volumes.  The Company regularly reviews the information related to these estimates and adjusts its reserves accordingly, if and when actual experience differs from previous estimates.  There were no material changes to any of the underlying assumptions used by the Company to estimate such sales allowances and no material adjustments were made to these accruals for the fiscal years 2005 and 2004.

123.    In addition, the 2005 10-K represented that Par's financial statements were prepared in conformity with GAAP, stating in pertinent part as follows:

The consolidated financial statements are prepared in conformity with accounting principles generally accepted in the United States.

The 2005 10-K also included Sarbanes-Oxley certifications signed by Defendants Tarriff and O'Connor.  In their respective certifications, Tarriff and O'Connor represented, among other things, that "based on my knowledge this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading. . . ."

124.    The statements referenced above in ¶¶112-123 were each materially false and misleading when made for the reasons stated in ¶64.  In addition the statements in ¶¶112-123 were materially false and misleading and failed to disclose:

(a)    that Par's 2005 net sales were actually $412,126,000 and not $425,644,000 as originally reported, an overstatement of $13,518,000 or 3% due to Defendants' knowing or reckless misstatement of the Company's accounts receivable reserves;

(b)    that Par's 2005 net loss was actually $15,309,000 and not $8,250,000 as originally reported, an overstatement of $7,059,000 or 86%;

(c)    that Par's working capital at December 31, 2005 was actually $307,610,000 and not $366,096,000 as originally reported, an overstatement of $58,486,000 or 19% primarily due to the overstatement of Par's accounts receivable and inventory assets; and

(d)    based on the foregoing, Defendant Tariff's statements that Par's "results also reflect strategic actions taken in preparation for a significantly improved financial performance in 2006" lacked any reasonable basis at all times.

125.    On or about May 1, 2006, Par issued a press release announcing its financial results for the first quarter of 2006, the period ending April 2, 2006.  For the quarter, the Company reported net income of $8,401,000 or $0.24 per diluted share on net sales of $173,608,000.  Defendant Tariff commented on Par's financial results stating in pertinent part as follows:

> Par's first-quarter total revenues included new product sales of more than $100 million.  Additions since last year's first quarter include generic versions of Flonase(R), Augmentin(R) and Ultracet(R), and Par's first branded pharmaceutical product, Megace(R) ES.
>
> Par significantly improved its financial performance despite the continued investment necessary to build its branded pharmaceutical organization and its first brand.  This investment diluted Par's first-quarter earnings by almost $9 million, or $.16 a share.  However, as sales of Megace ES grow and we add additional products, the dilution will diminish and the investment will be rewarded.

126.    On or about May 12, 2006, Par filed its Form 10-Q for the quarter ended April 2, 2006, with the SEC which was signed by Defendant Tarriff and confirmed the previously announced financial results (the "First Quarter 2006 10-Q").  The First Quarter 2006 10-Q reported that Par's accounts receivable net of allowances were $234,401,000 and that inventories were $117,568,000. The First Quarter 2006 10-Q described the Company's accounting policies and procedures for sales reserves relating to "price protection," "shelf-stock adjustments," "product returns," "price rebates," and "chargebacks," stating in pertinent part as follows:

> At the time that the Company recognizes revenues for product sales, it simultaneously records estimates for sales allowances, the most significant of which are described below and include rebates, chargebacks, returns, price adjustments and other sales allowances, as reductions to its gross revenues, with corresponding adjustments to its accounts receivable reserves and allowances.

> *       *       *

> [T]he Company has the experience and access to relevant information that it believes are necessary to reasonably estimate the amounts of such deductions from its gross revenues.  Some of the assumptions used by the Company for certain of its estimates are based on information received from third parties, such as customers' inventories at a particular point in time and market data, or other market factors beyond the Company's control.  The estimates that are most critical to the establishment of these reserves and, therefore, would have the largest impact if these estimates were not accurate, are estimates related to non-contract sales volumes, average contract pricing, customer inventories and return volumes.  The Company regularly reviews the information related to these estimates and adjusts its reserves accordingly, if and when actual experience differs from previous estimates.  There were no material changes to any of the underlying assumptions used by the Company to estimate such sales allowances, and no material adjustments were made to these accruals, for the three months ended April 2, 2006 and April 3, 2005.

127.    The First Quarter 2006 10-Q further represented that the financial statements contained therein included "all adjustments" necessary for a "fair presentation" of the Company's financial position stating in pertinent part as follows:

> The accompanying consolidated financial statements at April 2, 2006 and for the three month periods ended April 2, 2006 and April 3, 2005 are unaudited; in the opinion of the Company's management, however, such statements include all adjustments necessary to present fairly the information presented therein.  The

consolidated balance sheet at December 31, 2005 was derived from the Company's audited consolidated financial statements at such date.

The First Quarter 2006 10-Q also included a Sarbanes-Oxley certification signed by Defendant Tarriff.  In the certification, Tarriff represented, among other things, that "based on my knowledge this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading. . . ."

       (a)     The statements referenced above in ¶¶126-127 were each materially false and misleading when made for the reasons stated in ¶64.

### THE TRUTH EMERGES

128.    On July 5, 2006, Par admitted that its previously issued financial results and financial statements materially overstated the Company's financial performance and that the Company's financial statements were not prepared in accordance with GAAP.  On that date, Par issued a press release announcing that it would be restating its financial statements for fiscal years 2004, 2005 and the first quarter of 2006 to correct for "an understatement of accounts receivable reserves which resulted primarily from delays in recognizing customer credits and uncollectible customer deductions."  The Company reported that the effect of the restatement over reported periods would be $55 million, that the Company would also write down $15 million in inventory and that its prior financial statements "should not be relied upon."

129.    In response to the announcement of the restatement, the price of Par stock dropped from $18.25 per share to $13.47 per share on extremely heavy trading volume.

130.    On July 7, 2006, the SEC informed the Company that it was conducting an informal investigation related to its impending restatement.  Following the announcement of the restatement Par announced that its Audit Committee had engaged the law firm of Nixon Peabody to conduct an independent investigation into the matters giving rise to the restatement.

131.    On September 26, 2007 Par issued a press release announcing that, at the request of the Board, Scott Tarriff resigned as president and chief executive officer of the Company as of September 26, 2006.

132.    On December 14, 2006, Par announced that the scope of the restatement had expanded to include fiscal periods prior to 2004 and that the overstatement of revenues and assets due to improper accounting for sales allowances and receivable reserves was now much larger than previously estimated.  Rather than $55 million, Par would be required to reduce previous revenues and earnings by at least $84 million through the first quarter of fiscal 2006.

133.    On March 13, 2007, the Company filed with the SEC its amended annual report on Form 10-K/A for the year ended December 31, 2005 (the "Amended 2005 10-K").  The Amended 2005 10-K reported a host of accounting and internal control deficiencies stemming from Defendants' improper accounting for sales allowance and receivable reserves.  *See* ¶¶36-42 infra.

134.    The market for Par's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Par's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Par securities relying upon the integrity of the market price of Par's securities and market information relating to Par, and have been damaged thereby.

135.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Par's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

136.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Par's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Par and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.  When the true facts about the Company were revealed to the market the inflation in the price of Par stock was removed and the price of Par stock declined dramatically causing loss to Plaintiff and the other members of the Class.

## PAR'S VIOLATIONS OF GAAP

137.    Defendants had the responsibility to present Par's business activities in accordance with Section 13 of the Exchange Act of 1934, which provides:

Every issuer which has a class of securities registered pursuant to Section 12 of this title and every issuer which is required to file reports pursuant to Section 15(d) of this title shall - -

A.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

B.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that - -

i.    transactions are executed in accordance with management's general or specific authorization;

ii.      transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets;

iii.     access to assets is permitted only in accordance with management's general or specific authorization; and

iv.      the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

138.    As set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts ("Concepts Statement") No. 1 a fundamental objective of financial reporting is to provide useful information about an entity's financial performance.   In addition, GAAP, in Concepts Statement No. 2, provide that financial reporting should be reliable in that it represents what it purports to represent with reliable financial information being a notion that is central to GAAP.

139.    As Par has now admitted, Par's financial reporting violated these and numerous other provisions of GAAP, which materially inflated its true financial results during the Class Period.

**Par's Improper Recognition of Revenue Violated GAAP**

140.    GAAP provides that revenue should not be recognized until it is realized or realizable and earned.   Concepts Statement No. 5, 83.   The conditions for revenue recognition ordinarily are met when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller's price is fixed or determinable, collectibility of the sales price is reasonably assured and when the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue.   Generally, revenue should not be recognized until an exchange has occurred and the earnings process is complete.   SEC SAB Nos. 101 and 104;[10] FASB Concept

---

[10] In December 2003, SAB No. 101 was superceded by SAB No. 104, which updated portions of SAB No. 101 to make it consistent with then current authoritative accounting guidance.   The principal revisions to SAB No. 101 included the deletion of certain interpretive guidance because of the issuance of private sector GAAP and the incorporation of certain sections of the staff's "Revenue Recognition in Financial Statements Frequently Asked Questions and Answers" into SAB No. 104.

Statement Nos. 2 and 5; FASB SFAS No. 48; Accounting Research Bulletin ("ARB") No. 43;

Accounting Principles Board ("APB") Opinion No. 10; and American Institute of Certified Public

Accountants ("AICPA") Statement of Position ("SOP") 97-2.

141.    Par falsely represented that it complied with the above accounting rules during the

Class Period.  For example, Par's year end financial statements filed with the SEC on Form 10-K

during the Class Period disclosed:

2003 10-K

REVENUE  RECOGNITION  AND  ACCOUNTS  RECEIVABLE  AND
ALLOWANCES:

The Company recognizes revenues for product sales when title and risk of loss pass
to its customers, and simultaneously records estimates for sales returns, chargebacks,
rebates, shelf-stock or price protection adjustments or other sales allowances, as a
reduction in revenues, with a corresponding adjustment to the accounts receivable
allowances.  Customers are permitted to return unused product, after approval from
the Company, up to 180 days before and one year after the expiration date for the
product's lot.  Additionally, certain customers are eligible for price rebates, offered
as an incentive to increase sales volume, on the basis of the volume of purchases of a
product over a specified period which generally ranges from one to three months, and
certain customers are credited with chargebacks on the basis of their resales to end-
use customers, such as HMOs, which have contracts with the Company.  The
Company also generally offers price protection for sales of new generic drugs for
which it has a market exclusivity period.  Such price protection accounts for the fact
that the prices of such drugs typically will decline, sometimes substantially, when
additional generic manufacturers introduce and market a comparable generic product
following the expiration of an exclusivity period.  Such price protection plans, which
are common in the Company's industry, generally provide for a shelf-stock
adjustment to customers with respect to the customer's remaining inventory at the
expiration of the exclusivity period for the difference between the Company's new
price and the price at which the Company originally sold the product.  The Company
may also offer price protection with respect to existing products for which it
anticipates significant price erosion through an increase in competition.  The
Company records charges (reductions of revenue) to accrue this amount for specific
product sales that will be subject to price protection based on the Company's
estimate of customer inventory levels and market prices at the expiration of the
exclusivity period.  In each of the instances described above, the Company has the
historical experience and access to other information, including the total demand for
each drug the Company manufactures, the Company's market share, recent or
pending introduction of new drugs, inventory practices of the Company's customers
and the resales by its customers to end-users having contracts with the Company,

necessary to reasonably estimate the amount of such sales allowances and returns, and records reserves for such sales allowances and returns at the time of sale.

2004 10-K

REVENUE RECOGNITION AND ACCOUNTS RECEIVABLE AND ALLOWANCES:

The Company recognizes revenues for product sales when title and risk of loss pass to its customers, and simultaneously records estimates for sales allowances, the most significant of which are described in Note 4 – Accounts Receivable and include rebates, chargebacks, returns, price adjustments and other sales allowances, as reductions to gross revenues, with corresponding adjustments to the accounts receivable allowances.  The Company has the historical experience and access to other information, including rebate agreements with each customer, resales by its customers to end-users having contracts with the Company, the total demand for each drug that the Company manufactures or distributes, its market share, recent or pending new drug introductions, and inventory practices of the Company's customers, it believes is necessary to reasonably estimate the amount of such sales allowances.  Some of the assumptions used for certain of the Company's estimates are based on information received from third parties, such as customer inventories at a particular point in time and market data, or other market factors beyond the Company's control.  The Company regularly reviews all information related to these estimates and adjusts its reserves accordingly if and when actual experience differs from previous estimates.

2005 10-K

Revenue Recognition and Accounts Receivable, Reserves and Allowances:

The Company recognizes revenues for product sales when title and risk of loss pass to its customers and collectibility is reasonably assured.  Included in the Company's recognition of revenues are estimated provisions for sales allowances, the most significant of which include rebates, chargebacks, returns, price adjustments and other sales allowances, recorded as reductions to gross revenues, with corresponding adjustments to the accounts receivable reserves and allowances (see "Notes to Consolidated Financial Statements - Note 4 – Accounts Receivable").  In addition, the Company records estimates for rebates paid under federal and state government Medicaid drug reimbursement programs as reductions to gross revenues, with corresponding adjustments to accrued liabilities.  The Company has the experience and access to relevant information that it believes are necessary to reasonably estimate the amounts of such deductions from gross revenues.  Some of the assumptions used by the Company for certain of its estimates are based on information received from third parties, such as customers' inventories at a particular point in time and market data, or other market factors beyond the Company's control.  The estimates that are most critical to the Company's establishment of these reserves, and therefore would have the largest impact if these estimates were not accurate, are its estimates of non-contract sales volumes, average contract pricing, customer

inventories and return volumes. The Company regularly reviews the information related to these estimates and adjusts its reserves accordingly, if and when actual experience differs from previous estimates.

142.    Despite appearing to comply with GAAP, the representations above were materially false and misleading when made because, as defendants knew or recklessly ignored, Par's revenue recognition policies violated GAAP in that its revenues were not "fixed or determinable" when recognized.

143.    GAAP defines a fixed fee as "a fee required to be paid at a set amount that is not subject to refund or adjustment." Accordingly, if, as was Par's practice, a vendor can adjust the sales price charged by Par, the fee may not be fixed and determinable at the outset of the arrangement. GAAP provides that if a vendor (*e.g.*, Par) cannot conclude that a fee is fixed and determinable at the outset of an arrangement, revenue must be recognized as payments come due, and not upon shipment, as was Par's general policy of revenue recognition.

144.    In this regard, paragraph 30 of SOP 97-2 states, in pertinent part, that:

Distribution arrangements with resellers require the vendor to rebate or credit a portion of the original fee if the vendor subsequently reduces its price for a product and the reseller still has rights with respect to that product (sometimes referred to as price protection). ***If a vendor is unable to reasonably estimate future price changes in light of competitive conditions or, if significant uncertainties exist about the vendor's ability to maintain its price, the arrangement fee is not fixed or determinable. In such circumstances, revenue from the arrangement should be deferred until the vendor is able to reasonably estimate the effects of future price changes and the other conditions of the SOP have been satisfied.*** [Emphasis added]

145.    In addition, both SOP 97-2 and SAB Nos. 101 and 104 mandate (via reference to FASB's SFAS No. 48) that when a vendor grants a customer the right to return product, revenue is not to be recognized if any of the following conditions exist:

(a)    The seller's price to the buyer is not substantially fixed or determinable at the date of sale;

(b)     The buyer's obligation to pay the seller and is contingent on resale of the product; or

(c)     The amount of future returns cannot be reasonably estimated.

146.   Par has now admitted that it was unable to reasonably estimate its product returns and the price concessions it granted to its customers during the Class Period, thereby rendering its policy of revenue recognition to be in violation of GAAP.   For example, in its December 31, 2005 Amended Form 10-K filed with the SEC, Par admitted that its estimates of product returns and price concessions during the Class Period were misstated as follows:

December 31, 2003

- Reserve for Rebates and Incentives Understated by approximately 48%

- Reserve for Product Returns Understated by approximately 56%

- Total reserve for Returns and Concessions Understated by approximately 25%

December 31, 2004

- Reserve for Rebates and Incentives Understated by more than 52%

- Reserve for Product Returns Understated by more than 62%

- Reserve for Cash Discounts Understated by more than 46%

- Total reserve for Returns and Concessions Understated by approximately 32%

December 31, 2005

- Reserve for Chargebacks Understated by more than 24%

- Reserve for Rebates and Incentives Understated by approximately 54%

- Reserve for Product Returns Understated by approximately 72%

- Reserve for Cash Discounts Understated by approximately 33%

- Total reserve for Returns and Concessions Understated by approximately 40%

147.    Indeed, the duration and magnitude by which Par's sales returns and concessions reserves were misstated during the Class Period evidences the Company's inability to reasonably estimate its sales returns and price concessions during the Class Period.  Accordingly, Par's policy of revenue recognition violated GAAP during the Class Period.[11]

**Par's Improper Manipulation of Accounting**
**Reserves During the Class Period**

148.    In furtherance of their attempt to inflate the Company's operating results, defendants also manipulated Par's accounting reserves during the Class Period.

149.    GAAP requires that financial statements account for existing uncertainties as to probable losses.  Such loss contingencies should be recognized and reported as a charge to income when: information existing at the date of the financial statements indicates that it is probable (e.g., a likely chance) that an asset has been impaired or a liability has been incurred; and the amount of such loss can be reasonably estimated.  SFAS No. 5, 8.

150.    GAAP also provides that changes in accounting estimates are to be accounted for in the period of change or future periods, while errors due to mistakes or a misuse of facts are to be

---

[11] While Par has not admitted its revenue recognition policy during the Class Period violated GAAP, it has admitted that certain of its revenue was recognized in violation of GAAP.

corrected via a restatement of previously issued financial statements.[12]   Accordingly, Par's restatement is an admission that it did not benignly make incorrect estimates of its sales returns during the Class Period.  Rather, Par's restatement is, in fact, an admission that its sales return estimates were materially misstated due to an "oversight" or "misuse" of facts that existed at the time its financial statements were prepared.

151.    During the Class Period, Par's year end financial statements disclosed "[t]he Company regularly reviews the information related to these [accounts receivable reserve] estimates and adjusts its reserves accordingly, if and when actual experience differs from previous estimates." After the end of the Class Period, Par admitted that such representation was false in that Par did not timely record customer credits and utilized inappropriate methodologies in calculating the amount of its chargebacks, rebates, product returns, and other accounts receivable reserves.

**Par's Other Violations of GAAP**

152.    In addition to the accounting improprieties stated above, Par has admitted that it presented its financial statements during the Class Period in a manner which also violated at least the following provisions of GAAP:

(a)    The principle that, when certain conditions exist, financial statements recognize an investor's share of profit and loss in common stock investments (APB No. 18);

(b)    The principle that financial statement report leases containing a bargain purchase option as a capital lease (SFAS No. 13);

(c)    The principle that financial statement recognized and reported as a charge against income when it is at least probable that a liability has been incurred and the amount of such loss can be reasonably estimated (SFAS No. 5);

---

[12] *See, e.g.*, SFAS No. 154.

(d)     The principle that offsetting assets and liabilities in the balance sheet is improper except where a right of set off exists (FASB Interpretation 39);

(e)     The principle that unrealized holding gains and losses on available-for-sale securities should be reported as an item of other comprehensive income (SFAS No. 130);

(f)     The principle that product revenue and licensing and royalty revenue be separately stated on the Statement of Operations (Rule 5-03(b)(1) of Regulation S-X);

(g)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

(h)     The principle that the operating section of the Statement of Cash Flows begin with "Net Income (Loss)" from operations (SFAS No. 95);

(i)     The principle that financial statements provide disclosure about the major customers of the enterprise (SFAS No. 131);

(j)     The principle that current assets are those assets which are reasonably expected to be realized in cash, sold or consumed during the normal operating cycle of a business (ARB, Chapter 3A);

(k)     The principle that interest expense, including debt discount and the amortized cost of debt initiation, must be reflected on the face of the income statement (Rule 5-03(b)(8) of Regulation S-X);

(l)     The concept that financial statements report probable future economic benefits as assets of an enterprise (Concepts Statement No. 1);

(m)     The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶40);

(n)      The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶50);

(o)      The concept that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶58-59);

(p)      The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶79); and

(q)      The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶95, 97).

153.   In failing to file financial statements with the SEC which conformed to the requirements of GAAP, Par disseminated financial statements that were presumptively misleading and inaccurate.  The Company's Class Period Forms 10-K and 10-Q filed with the SEC were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K.

## PAR'S FALSE AND MISLEADING REPORTING ON AND
## CERTIFICATIONS OF DISCLOSURE AND INTERNAL CONTROLS

154.    As a result of the rash of recent corporate accounting scandals, Congress enacted the

Sarbanes-Oxley Act ("Sarbanes-Oxley") in 2002, in part, to heighten the responsibility of public

company directors and senior managers associated with the quality of financial reporting and

disclosures made by their companies.  The SEC revised Item 307 and added Item 308 of Regulation

S-K [17 C.F.R. 229.307 and 308] to require companies to disclose the conclusions of its principal

executive and principal financial officer on the effectiveness of the Company's disclosure controls

and procedures and disclose a report by management on its internal control over its financial

reporting.[13]

155.    Accordingly, Par's fiscal 2003, 2004 and 2005 Forms 10-K disclosed:[14]

2003 10-K

Based on an evaluation under the supervision and with the participation of the
Company's management, *the Company's principal executive officer [Defendant
Tarriff] and principal financial officer  [Defendant O'Conner] have concluded
that the Company's disclosure controls and procedures* (as defined in Rules 13a-
15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) *were
effective as of December 31, 2003 to ensure that information required to be
disclosed* by the Company in reports that it files or submits under the Exchange Act
*is recorded, processed, summarized and reported* within the time periods specified
in the Commission's rules and forms.

---

[13] The Securities Exchange Act Rules and Regulations define disclosure controls as: (1) controls and
other procedures designed to ensure that the information required to be disclosed to investors under
The Securities Exchange Act is recorded, processed, summarized and reported; and (2) internal
control over financial reporting as a process designed by, or under the supervision of, the issuer's
principal executive and principal financial officers to provide reasonable assurance regarding the
reliability of financial reporting and the preparation of financial statements for external purposes in
accordance with GAAP.

[14] Par made similar false representations in its interim filings made with the SEC on Form 10-Q
during the Class Period.

There were no changes in the Company's internal control over financial reporting identified in management's evaluation during the fourth quarter of fiscal 2003 that have materially affected or are reasonably likely to materially affect the Company's internal controls over financial reporting.  [Emphasis added.]

2004 10-K

***Based on an evaluation under the supervision and with the participation of the Company's management, the Company's principal executive officer [Defendant Tarriff] and principal financial officer [Defendant O'Conner] have concluded that the Company's disclosure controls and procedures*** (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) (the "Exchange Act") ***were effective as of December 31, 2004 to ensure that information required to be disclosed*** by the Company in reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.

There were no changes in the Company's internal control over financial reporting identified in management's evaluation during the fourth quarter of fiscal 2004 that have materially affected or are reasonably likely to materially affect the Company's internal controls over financial reporting.

*          *          *

Management Report on Internal Control Over Financial Reporting

The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting.  Internal control over financial reporting is defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Securities Exchange Act of 1934 as a process designed by, or under the supervision of, the Company's principal executive [Defendant Tarriff] and financial officers [Defendant O'Conner] and effected by the Company's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

•       Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

•       Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with due authorizations of management and directors of the Company; and

• Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect certain misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2004. In making this assessment, the Company's management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework.

Based on our assessment, ***management believes that, as of December 31, 2004, the Company's internal control over financial reporting is effective*** based on those criteria. [Emphasis added.]

2005 10-K

***Based on an evaluation under the supervision and with the participation of the Company's management, the Company's principal executive officer [Defendant Tarriff] and principal financial officer [Defendant O'Conner] have concluded that the Company's disclosure controls and procedures*** (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act **were effective as of December 31, 2005 to ensure that information required to be disclosed** by the Company in reports that it files or submits under the Exchange Act ***is recorded, processed, summarized and reported*** within the time periods specified in the SEC's rules and forms.

There were no changes in the Company's internal control over financial reporting identified in management's evaluation during the fourth quarter of fiscal 2005 that have materially affected or are reasonably likely to materially affect the Company's internal controls over financial reporting.

Management Report on Internal Control Over Financial Reporting

The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Securities Exchange Act of 1934 as a process designed by, or under the supervision of, the Company's principal executive [Defendant Tarriff] and financial officers [Defendant O'Conner] and effected by the Company's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

• Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

• Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with due authorizations of management and directors of the Company; and

• Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect certain misstatements.   Projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

The Company's management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2005.  In making this assessment, the Company's management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework.

Based on our assessment, ***management believes that, as of December 31, 2005, the Company's internal control over financial reporting is effective*** based on those criteria.  [Emphasis added.]

156.    Then, at the end of the Class Period, Par admitted that the above representations about its internal and disclosure controls, and the similar representations defendants included in the Company's interim filings made with the SEC on Form 10-Q during the Class Period, were materially false and misleading when made.

157.    Concerning its internal and disclosure control representations during the Class Period, Par has now admitted:

Disclosure Controls and Procedures

The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Company's filings with the SEC is recorded, processed, summarized and reported within the time period specified in the SEC's rules and forms, and that such information is accumulated and communicated to management, including the Company's Chief Executive Officer

("CEO") and Chief Financial Officer ("CFO"), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" as defined in Rule 13a-15(e) promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). In designing and evaluating disclosure controls and procedures, the Company has recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating its controls and procedures.

In connection with the restatement of its financial statements, the Company reevaluated its disclosure controls and procedures. The evaluation was performed under the supervision and with the participation of Company management, including its CEO and CFO, to assess the effectiveness of the design and operation of its disclosure controls and procedures (as defined under the Exchange Act). Based on that evaluation, the Company's management, including its CEO and CFO, concluded that the Company's disclosure controls and procedures were not effective as of December 31, 2005 because of material weaknesses in its internal controls over financial reporting. This conclusion is different from the conclusion disclosed in the Company's Original 10-K.

Management Report on Internal Control Over Financial Reporting (Restated)

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. The Company's internal control over financial reporting is designed, under the supervision of the Company's CEO and CFO, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP. The Company's internal control over financial reporting includes those policies and procedures that: (a) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of its assets; (b) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that the Company receipts and expenditures are being made only in accordance with authorizations of management and directors of the Company; and (c) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of its assets that could have a material effect on the financial statements. All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

As disclosed in the Original Form 10-K, the Company assessed the effectiveness of its internal controls over financial reporting as of December 31, 2005. The Company based the evaluation on the framework in "Internal Control - Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission

(COSO). Based on this assessment, the Company had previously concluded that its internal controls over financial reporting were effective in the Original Form 10-K.

After the Company filed its Original Form 10-K for the year ended December 31, 2005, the Company identified errors in the Company's previously issued consolidated financial statements and concluded that the financial statements included in the Original Form 10-K should be restated as discussed in Note 1 to the consolidated financial statements included elsewhere in this Form 10-K/A.

The Company determined that these errors resulted from material weaknesses in the Company's internal controls over financial reporting. As a result, the Company has restated its original assessment of the effectiveness of internal controls over financial reporting in this Annual Report on Form 10-K/A. The Company's management has concluded that the Company did not maintain effective internal controls over financial reporting as of December 31, 2005.

A material weakness is defined as a significant deficiency or a combination of significant deficiencies that results in more than a remote likelihood that material misstatement of its annual or interim financial statements would not be prevented or detected by company personnel in the normal course of performing their assigned functions. The material weaknesses identified are:

(a)      insufficient resources with the appropriate level of expertise and inadequate management oversight in the accounting and finance organizations to ensure appropriate application of GAAP, particularly in the areas of accounts receivable reserves, inventory valuation and existence and the accounting for certain of the Company's non-routine transactions,

(b)      inadequate design of controls to provide reasonable assurance (i) that valid customer deductions were identified and accurately recorded in a timely manner and (ii) to determine that inventory was accurately valued, and (c) inadequate design of controls over estimating reserves for (i) chargebacks, rebates, product returns and (ii) excess inventory including inadequate design of the methodology, inadequate development of the assumptions and corroboration of inputs used.

158.     In its 2005 Form 10-K, Par also stated that:

The Company has implemented, or plans to implement, certain measures to remediate the identified material weaknesses and to enhance the Company's internal control over its quarterly and year-end financial reporting processes. As of the date of the filing of this Annual Report on Form 10-K/A, the Company has implemented the following measures:

•        Increased the size, expertise and training of the finance and accounting staff to include adequate resources for ensuring GAAP compliance, particularly in the areas of accounts receivable reserves, inventory valuation and existence and the accounting for certain of the Company's non-routine transactions.

• Assigned individuals with significant industry experience and increased the involvement of its senior finance team members in the preparation and review of accounts receivable reserves and inventory valuation and existence.

• Enhanced the accounting policies and procedures to provide adequate, sufficient, and useful guidance to its staff in the area of accounts receivable reserves and inventory valuation and existence.

• Corrected its methodologies with respect to estimating accounts receivable reserves for chargebacks, rebates, and product returns.

• Increased the level of interdepartmental communication in a way that will foster information sharing between our finance staff and operational personnel.

The Company anticipates that these remediation actions represent ongoing improvement measures.  Furthermore, while the Company has taken steps to remediate the material weaknesses, these steps may not be adequate to fully remediate those weaknesses, and additional measures may be required.  The effectiveness of its remediation efforts will not be known until the Company can test those controls in connection with the management tests of internal controls over financial reporting that the Company will perform as of December 31, 2006.

159.    Par's false and misleading representations about its disclosure and internal controls during the Class Period were repeatedly certified by defendants Tariff and O'Conner when they knew such certifications were false and caused such certifications to be included in Par's Forms 10-K during Class Period:[15]

2003 Form 10-K

I, . . . , certify that:

1.      I have reviewed this annual report on Form 10-K of Pharmaceutical Resources, Inc.;

2.      Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

_____

[15] Defendants Tariff and O'Conner signed similar false certifications that Par included in its interim filings made with the SEC during the Class Period.

3.      Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and we have:

a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities,  particularly during the period in which this annual report is being prepared;

b)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation; and

c) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect the registrant's internal control over financial reporting;

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, [sic] of the registrant's auditors and the audit committee of the registrant's bard of directors:

a)      all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

<u>2004 Form 10-K</u>

I, . . . , certify that:

1.      I have reviewed this annual report on Form 10-K of Par Pharmaceutical Companies, Inc.;

2.      Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the

statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.      Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation; and

d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

a)      all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internalcontrol over financial reporting.

<u>2005 Form 10-K</u>

I, . . . ., certify that:

1.      I have reviewed this annual report on Form 10-K of Par Pharmaceutical Companies, Inc.;

2.      Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.      Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluation; and

d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

a)      all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

## ADDITIONAL SCIENTER ALLEGATIONS

160.   As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Par, their control over, and/or receipt and/or modification of Par's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Par, participated in the fraudulent scheme alleged herein.

161.   Defendants were further motivated to engage in the fraudulent scheme in order for company insiders, including the Individual Defendants, to sell hundreds of thousands of their personally-held Par securities and reap millions of dollars in proceeds, as follows:

| Name | Date | Shares | Price | Proceeds | End of CP Stock Holdings | % Sold | End of CP Restricted Stock + Vested Options + Stock Holdings | % Sold |
|---|---|---|---|---|---|---|---|---|
| **AUERBACH** | 8/3/2001 | 18,000 | $40.00 | $720,000 | | | | |
| | 8/3/2001 | 5,000 | $40.00 | $200,000 | | | | |
| | 11/21/2002 | 11,600 | $27.50 | $319,000 | | | | |
| | 11/21/2002 | 4,900 | $27.57 | $135,093 | | | | |
| | 11/21/2002 | 3,000 | $27.40 | $82,200 | | | | |
| | 11/21/2002 | 2,000 | $27.47 | $54,940 | | | | |
| | 11/21/2002 | 300 | $27.56 | $8,268 | | | | |
| | 11/21/2002 | 100 | $27.51 | $2,751 | | | | |
| | 11/21/2002 | 100 | $27.60 | $2,760 | | | | |
| | | **45,000** | | **$1,525,012** | **12,000** | **79%** | **183,691** | **20%** |
| **GUTMAN** | 4/25/2003 | 24,800 | $44.00 | $1,091,200 | | | | |
| | 4/25/2003 | 10,000 | $43.50 | $435,000 | | | | |
| | 4/25/2003 | 3,400 | $44.09 | $149,906 | | | | |
| | 4/25/2003 | 2,000 | $44.20 | $88,400 | | | | |
| | 4/25/2003 | 1,600 | $44.08 | $70,528 | | | | |
| | 4/25/2003 | 900 | $44.15 | $39,735 | | | | |
| | 4/25/2003 | 500 | $44.10 | $22,050 | | | | |
| | 4/25/2003 | 500 | $44.32 | $22,160 | | | | |
| | 4/25/2003 | 500 | $43.51 | $21,755 | | | | |
| | 4/25/2003 | 300 | $44.30 | $13,290 | | | | |
| | 4/25/2003 | 200 | $44.11 | $8,822 | | | | |
| | 4/25/2003 | 100 | $44.16 | $4,416 | | | | |
| | 4/25/2003 | 100 | $44.25 | $4,425 | | | | |
| | 4/25/2003 | 100 | $44.26 | $4,426 | | | | |
| | 4/28/2003 | 15,000 | $44.35 | $665,250 | | | | |
| | 4/28/2003 | 5,700 | $43.95 | $250,515 | | | | |
| | 4/28/2003 | 4,700 | $44.50 | $209,150 | | | | |
| | 4/28/2003 | 2,750 | $44.38 | $122,045 | | | | |
| | 4/28/2003 | 2,200 | $43.94 | $96,668 | | | | |
| | 4/28/2003 | 1,100 | $43.98 | $48,378 | | | | |
| | 4/28/2003 | 600 | $44.00 | $26,400 | | | | |
| | 4/28/2003 | 600 | $43.97 | $26,382 | | | | |
| | 4/28/2003 | 100 | $43.96 | $4,396 | | | | |
| | 9/17/2004 | 19,900 | $41.50 | $825,850 | | | | |
| | 9/17/2004 | 100 | $41.70 | $4,170 | | | | |
| | 9/21/2004 | 15,000 | $38.40 | $576,000 | | | | |
| | 9/21/2004 | 10,000 | $37.80 | $378,000 | | | | |
| | 9/21/2004 | 8,500 | $38.80 | $329,800 | | | | |
| | 9/21/2004 | 1,500 | $38.84 | $58,260 | | | | |
| | 12/23/2004 | 10,000 | $42.00 | $420,000 | | | | |
| | 12/23/2004 | 9,900 | $42.40 | $419,760 | | | | |

| Name | Date | Shares | Price | Proceeds | End of CP Stock Holdings | % Sold | End of CP Restricted Stock + Vested Options + Stock Holdings | % Sold |
|------|------|-------:|------:|---------:|------:|------:|------:|------:|
| | 12/23/2004 | 100 | $42.58 | $4,258 | | | | |
| | 1/23/2006 | 60,000 | $32.20 | $1,932,000 | | | | |
| | 1/24/2006 | 23,300 | $32.12 | $748,396 | | | | |
| | 1/25/2006 | 60,000 | $31.83 | $1,909,800 | | | | |
| | 1/26/2006 | 6,700 | $31.60 | $211,720 | | | | |
| | 1/31/2006 | 5,400 | $32.77 | $176,958 | | | | |
| | 1/31/2006 | 135 | $32.70 | $4,415 | | | | |
| | | **308,285** | | **$11,424,684** | **0** | **100%** | **375** | **100%** |
| | | | | | | | | |
| **O CONNOR** | 7/29/2002 | 14,000 | $26.00 | $364,000 | | | | |
| | 7/30/2002 | 3,500 | $25.73 | $90,055 | | | | |
| | 8/26/2002 | 5,000 | $27.02 | $135,100 | | | | |
| | 12/31/2002 | 7,500 | $29.80 | $223,500 | | | | |
| | 1/3/2003 | 3,900 | $29.30 | $114,270 | | | | |
| | 1/3/2003 | 3,100 | $29.40 | $91,140 | | | | |
| | 1/3/2003 | 400 | $29.45 | $11,780 | | | | |
| | 1/3/2003 | 100 | $29.36 | $2,936 | | | | |
| | 6/24/2003 | 27,000 | $47.35 | $1,278,450 | | | | |
| | 11/17/2003 | 20,100 | $71.98 | $1,446,798 | | | | |
| | 11/18/2003 | 7,900 | $71.85 | $567,615 | | | | |
| | 11/26/2003 | 47,000 | $71.50 | $3,360,500 | | | | |
| | | **139,500** | | **$7,686,144** | **5,619** | **96%** | **163,175** | **46%** |
| | | | | | | | | |
| **SAWYER** | 7/27/2001 | 125,000 | $38.76 | $4,845,000 | | | | |
| | 7/30/2001 | 75,000 | $38.80 | $2,910,000 | | | | |
| | 7/31/2002 | 100,000 | $27.06 | $2,706,000 | | | | |
| | 8/1/2002 | 34,200 | $27.26 | $932,292 | | | | |
| | 8/7/2002 | 15,800 | $27.25 | $430,550 | | | | |
| | 8/14/2002 | 35,600 | $28.07 | $999,292 | | | | |
| | 8/15/2002 | 14,700 | $28.00 | $411,600 | | | | |
| | 8/16/2002 | 38,800 | $28.26 | $1,096,488 | | | | |
| | 9/13/2002 | 10,900 | $28.26 | $308,034 | | | | |
| | 10/1/2002 | 10,000 | $28.01 | $280,100 | | | | |
| | 10/2/2002 | 10,000 | $28.01 | $280,100 | | | | |
| | 4/30/2003 | 19,000 | $43.95 | $835,050 | | | | |
| | 4/30/2003 | 14,000 | $44.00 | $616,000 | | | | |
| | 4/30/2003 | 12,500 | $43.90 | $548,750 | | | | |
| | 4/30/2003 | 7,500 | $44.06 | $330,450 | | | | |
| | 4/30/2003 | 6,500 | $43.93 | $285,545 | | | | |
| | 4/30/2003 | 6,000 | $43.88 | $263,280 | | | | |
| | 4/30/2003 | 6,000 | $43.89 | $263,340 | | | | |
| | 4/30/2003 | 5,500 | $43.92 | $241,560 | | | | |
| | 4/30/2003 | 4,000 | $43.91 | $175,640 | | | | |
| | 4/30/2003 | 4,000 | $43.96 | $175,840 | | | | |
| | 4/30/2003 | 4,000 | $43.97 | $175,880 | | | | |

| Name | Date | Shares | Price | Proceeds | End of CP Stock Holdings | % Sold | End of CP Restricted Stock + Vested Options + Stock Holdings | % Sold |
|------|------|--------|-------|----------|---------|--------|---------|--------|
| | 4/30/2003 | 4,000 | $44.15 | $176,600 | | | | |
| | 4/30/2003 | 3,500 | $43.98 | $153,930 | | | | |
| | 4/30/2003 | 2,500 | $43.94 | $109,850 | | | | |
| | 4/30/2003 | 1,900 | $44.16 | $83,904 | | | | |
| | 4/30/2003 | 1,500 | $44.18 | $66,270 | | | | |
| | 4/30/2003 | 1,200 | $44.17 | $53,004 | | | | |
| | 4/30/2003 | 1,066 | $44.24 | $47,160 | | | | |
| | 4/30/2003 | 1,000 | $44.22 | $44,220 | | | | |
| | 4/30/2003 | 1,000 | $43.86 | $43,860 | | | | |
| | 4/30/2003 | 1,000 | $43.87 | $43,870 | | | | |
| | 4/30/2003 | 1,000 | $44.01 | $44,010 | | | | |
| | 4/30/2003 | 1,000 | $44.10 | $44,100 | | | | |
| | 4/30/2003 | 1,000 | $44.13 | $44,130 | | | | |
| | 4/30/2003 | 500 | $44.19 | $22,095 | | | | |
| | 4/30/2003 | 500 | $44.07 | $22,035 | | | | |
| | 6/23/2003 | 5,600 | $46.29 | $259,224 | | | | |
| | 6/23/2003 | 4,200 | $46.33 | $194,586 | | | | |
| | 6/23/2003 | 4,200 | $46.32 | $194,544 | | | | |
| | 6/23/2003 | 3,800 | $46.30 | $175,940 | | | | |
| | 6/23/2003 | 1,900 | $46.20 | $87,780 | | | | |
| | 6/23/2003 | 1,500 | $46.34 | $69,510 | | | | |
| | 6/23/2003 | 1,000 | $46.82 | $46,820 | | | | |
| | 6/23/2003 | 1,000 | $46.80 | $46,800 | | | | |
| | 6/23/2003 | 900 | $46.38 | $41,742 | | | | |
| | 6/23/2003 | 800 | $46.35 | $37,080 | | | | |
| | 6/23/2003 | 600 | $46.22 | $27,732 | | | | |
| | 6/23/2003 | 500 | $46.76 | $23,380 | | | | |
| | 6/23/2003 | 500 | $46.75 | $23,375 | | | | |
| | 6/23/2003 | 400 | $46.31 | $18,524 | | | | |
| | 6/23/2003 | 400 | $46.24 | $18,496 | | | | |
| | 6/23/2003 | 100 | $46.28 | $4,628 | | | | |
| | 6/23/2003 | 100 | $46.25 | $4,625 | | | | |
| | 7/1/2003 | 192,534 | $48.12 | $9,264,736 | | | | |
| | 7/2/2003 | 70,800 | $48.85 | $3,458,580 | | | | |
| | | **872,500** | | **$34,107,931** | **0** | **100%** | **0** | **100%** |
| | | | | | | | | |
| **TARRIFF** | 7/27/2001 | 50,000 | $38.65 | $1,932,500 | | | | |
| | 7/30/2002 | 45,000 | $25.79 | $1,160,550 | | | | |
| | 8/13/2002 | 10,900 | $27.93 | $304,437 | | | | |
| | 8/14/2002 | 20,000 | $27.38 | $547,600 | | | | |
| | 8/15/2002 | 24,100 | $28.01 | $675,041 | | | | |
| | 1/2/2003 | 600 | $29.65 | $17,790 | | | | |
| | 1/2/2003 | 200 | $29.80 | $5,960 | | | | |
| | 1/2/2003 | 100 | $29.60 | $2,960 | | | | |
| | 1/2/2003 | 100 | $29.63 | $2,963 | | | | |
| | 1/2/2003 | 100 | $29.64 | $2,964 | | | | |

| Name | Date | Shares | Price | Proceeds | End of CP Stock Holdings | % Sold | End of CP Restricted Stock + Vested Options + Stock Holdings | % Sold |
|---|---|---|---|---|---|---|---|---|
| | 1/3/2003 | 23,900 | $29.50 | $705,050 | | | | |
| | 1/3/2003 | 4,900 | $29.34 | $143,766 | | | | |
| | 1/3/2003 | 4,400 | $29.35 | $129,140 | | | | |
| | 1/3/2003 | 700 | $29.33 | $20,531 | | | | |
| | 6/30/2003 | 40,000 | $48.33 | $1,933,200 | | | | |
| | 11/17/2003 | 70,500 | $71.76 | $5,059,080 | | | | |
| | | 295,500 | | $12,643,532 | 50,100 | 86% | 585,983 | 34% |
| **Ind. Total:** | | **1,660,785** | | **$67,387,302** | | | | |

162.    The size and timing of Defendants' insider selling was highly unusual in nature. Defendant Auerbach sold 79% of his Par common stock owned during the Class Period. Defendant O'Connor sold 96% of his Par common stock owned during the Class Period. Defendant Tarriff sold 86% of his Par common stock owned during the Class Period. Defendant Sawyer sold 100% of his Par common stock owned during the Class Period. In addition, Defendants Tariff and O'Connor, together sold more than 185,000 shares in November 2003 near the Class Period high. These sales followed Par's October 2003 third quarter earnings announcement in which Tarriff boasted, "Through only nine months, we have already established annual records for both sales and earnings."

163.    In addition, Defendants were motivated to engage in the fraudulent scheme in order to register and sell Par common stock and convertible debt during the Class Period, generating hundreds of millions of dollars in proceeds, as follows:

(a)      On September 7, 2001, Par registered for resale to the public 13,634,012 common shares held by institutional investors that had purchased shares in a private placement from Merck. When the offering became effective Par common stock was trading in a range of $33 to $34 per share generating estimated proceeds to the institutional sellers of approximately $450 to $460

million.  The offering provided much needed liquidity to the Company's shares following Merck's divestiture of its 40% interest in the Company earlier in the year.  The offering was supported by Par's false and misleading First Quarter 2001 10-Q and Second Quarter 2001 10-Q which Par has now admitted can no longer be relied upon.

(b)     In September 2003, the Company sold an aggregate principal amount of $200 million of senior subordinated convertible notes pursuant to Rule 144A.  Net proceeds from the sale of the notes was $177,945,000.  The Company obtained more favorable interest rates on the notes than would have occurred had the Company's true financial condition be known.  The note offering provided critical funding to the Company during 2003 when Par's reported accounts receivable increased by more than $100 million.

**Applicability Of Presumption Of Reliance:**
**Fraud On The Market Doctrine**

164.    At all relevant times, the market for Par's common stock was an efficient market for the following reasons, among others:

(a)     Par's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Par filed periodic public reports with the SEC and the NYSE;

(c)     Par regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Par was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their

respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

165.    As a result of the foregoing, the market for Par's common stock promptly digested current information regarding Par from all publicly-available sources and reflected such information in Par's stock price.  Under these circumstances, all purchasers of Par's common stock during the Class Period suffered similar injury through their purchase of Par's common stock at artificially inflated prices and a presumption of reliance applies.

## LOSS CAUSATION/ECONOMIC LOSS

166.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Par securities and operated as a fraud or deceit on Class Period purchasers of Par securities by misrepresenting the Company's financial results.  During the Class Period, Defendants improperly inflated Par's reported financial results and made numerous other misrepresentations as detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Par securities fell precipitously as the prior artificial inflation came out of the price of Par securities.  As a result of their purchases of Par securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

167.    By improperly reporting Par's financial results, Defendants presented a misleading picture of Par's business and financial performance.  During the Class Period, Defendants repeatedly emphasized Par's "record earnings."  These claims of "record earnings" caused and maintained the artificial inflation in the price of Par securities throughout the Class Period and until the truth was revealed to the market.

168.    Defendants' materially false and misleading statements had the intended effect and caused Par stock to trade at artificially inflated levels throughout the Class Period, trading above $70

per share during November and December 2003, following Par's reporting "the most successful quarter in the Company's history" surpassing the prior year's annual sales and earnings in just nine months for the third quarter 2003.

169.    On the last day of the Class Period, July, 2005, Par issued a press release announcing that the restatement of 2004 and 2005 results would wipe away at least $55 million in previously reported earnings due to material understatements of the Company's accounts receivable reserves.

170.    These public revelations indicated that there had been prior falsification of Par's financial results and condition and business prospects due to defendants' accounting manipulations. As investors and the market became aware that Par's prior financial results and condition and business prospects had been falsified, the prior artificial inflation came out of the price of Par securities, damaging investors.

171.    As a direct result of the news of Defendants' manipulation of Par's reported earnings and accounting reserves entering the market on July 6, 2006, the price of Par common stock declined 26% to close at $13.47 per share on volume of more than 9.0 million shares, a decline of $4.78 per share.

172.    The decline in the price of Par stock and other Par securities, as detailed above, was a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the decline in the price of Par stock and other Par securities negates any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  During the same period in which Par's stock price fell as much as 26% as a result of Defendants' fraud being revealed, the Standard & Poor's 500 securities index was flat.  The economic loss, i.e., damages, suffered by Plaintiffs and other members of the Class, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Par securities and the

subsequent significant decline in the value of Par stock and other Par securities when Defendants'
prior misrepresentations and other fraudulent conduct was revealed.

## NO SAFE HARBOR

173.    The statutory safe harbor provided for forward-looking statements under certain
circumstances does not apply to any of the allegedly false statements pleaded in this complaint.
Many of the specific statements pleaded herein were not identified as "forward-looking statements"
when made.  To the extent there were any forward-looking statements, there were no meaningful
cautionary statements identifying important factors that could cause actual results to differ materially
from those in the purportedly forward-looking statements.  Alternatively, to the extent that the
statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are
liable for those false forward-looking statements because at the time each of those forward-looking
statements was made, the particular speaker knew that the particular forward-looking statement was
false, and/or the forward-looking statement was authorized and/or approved by an executive officer
of Par who knew that those statements were false when made.

## COUNT I

**Violation of Section 10(b) of
the Exchange Act Against and Rule 10b-5
Promulgated Thereunder Against All Defendants**

174.    Plaintiff incorporates ¶¶1-174 by reference.

175.    During the Class Period, Defendants disseminated or approved the false statements
specified above, which they knew or deliberately disregarded were misleading in that they contained
misrepresentations and failed to disclose material facts necessary in order to make the statements
made, in light of the circumstances under which they were made, not misleading.

176.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)      Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Par publicly traded securities during the Class Period.

177.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Par securities.  Plaintiff and the Class would not have purchased Par securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

178.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Par securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

179.    Plaintiff incorporates ¶¶1-179 by reference.

180.    The Individual Defendants acted as controlling persons of Par within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of Par, and their ownership of Par stock, the Individual Defendants had the power and authority to cause Par to engage in the wrongful conduct complained of herein.  Par controlled each of the Individual Defendants and all of its employees.  By reason of such conduct, the Individual Defendants and Par are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated:  April 30, 2007                    **LITE DePALMA GREENBERG & RIVAS, LLC**


                                          /s/ Joseph J. DePalma
                                          _____
                                          Joseph J. DePalma
                                          Susan D. Pontoriero

                                          Two Gateway Center, 12th Floor
                                          Newark, NJ  07102-5003
                                          Telephone:  (973) 623-3000
                                          Facsimile: (973) 623-0858

                                          *Liaison Counsel for Plaintiffs*

                                          **LERACH COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP**
                                          Samuel H. Rudman
                                          Russell J. Gunyan
                                          58 South Service Road, Suite 200
                                          Melville, NY  11747
                                          Telephone:  (631) 367-7100
                                          Facsimile: (631) 367-1173

**LERACH COUGHLIN STOIA GELLER**
**RUDMAN & ROBBINS LLP**
Darren J. Robbins
Tricia L. Mccormick
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  (619) 231-1058
Facsimile: (619) 231-7423

**FEDERMAN & SHERWOOD**
William B. Federman
10205 N. Pennsylvania Avenue
Oklahoma City, OK  73120
Telephone:  (405) 235-1560
Facsimile: (405) 239-2112

*Co-Lead Counsel for Plaintiffs*

**SCHIFFRIN, BARROWAY, TOPAZ**
**& KESSLER, LLP**
Benjamin Hinerfeld
Jennifer Keeney
280 King of Prussia Road
Radnor, PA  19087
Telephone:  (610) 667-7706
Facsimile: (610) 667-7056

**MOTLEY RICE LLC**
Stuart J. Guber
Jim Evangelista
One Georgia Center
600 West Peachtree Street, Suite 800
Atlanta, GA  30308
Telephone:  (404) 201-6900
Facsimile: (404) 201-6959

**BERMAN DeVALERIO PEASE**
**TABACCO BURT & PUCILLO**
Jeffrey C. Block
Leslie R. Stern
One Liberty Square
Boston, MA  02109
Telephone:  (617) 542-8300
Facsimile: (617) 542-1194

*Lead Plaintiffs' Executive Committee*

**LAW OFFICE OF ALFRED G. YATES JR., PC**
Alfred G. Yates, Jr.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone: (412) 391-5164
Facsimile: (412) 471-1033

*Additional Attorneys for Plaintiffs*