NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                        :
**IN RE PAR PHARMACEUTICAL**            :
**SECURITIES LITIGATION**               :          Civil Action No. 06-cv-3226 (PGS)
_____ :


**OPINION**


<u>**SHERIDAN,  U.S.D.J.**</u>

Plaintiffs in this securities class action seek remedies under the Securities Exchange Act of 1934 ("the Exchange Act") for accounting fraud allegedly committed between July 23, 2001, and July 5, 2006 ("the Class Period").[1]  Plaintiffs allege that Defendant Par Pharmaceuticals ("Par") issued false and misleading statements regarding the company's financial performance and prospects and that the subsequent revelation that Par's assets, revenues, and net income were overstated and accounts receivable reserves were understated caused the value of Par's stock to drop, thus financially harming investors.  Defendants have moved to dismiss, arguing that Plaintiffs have failed to properly plead a 10(b)(5) claim pursuant to Federal Rule of Civil Procedure 9(b) and the Public Securities Litigation Reform Act ("PSLRA").  The claims in this case arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).  The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).  For the reasons set forth at length below, the Court will grant the motions to dismiss and grant Plaintiffs leave to amend the complaint within 30

---

[1]  Defendants appear to argue that the only relevant time period is that covered by Par's first restatement of its erroneous financials (2004 through 2006).

days of this Opinion and Order.

I.

Plaintiffs in this case are purchasers of Par stock who allege to have suffered damages because of the acts of Defendants.  Defendant Par is a Delaware corporation with executive offices in New Jersey.  Par manufactures and distributes generic and branded drugs in the United States. Defendant Kenneth I. Sawyer ("Sawyer") is the former Chairman of the Board, CEO, and President of Par.  He retired in July 2003.  Defendant Scott Tarriff ("Tarriff") was Par's President and CEO since September 2003.  Between January 1998 and September 2003, Tarriff was Executive Vice President.  Tarriff resigned his position as President and CEO in September 2006.  Defendant Dennis J. O'Connor ("O'Connor") was the Vice President and CFO of Par from 1996 until his resignation in March 2006.  Defendant Mark Auerbach ("Auerbach") was a Par Board Member from 1990 until September 2003 when he was appointed Executive Chairman of the Board.  Auerbach resigned in September 2006.  Defendants Sawyer, Tarriff, O'Connor, and Auerbach are collectively referred to as "the Individual Defendants."

Par manufactures and distributes various generic and branded drugs – both prescription and over-the-counter products that come in many different forms.  Par's customer base is fairly narrow, with most of its revenues coming from large drug wholesalers.[2]  In 1987, Par shares were first listed on the New York Stock Exchange.  Par's auditors were Deloitte & Touche and Arthur Anderson LLP, who had given clean audit opinions to Par throughout the Class Period.  On July 5, 2006, shortly after the appointment of a new CFO, Gerald Martino ("Martino"), Par's executives

---

[2]  Par explains that it has approximately 150 customers, but its four largest customers are Walgreens and wholesalers McKesson Drug Co. ("McKesson"), Cardinal Health, Inc. ("Cardinal"), and AmerisourceBergen ("Amerisource"), which account for between 32 and 41% of Par's revenues.

announced that, due to various "accounting errors," its financial statements from 2004 through the first quarter of 2006 were erroneous and "should no longer be relied upon." The press release indicated that the restatement would correct for "an understatement of accounts receivable reserves which resulted primarily from delays in recognizing customer credits and uncollectible customer deductions" and write-offs. The effect would be a $55 million revenue reduction, and that Par would write down $15 million in inventory.

Plaintiffs allege that the financial statements were not in accordance with Generally Accepted Accounting Procedures ("GAAP"), that Par's financial results were grossly overstated as reported, the press releases and financial statements were materially false and misleading, and that Par's internal and disclosure controls were deficient despite representations to the SEC otherwise.[3] After Par's disclosure of its accounting irregularities, its stock price dropped from $18.25 per share to $13.47 per share on heavy trading volume.[4] On July 7, 2006, the SEC informed Par that it would

---

[3] In its moving brief, Par notes that wholesalers purchase product from Par at invoice price, then resell the product to healthcare providers at a price negotiated between Par and the providers. The wholesaler submits a chargeback credit to Par for the difference. Also, customers are entitled to rebates and right of return which could result in differences between the original invoice price and Par's net selling price. Furthermore, Par indicates that it recognizes revenue for product sales when title and risk of loss pass to its customers and collectibility is reasonably assured. Par simultaneously records estimates for sales allowances (rebates, chargebacks, returns, price adjustments, etc.) with corresponding adjustments to accounts receivable allowances. Par estimates the amount of such sales allowances for which it needs to create a reserve.

[4] Par, in its moving brief, indicates that Par's stock "bounced back withing 60 days to the level it was prior to the July 5, 2006 disclosure of the need to restate" and that it "continued to climb during the interim between the announcement of a need for a restatement and the restatement itself on March 13, 2007. Furthermore, Par observes that the stock traded up on the day of the restatement and has recently reached $30 per share.

Par points out that the July 5, 2006 restatement did not mention Fiscal Year Ends 2001, 2002, or 2003, or other issues such as joint ventures or leases, and that these issues were addressed in a supplemental disclosure on December 14, 2006. Par urges that the adjustments in the December 14, 2006 disclosure are immaterial because the Class Period closes on July 5, 2006. This hearkens back to Defendants' apparent belief that the only relevant time period is

be conducting an informal investigation into the company due to its impending restatement.  Par's Audit Committee consequently engaged the law firm of Nixon Peabody to conduct an independent investigation of the events and circumstances resulting in the restatements. On September 26, 2007, Defendant Tarriff resigned as President and CEO of Par at the request of the Board.

On December 14, 2006, the Par executives released another statement indicating further unearthed irregularities and errors.  The Par Audit Committee had also found that Par's financial statements for the fiscal year ended December 31, 2003 "and prior periods" could not be relied upon.[5]  These misstatements resulted from understatement of accounts receivable reserves due to errors in the company's reserves for future product returns, chargebacks, and rebates.  Product revenues were predicted to be reduced by $84 million through April 1, 2006 – up from the $55 million reduction caused by the initial July 5, 2006 disclosure and restatement.  Plaintiffs allege that "[i]n failing to file financial statements with the SEC which conformed to GAAP, defendants repeatedly disseminated financial statements for Par that materially inflated the Company's operating performance during the Class Period."

Par does not admit that management knew of the misstatements when made, and has stated that the Audit Committee investigation conducted by Nixon Peabody found no evidence indicating that any misconduct was "anything but inadvertent."  Defendants characterize the financial irregularities in this case as nothing more than "mistakes."  Plaintiffs allege, however, that because Par concentrated its sales to just a few large wholesale customers, that Par's failure to record reserves

---

2004 through the first quarter of 2006, and not anything prior, and that any activity before 2004 was addressed only by the December 14, 2006 supplemental disclosure (which was released after the end date of Plaintiff's own proposed class period).

[5]  Whereas the initial July 5, 2006 statement covered only fiscal years 2004 and 2005 and the first quarter of 2006.

for accounts receivable from these customers was not merely a mistake.  As evidence, Plaintiffs'

complaint relies in part on the recollections of two confidential informants ("CI").

CI-1, a former accounts receivable representative, indicated that one of Par's largest

customers, Cardinal, only paid Par sporadically, and took credit for returns outside of Par's normal

procedures by taking credit for product returns before Par had approved them.  Furthermore, the

large wholesalers did not pay on a regular basis because they held large credits with Par and utilized

the credit lines instead of actually paying.

CI-2, a former Associate Director of Information Systems, had helped to create a "gross-to-

net" computer program to replace Microsoft Excel in calculating accounts receivable; Par still used

Excel at the time of CI-2's termination.  CI-2 indicated that the computer programs were accessible

and easily adjusted with no record of who changed them and why.  Usual monthly adjustments to

the numbers in these records included "price protection," which was an adjustment of aggregate sales

to guess how much revenues sales would actually produce.  CI-2's supervisors had access to and

knowledge of these types of adjustments, and allegedly reported to Defendant O'Connor.  CI-2's new

program, however, derived different numbers from the manual Excel spreadsheets; CI-2 believed

his numbers were accurate and could not reconcile his numbers with the math done in the Excel

spreadsheets, which consistently showed that Par needed to increase its accounts receivable reserves

(resulting in the Excel spreadsheets showing higher revenues than the automated gross-to-net

program).  CI-2 further believed that at the end of each quarter, Par's computer systems allowed for

modification of transaction dates.[6]  CI-2 was fired in December 2004 because his supervisors were

---

[6] Par indicated that it had to restate its financial statements in part to correct "certain
sales cut-off errors that resulted in certain receivables [and related sales] being recorded in the
wrong period" and that "[t]he accounts receivable reserves and related revenue errors resulted, in
part, from the utilization of methodologies that did not contemplate all necessary components to
estimate reserves that impacted the accuracy of recorded amounts for chargebacks, rebates,

allegedly "unhappy" with the gross-to-net application's numbers.

The complaint also relies upon the doctrine of "group pleading," which is addressed in substance later in this Opinion.  The complaint states, for example, in paragraph 18:

> It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above.  Each of the above officers of Par, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

And in paragraph 160:

> As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Par, their control over, and/or receipt and/or modification of Par's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Par, participated in the fraudulent scheme alleged herein.

---

product returns and other accounts receivable reserves."

Plaintiffs' complaint details, at length, the alleged material misstatements made in each quarter of each year during the Class Period.  A summary of these allegations is warranted:

-Second Quarter of 2001: On July 23, 2001, Sawyer issued a press release announcing Par's financial results, indicating that "a base line of results has been established for the Company in which we can overlay the expectations of products in our development pipeline as incremental growth."  On August 14, 2001, Par filed a Form 10-Q[7] with the SEC, signed by Defendants Sawyer and O'Connor confirming the financial results and indicating that the statements included "all adjustments" necessary for a "fair presentation" of the financial position.[8]

-Third Quarter of 2001: On October 25, 2001, Sawyer issued a press release announcing Par's financial results and that it was "our sixth consecutive profitable quarter" and "our most successful one ever," and that "the Company's current momentum is sustainable."  On November 13, 2001, Par filed its Form 10-Q with the SEC, signed by Defendants Sawyer and O'Connor, confirming these results and indicating that the forms included "all adjustments" necessary for a "fair presentation" of Par's financial position.  Plaintiffs allege that this information was false and

---

[7] On September 5, 2001, Merck KGaA ("Merck") sold their entire holdings of Par common stock (43% of the Company's outstanding shares) to institutional investors in a private placement.  This was converted into a public offering and filed with the SEC, with forms signed by Sawyer and O'Connor; the Prospectus incorporated, *inter alia*, this 10-Q alleged to be false and misleading.

[8] Plaintiff's complaint, Paragraph 64, alleges a list of reasons why the financial filings for this quarter were materially false and misleading.  Plaintiff cites back to Paragraph 64 after each recitation of a quarter's financial results.  The list indicates: Par overstated its financial performance because it failed to reserve for customer credits and uncollectible accounts; Par failed to timely write down the value of impaired inventory; Par's financial statements were false and misleading and violated GAAP; Par had insufficient resources and inadequate management oversight in accounting and finance; Par had inadequate design controls to ensure valid customer deductions were accurately recorded in a timely manner to properly valuate inventory; Par had inadequate controls over estimating reserves for chargebacks, rebates, product returns, and excess inventory.

misleading for the reasons set forth in Paragraph 64.

-Fourth Quarter of 2001 and Fiscal Year End: On April 1, 2002, Sawyer issued a press release stating that it had been "the most successful year in our history, having achieved record sales and earnings" and "to support our aggressive growth strategies, we have built an efficient and effective organization that is poised for continued success." Par filed its Form 10-K on the same day, signed by Defendants Sawyer, O'Connor, and Auerbach, confirming the financial results and describing company policies and procedures for sales reserves relating to price protection, shelf-stock adjustments, product returns, price rebates, and chargebacks.[9] The 10-K indicated that the financial statements were prepared in conformity with GAAP.

-First Quarter of 2002: On April 25, 2002, Sawyer issued a press release announcing Par's financial results and indicating, *inter alia*, that "we are very encouraged by the continued strength of our business across our product portfolio. Based on our performance to date, we now expect to exceed analysts' current consensus earnings estimates for the second quarter." On May 15, 2002, Par filed its Form 10-Q with the SEC, signed by Defendants Sawyer and O'Connor, confirming the financial results. The form indicated that it included "all adjustments" necessary for a "fair presentation" of the financial position of Par.

-Second Quarter of 2002: On July 25, 2002, Sawyer issued a press release indicating Par's financial results and stating, *inter alia*, that "our business continues to perform well across the board. As a result, we now expect to exceed analysts' current consensus earnings estimates for the third

---

[9] Chargebacks are credits issued to wholesalers for the difference between Par's invoice price and the contract price through which the wholesaler resells the product; customer rebates are simply price breaks that are used as an incentive for customers to carry Par's products; shelf stock adjustments occur when Par "lowers its invoice pricing and provides the customer with a credit for the difference between the old and new invoice prices for the inventory the customer has on had at the time of the price adjustment." (Compl. ¶ 122).

quarter and for the full year of 2002."  On August 14, 2002, Par filed a Form 10-Q with the SEC, signed by Defendants Sawyer and O'Connor, confirming the financial results.  The form indicated that the financials included "all adjustments" necessary for "fair presentation" of the financial position.  Also included was a Sarbanes-Oxley ("SOX") certification signed by Defendants Sawyer and O'Connor.

-Third Quarter of 2002: On October 24, 2002, Sawyer issued a press release announcing Par's financial results and indicating, *inter alia*, that "this quarter was perhaps our Company's finest, as our base business grew substantially" due to "the substantial growth of our core product portfolio."  On November 14, 2002, Par filed its form 10-Q with the SEC, signed by Defendants Sawyer and O'Connor, confirming the financial results.  The 10-Q indicated that the financials included "all adjustments" necessary for a "fair presentation" of Par's financial position.  The 10-Q also included a SOX certification signed by Defendants Sawyer and O'Connor.

-Fourth Quarter of 2002 and Fiscal Year End: On February 27, 2003, Sawyer issued a press release announcing Par's financial results and indicating, *inter alia*, that "we have exceeded all earnings estimates for both the quarter and the year" and that "we are confident that [Par's] best days are yet to come."  On March 28, 2003, Par filed its Form 10-K with the SEC, signed by Defendants Sawyer, O'Connor, and Auerbach, confirming the financial results and describing Par's accounting policies and procedures as aforementioned.  The 10-K indicated that the financials were prepared in accordance with GAAP, and included a SOX certification signed by Defendants Sawyer and O'Connor.  Plaintiff alleges the financial statements were false and misleading for the reasons set forth in Paragraph 64 and because Par overstated its net sales, net income, and working capital.

-First Quarter of 2003: On April 23, 2003, Sawyer issued a press release announcing Par's financial results, indicating, *inter alia*, "[w]e are off to a great start in 2003 and we currently believe

this year will be our most successful ever.  Our impressive firs-quarter performance reflects the continuing strength of our base business . . . .  Importantly, we were able to achieve these exceptional financial results while continuing to invest heavily in research and development."  On May 14, 2003, Par filed its form 10-Q with the SEC, signed by Defendants Sawyer and O'Connor, confirming the financial results and describing Par's accounting policies and procedures.  The 10-Q indicated that the financials included "all adjustments" necessary for a "fair presentation" of Par's financial position, and included a SOX certification signed by Defendants Sawyer and O'Connor.

-Second Quarter of 2003: On July 24, 2003, Tarriff issued a press release announcing Par's financial results and indicated, *inter alia*, that "[w]e are well on our way toward achieving the most successful year in our Company's history" due to "explosive growth in revenues" and "we now expect to exceed analysts' current consensus earnings estimates for the third quarter and for the full year of 2002."  On August 11, 2003, Par filed its Form 10-Q with the SEC, signed by Defendants Tarriff and O'Connor, confirming the financial results and describing Par's accounting policies and procedures.  The 10-Q indicated that "all adjustments" necessary for a "fair presentation" of the financials had been made, and included a SOX certification signed by Defendants Tarriff and O'Connor.

-Third Quarter of 2003: On October 23, 2003, Tarriff issued a press release announcing Par's financial results, and indicating, *inter alia*, that "we have achieved the most successful quarter in our Company's history" and "we have already established annual records for both sales and earnings, ensuring a third consecutive record year for our Company."  On November 12, 2003, Par filed its Form 10-Q, signed by Defendants Tarriff and O'Connor, confirming the financial results and explaining Par's accounting policies and procedures.  The 10-Q indicated that "all adjustments" necessary for a "fair presentation" of the financials had been made, and included a SOX certification

signed by Defendants Tarriff and O'Connor.

-Fourth Quarter of 2003 and Fiscal Year End: On February 26, 2004, Tarriff issued a press release announcing Par's financial results, indicating, *inter alia*, that "2003 represented our Company's third consecutive record year of sales and earnings growth" and that "[w]e fully expect our growth to continue."  On March 15, 2004, Par filed its Form 10-K with the SEC, which was signed by Defendants Tarriff, O'Connor, and Auerbach, confirming the financial results and describing Par's accounting policies and procedures.  The 10-K represented that the financials were prepared in accordance with GAAP, and included a SOX certification signed by Defendants Tarriff and O'Connor.  Plaintiff alleges the financial statements were false and misleading for the reasons set forth in Paragraph 64 and because Par overstated its net sales, net income, and working capital.

-First Quarter of 2004: On April 29, 2004, Tarriff issued a press release announcing Par's financial results and indicating, *inter alia*, that "our Company has never been stronger."  On May 14, 2004, Par filed its Form 10-Q with the SEC, signed by Defendants Tarriff and O'Connor, confirming the financial results and describing Par's accounting policies and procedures.  The 10-Q indicated that "all adjustments" necessary for a "fair presentation" had been made, and included a SOX certification signed by Defendants Tarriff and O'Connor.

-Second Quarter of 2004: On July 28, 2004, Tarriff issued a press release announcing Par's financial results and indicating, *inter alia*, that "Par's second quarter benefitted from the strong performance of our base business and new product introductions" and that "our company has simply never been stronger."  On August 13, 2004, Par filed its Form 10-Q with the SEC, signed by Defendants Tarriff and O'Connor, confirming the financial results and describing Par's accounting policies and procedures.  The 10-Q indicated that "all adjustments" necessary for a "fair presentation" had been made, and included a SOX certification signed by Defendants Tarriff and

O'Connor.

-Third Quarter of 2004: On October 24, 2004, Tarriff issued a press release announcing Par's financial results and indicating, *inter alia*, "our base business growth was impressive" and that an increased investment in research and development "demonstrates our commitment to building a company that can sustain growth for years to come." On November 12, 2004, Par filed its Form 10-Q with the SEC, signed by Defendants Tarriff and O'Connor, confirming the financial results and describing Par's accounting policies and procedures. The 10-Q indicated that "all adjustments" necessary for a "fair presentation" had been made, and included a SOX certification signed by Defendants Tarriff and O'Connor.

-Fourth Quarter of 2004 and Fiscal Year End: On February 24, 2005, Tarriff issued a press release announcing Par's financial results, and stating, *inter alia*, that "our company has never been stronger or better positioned for sustainable growth" and "we are comfortable with the current consensus earnings estimate for 2005." On March 16, 2005, Par filed its Form 10-K with the SEC, signed by Defendants Tarriff, O'Connor, and Auerbach, confirming the financial results and describing Par's accounting policies and procedures. The 10-K represented that the financials were prepared in accordance with GAAP, and contained a SOX certification signed by Defendants Tarriff and O'Connor. Plaintiff alleges the financial statements were false and misleading for the reasons set forth in Paragraph 64 and because Par overstated its net sales, net income, and working capital.

-First Quarter of 2005: On April 28, 2005, Tarriff issued a press release announcing Par's financial results and indicated, *inter alia*, that "[w]e can now look forward to acceleration in earnings beginning in the second quarter." On May 13, 2005, Par filed its Form 10-Q with the SEC, signed by Defendants Tarriff and O'Connor, confirming the financial results and describing Par's accounting policies and procedures. The 10-Q represented that "all adjustments" necessary for a

"fair presentation" had been made, and included a SOX certification signed by Defendants Tarriff and O'Connor.

     -Second Quarter of 2005: On July 28, 2005, Tarriff issued a press release announcing Par's financial results, and indicating, *inter alia*, that "while the quarter's results reflect [a significant investment to build a branded pharmaceutical business], the improved performance of our generic business should not be overlooked . . . we believe that the dilutive impact of building our new branded business is now behind us."  On August 12, 2005, Par filed its form 10-Q with the SEC, signed by Defendants Tarriff and O'Connor, confirming the financial results and explaining Par's accounting policies and procedures.  The 10-Q indicated that "all adjustments" necessary for a "fair presentation" had been made, and included a SOX certification signed by Defendants Tarriff and O'Connor.

     -Third Quarter of 2005: On October 27, 2005, Tarriff issued a press release announcing Par's financial results, and indicated, *inter alia*, that "[w]e believe that [a new product launch] will ultimately be viewed as the transforming event that established Par as a successful specialty pharmaceutical company."  On November 15, 2005, Par filed its Form 10-Q with the SEC, signed by Defendants Tarriff and O'Connor, confirming the financial results and describing Par's accounting policies and procedures.  The 10-Q indicated that "all adjustments" necessary for a "fair presentation" had been made, and included a SOX certification signed by Defendants Tarriff and O'Connor.

     -Fourth Quarter of 2005 and Fiscal Year End: On February 28, 2006, Tarriff issued a press release announcing Par's financial results and stating, *inter alia*, that [o]ur results also reflect strategic actions taken in preparing for a significantly improved financial performance in 2006.  This year, we look forward to rapid expansion in sales, while growth in spending moderates."  On March

15, 2006, Par filed its Form 10-K with the SEC, signed by Defendants Tarriff, O'Connor, and Auerbach, confirming the financial results and describing Par's accounting policies and procedures. The 10-K represented that the financials had been prepared in accordance with GAAP, and included a SOX certification signed by Defendants Tarriff and O'Connor.  Plaintiff alleges the financial statements were false and misleading for the reasons set forth in Paragraph 64 and because Par overstated its net sales and working capital and understated its net loss.

-First Quarter of 2006: On May 1, 2006, Tarriff issued a press release announcing Par's financial results, and indicating, *inter alia*, that "Par significantly improved its financial performance despite the continued investment necessary to build its branded pharmaceutical organization and its first brand.  This investment diluted Par's first-quarter earnings by almost $9 million, or $.16 a share. However, as sales of [Par's branded drug product] grow and we add additional products, the dilution will diminish and the investment will be rewarded."  On May 12, 2006, Par filed its Form 10-Q with the SEC, signed by Defendant Tarriff, confirming the financial results and describing Par's accounting policies and procedures.  The 10-Q indicated that "all adjustments" necessary for a "fair presentation" had been made, and included a SOX certification signed by Defendant Tarriff. Plaintiff alleges the financial statements were false and misleading for the reasons set forth in Paragraph 64.

Plaintiffs further allege that the statements made in the Class Period SEC filings, certified to by Defendants Tarriff and O'Connor regarding the adequacy of Par's internal disclosure controls and Par's internal control over financial reporting, were materially false and misleading when made. Par claims to have taken various measures to remediate the weaknesses in internal controls deficiencies.

With regard to scienter, Plaintiffs allege that Defendants knew that the public documents and statements issued in Par's name were materially false or misleading, knew that the documents would be issued to the public, and knowingly participated in or acquiesced in the issuance of such false and misleading statements.  Plaintiffs argue that Defendants, "by virtue of their receipt of information reflecting the true facts regarding Par, their control over, and/or receipt and/or modification of Par's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Par, participated in the fraudulent scheme alleged herein."  Plaintiffs also point to a motivation on the part of the Individual Defendants to engage in the alleged scheme so they could sell their personal Par securities for millions of dollars in proceeds.  Indeed, Auerbach, Gutman O'Connor, Sawyer, and Tarriff sold most, if not all, of their Par shares during the Class Period.[10]  Plaintiffs further allege that the Defendants had motivation to register and sell Par stock and convertible debt during the Class Period in order to generate hundreds of millions of dollars.[11]

II.

On a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), the

---

[10]  Defendants argue, as noted above, that because any activity occurring prior to 2004 was only addressed in the December 14, 2006 supplemental disclosure, and because the supplemental disclosure was released after the closing of the Class Period, the Individual Defendants' stock sales are immaterial because they all took place prior to 2004.  Defendants further argue that the Individual Defendants *purchased* Par stock during the class period, which negates the alleged scienter created by their stock sales. (Edlin Decl. Ex. R and S).

[11]  Plaintiffs also seem to point to the following facts as proof of scienter:   The Audit Committee hired independent counsel to investigate Par's reporting; the Audit Committee investigated around the time O'Connor resigned; the errors were discovered after Martino's appointment as CFO and the hiring of new accounting staff; Par restated financial statement line items and admitted its operating results were materially inflated prior to and during the Class Period; numerous deficiencies in internal control systems during the Class Period; Par's board requested Tarriff resign after errors were found; Par is now being investigated by the SEC.

Court is required to accept as true all allegations in the Complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir.1994). A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. *See In re Warfarin Sodium*, 214 F.3d 395, 397-98 (3d Cir.2000). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Semerenko v. Cendant Corp*., 223 F.3d 165, 173 (3d Cir.), *cert. denied, Forbes v. Semerenko*, 531 U.S. 1149, 121 S.Ct. 1091 (2001). While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3d Cir.1997). "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.' " *Kost v. Kozakewicz*, 1 F.3d 176, 183 (3d Cir.1993) (quoting 5A Wright & Miller, Fed. Practice & Procedure: Civil 2d § 1357 at 340).  The Supreme Court has recently held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, . . . .  Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact), . . . ."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (internal citations and quotations omitted).

In a case asserting a Section 10(b) and Rule 10b-5 violation, a plaintiff must plead:

"(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a

connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities market (fraud-on-the-market cases) as 'transaction causation'; (5) economic loss; and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir.2006) (*quoting Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005)).   As a Rule 10b-5 claim is a claim for fraud, a plaintiff must satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b), *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1996), which requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."   To satisfy Rule 9(b) in a Rule 10b-5 claim, a plaintiff must plead with particularity: "(1) a specific misrepresentation of material fact; (2) the knowledge by defendants of its falsity; (3) the ignorance by the plaintiff of its falsity; (4) the intention of defendants that it should be acted upon; and (5) that plaintiff acted upon it to his detriment." *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 935 (D.N.J. 1998).   Consequently, the pleadings must be more specific under Rule 9(b) to establish a violation of Section 10(b) and Rule 10b-5; as such, allegations of misrepresentations of material facts must be pleaded in greater detail, *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d at 935, and plaintiffs must specify "'the who, what, when where, and how: the first paragraph of any newspaper story.'" *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999) (citations omitted).

The PSLRA "requires any securities fraud claim brought under the 1934 Act to specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp*, 394 F.3d 126, 144 (3d Cir. 2004) (citing 15 U.S.C. §

78u-4(b)(1)). If this requirement is not met, "the court shall…dismiss the complaint." 15 U.S.C. §

78u-4(b)(3)(A).  Furthermore, "Plaintiff must prove that the defendants acted with a particular state

of mind.  This requires that 'the complaint shall, with respect to each act or omission alleged . . .

state with particularity the facts giving rise to a strong inference that the defendant acted with the

required state of mind.'" *Israeli v. Team Telecom Int'l, Ltd.*, No. 04-4305, 2006 U.S. Dist. LEXIS

73552, at *12 (D.N.J. Oct. 6, 2006) (quoting 15 U.S.C. § 78u-4(b)(2)).  Also, the PSLRA mandates

that in Rule 10b-5 actions, the Plaintiff must establish a strong inference of scienter by stating either

"(1) facts which show that defendants had both motive and opportunity to commit fraud"; or (2) "by

setting forth facts that constitute circumstantial evidence of either recklessness or conscious

behavior."  *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 534-35.  Plaintiff must "specify each

statement alleged to have been misleading, the reason or reasons why the statement is misleading,

and, if an allegation regarding the statement or omission is made on information and belief, the

complaint shall state with particularity the facts on which that belief is formed."  15 U.S.C. § 78u-

4(b)(1).

Rule 9(b) and the PSLRA impose independent, threshold pleading requirements that, if not

met, support dismissal apart from Rule 12(b)(6).  *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311

F.3d 198, 224 (3d Cir. 2002).  Thus, the Third Circuit has acknowledged that a complaint could pass

muster under the traditional Rule 12(b)(6) analysis and still fail on Rule 9(b) grounds.  *In re

Burlington*, 114 F.3d at 1424.

*a.  Group Pleading and Scienter*

This Court has previously held that "group pleading" "is contrary to the congressional intent

behind the PSLRA.  It is a method where plaintiffs could name corporate officers as individual

defendants without pleading the particulars of their participation in the preparation and dissemination

of corporate statements." *In re Bio-Technology Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 583 (D.N.J. 2005).  While it is true that "the Third Circuit has not expressly determined whether group pleading has survived enactment of the PSLRA . . . the prevailing authority within this District counsels that group pleading has been abolished." *Id.* at 584.  Thus, this Court acknowledges that group pleadings cannot be sustained, and allegations solely based on group pleading cannot establish a strong inference of scienter.  *See Payne v. DeLucoa*, 433 F. Supp. 2d 547, 569-70 (W.D. Pa. 2006).

Here, contrary to Plaintiffs' denial of same in its opposition brief, the complaint plainly states that it relies upon the doctrine of group pleading.  In paragraph 18, the complaint states:

> It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above.  Each of the above officers of Par, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

This Court has previously held that "generalized claims that each individual defendant, 'by virtue of his high-level position with the Company, directly participated in the management of the Company' or 'was privy to confidential proprietary information concerning the Company' are not sufficient to give rise to a strong inference that he acted with the required state of mind." *Israeli*, 2006 U.S. Dist. LEXIS 73552, at *15 (quoting *Payne*, 433 F. Supp. 2d at 570).  Each individual's

participation and scienter must be pled separately and with particularity. Plaintiffs' reliance on group pleading is insufficient as a matter of law, and the complaint is insufficiently pled to the extent it relies on group pleading. Thus, the Court will dismiss the complaint as to the Defendants whose only connection to the allegations in the complaint arise from the group pleading doctrine. *See Winer Family Trust v. Queen*, 503 F.3d 319, 337 (3d Cir. Pa. 2007).

Here, at very least, Defendant Martino is only connected to the allegations of misstatements by the group pleading doctrine. Martino was hired as Par's new CFO shortly before the July 5, 2006 press release regarding the restatement. The alleged mistakes were discovered shortly after Martino became CFO. These are the only facts alleged against Martino; Plaintiffs do not even attempt to allege specific facts to show scienter on the part of the new CFO. It is apparent that the Plaintiffs are using the generalization that Martino participated in the management of the company and was privy to sensitive information because of his high-level position at Par. As noted above, this is not enough standing on its own, and it is all that is offered with regard to Martino. "Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact), . . . ." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (internal citations and quotations omitted). Plaintiffs have not satisfied this burden, and thus, the complaint fails to adequately state a claim against Martino.

As to the other Individual Defendants, Plaintiffs' complaint is insufficient to the extent that it relies on group pleading and generalized allegations of knowledge or participation based on a Defendant's position at the company and the like. Thus, the allegations in paragraphs 17, 20, 21, and 22 of the complaint are insufficient to provide evidence of scienter as to all of the Individual Defendants.

b. *Allegations as to the Individual Defendants*

Plaintiffs may "still allege upon information and belief that an individual defendant is liable for a misleading statement made in a group published document if the complaint states with particularity all facts on which the belief that the statement was made by the individual defendant is based." *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 413 F. Supp. 2d 378, 395 (E.D. Pa. 2005) (citing 15 U.S.C. § 78u-4(b)(1)).

Like the *Israeli* case, Plaintiffs here have a separate section in the complaint labeled "Additional Scienter Allegations." Paragraph 160 states:

> As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Par, their control over, and/or receipt and/or modification of Par's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Par, participated in the fraudulent scheme alleged herein.

This paragraph, as stated, is also insufficient for the reasons noted above. These "additional scienter allegations" are more examples of group pleading and inadequate broad brush statements. The complaint simply offers insufficient detail of pleading to corroborate these allegations with one or more of the Defendants.

Furthermore, Plaintiffs, in their opposition brief at page 27, citing *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 508 (W.D. Pa. 2002), concede that "blanket allegations of weak internal controls do not alone suffice as basis for inference of scienter." Such deficiencies, however, would

be "probative" of scienter if coupled with allegations showing knowledge of weakness or problems in internal controls." (Pl. Opp. Brief at p. 27, citing *Rent-Way*, 209 F. Supp. 2d at 508). However, the two bases that Plaintiffs' utilize to argue Defendants' knowledge of the internal control deficiencies are the SOX certifications and the CI's. As noted below, neither of these arguments is sufficient in this case to infer knowledge on the part of the Defendants of the weak internal financial controls at Par.

Nonetheless, in paragraph 161, Plaintiffs allege that "Defendants were further motivated to engage in the fraudulent scheme in order for company insiders, including the Individual Defendants, to sell hundreds of thousands of their personally-held Par securities and reap millions of dollars in proceeds." These and other specific allegations against each Individual Defendant, are worth analyzing.

The specific individual allegations fall into five categories: corporate officer resignations; corporate officer stock sales; confidential information allegations of knowledge of wrongdoing; corporate officer signing of SEC forms and/or SOX certifications; and GAAP violations.

The Court finds the complaint insufficient on these bases for the following reasons. The Third Circuit has generally found "resignations of key officers to be insufficient to show that they acted with the requisite scienter to commit the alleged fraud. See, e.g. In re The Great Atl. & Pac. Tea Co., Inc. Sec. Litig., 103 Fed. Appx. 465 (3d Cir. 2004) (marked non-precedential) (declining to find that the allegation that nine employees were fired as a result of accounting irregularities supported a strong inference of scienter); n10 Abrams v. Baker Hughes Inc., 292 F.3d 424, 434 (5th Cir. 2002) (finding that resignations, without additional evidence that accounting irregularities were the reason for the resignations, do not have "any scienter implications")." *In re Interpool, Inc. Sec. Litig.*, No. 04-321, 2005 U.S. Dist. LEXIS 18112, at *55 (D.N.J. Aug. 16, 2005). "This Court . . .

may not infer scienter unless it is satisfied that the Defendants acted with reckless or conscious behavior." *Id.* Plaintiffs' complaint does not satisfy these requirements with regard to any of the Individual Defendants. Further, there was no evidence of "extraordinary corporate punishment measure" applied to any of the Individual Defendants as is required by other case law in this circuit. *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 348 (D.N.J. 2007).

The Third Circuit has also held that it "will not infer fraudulent intent from the mere fact that some officers sold stock," but sales of company stock by insiders that are "unusual in scope or timing . . . may support an inference of scienter." *In re Advanta*, 180 F.3d at 540. Plaintiffs' complaint offers none of the requisite contextual evidence needed to properly frame the argument that the stock sales here were "unusual in scope or timing" in accordance with Third Circuit standards.[12]

Furthermore, the connection between O'Connor and CI-2 is tenuous at best (with no evidence of corroboration or CI-2's reliability), and there appears to be no connection at all between Tarriff and CI-1 or CI-2. The Third Circuit has held that a complaint reliant on confidential sources can satisfy the particularity pleading requirements of Rule 9(b) and the PSLRA by providing "sufficient documentary evidence and/or a sufficient description of the personal sources of the plaintiff's beliefs." *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004) ("CALPERS"). Plaintiffs have not satisfied this standard.

Plaintiffs' argument as to the SEC and SOX forms amounts to nothing more than group pleading. With regard to the SOX certifications, Plaintiffs provide no proof that any of the Individual Defendants "had clear reasons to doubt the validity of financials being certified but kept turning their blind eye to all 'red flags.'" *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 288

---

[12]   Factors to consider include whether the sales were "normal and routine," and whether the profits were substantial relative to the seller's ordinary compensation. *In re Burlington*, 114 F.3d at 1423.

(D.N.J. 2007).  As to the other SEC filings, the law in this circuit dictates that

> if the complaint merely alleges that the issuer knew that certain
> accounting entries were recorded in a specific manner, such
> allegations should not be read as allegations that the issuer knew that
> the procedures used violated the general accounting principles, even
> if each of the issuer's financial disclosures contained boilerplate
> language that the procedures used in the reports conformed with the
> principles, because a securities plaintiff cannot merely point to a
> boilerplate language as proof that the issuer's officers acted with
> fraudulent intent. See The Great Atl. & Pac. Tea, 103 Fed. Appx. at
> 470.

*Id.* at 358.  Plaintiffs' complaint does not satisfy the standard announced in *Intelligroup*.

Lastly, with regard to the alleged GAAP violations, "[a]llegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim."  *In re Milestone Sci. Sec. Litig.*, 103 F. Supp. 2d 425, 472 (D.N.J. 2000) (internal citations omitted).  "To support even a reasonable inference of scienter, however, the complaint must describe the violation with sufficient particularity; a general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation."  *Id.* (citations omitted).  More specifically, "[w]hile violations of GAAP standards may provide evidence of scienter, the Complaint must describe the violations with sufficient particularity, e.g., the approximate amount by which revenues and earnings were overstated, the transactions involved, the identities of customers or employees involved in the transactions."  *Israeli*, 2006 U.S. Dist. LEXIS 73552, at *20.  Here, while the Plaintiffs cited many specific provisions of GAAP they allege to be violated, and state the amounts by which the financial statements were misstated, they fail to specifically identify the transactions involved.[13]

---

[13]  The Court acknowledges Plaintiffs' reference to CI-1 in paragraphs 47 through 49 of the complaint which deals with specific customers.  Plaintiffs set forth the testimony of CI-1, who indicates that Par's three biggest customers, Cardinal, McKesson, and Amerisource, made only "sporadic" payments to Par because they had credits "ranging in individual amounts from

Furthermore, even if there were GAAP violations present and sufficiently pled, as described at length above, the Plaintiffs offer insufficient additional evidence of the necessary "corresponding intent" of the Individual Defendants – i.e., the scienter requirement – to state a securities fraud claim. "While it is true that a violation of GAAP will generally not be sufficient to establish fraud, when combined with other circumstances suggesting fraudulent intent, allegations of improper accounting may support a strong inference of scienter." *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 608 (D.N.J. 2001). Plaintiffs fail to plead the requisite "other circumstances" necessary to accompany an allegation of GAAP violations.

In conclusion, because the Plaintiffs have failed to adequately plead scienter pursuant to Rule 9(b) and the PSLRA, the Defendants' motion to dismiss will be granted, and the complaint will be dismissed with leave to re-file. The Court need not address the various remaining arguments, including loss causation and the status of statements in the press releases, their materiality and affect on the market, and their truth or falsity. Since Plaintiffs have failed to adequately plead a material element of their claim (scienter), the complaint will be dismissed without regard to these other arguments. The Court, however, would consider these arguments in any future motions.

III.

Plaintiffs' Section 20(a) claim against the Individual Defendants is based on the underlying violation of Section 10(b). A corporate officer or director can be liable under Section 20(a) for exercising control over a corporation that has committed securities fraud. *In re Mobile Media Sec.*

---

hundreds of thousands to millions of dollars." CI-1 further indicated that Cardinal "took credit for some returns before Par had approved them" and that the three largest customers rarely paid Par, but "simply utilized their available credits to satisfy their obligations for products purchased from Par." These general references, however, lack specificity as to the actual transactions involved and who worked on those transactions other than CI-1. Furthermore, because Plaintiffs allege such massive accounting improprieties, it is clear that there must have been many large transactions that Plaintiffs could point to in order to more clearly allege GAAP violations.

*Litig.*, 28 F.Supp.2d 901, 940 (D.N.J. 1998). The Court, however, need not address these arguments. Plaintiffs' Section 10(b) claim, necessary as a base of Section 20(a) status, is dismissed, and thus Plaintiffs' Section 20(a) claim must be dismissed with leave to re-file. *In re Cendant Corp. Sec. Litig.*, 76 F.Supp.2d 539, 549 (D.N.J. 1999); *See also Gunter v. Ridgewood Energy Corp.*, 32 F.Supp.2d 166, 178-79 (D.N.J.1998); *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 279 (3d Cir.1992); *Kennilworth Partners L.P. v. Cendant Corp.*, 59 F.Supp.2d 417, 430 (D.N.J.1999).

IV.

Federal Rule of Civil Procedure 15(a) provides that "leave to amend shall be freely given when justice so requires." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." *Id.* Here, Plaintiffs have not acted in bad faith nor have they acted in an effort to prolong litigation. Furthermore, Defendants will not be unduly prejudiced by an amendment. Finally, this Court cannot make the conclusion, based upon the facts before it, that an amendment as to these Defendants would be futile.

Therefore, if Plaintiffs so choose, the Court will permit Plaintiffs to file a Second Amended Complaint, abandoning its group pleading, and adequately pleading the scienter of the Defendants. The individual allegations as listed above against each Individual Defendant (particularly with regard to the confidential informants) are not adequately pled in their present state to amount to scienter. The Plaintiffs are therefore given leave to amend the complaint within 30 days to adequately plead scienter.

V.

Par, Sawyer, O'Connor, Tarriff, and Auerbach's motions to dismiss are granted. The complaint is hereby dismissed without prejudice with leave to re-file no later than 30 days from the

date of this Opinion and Order.  The Court need not substantively address the Tarriff Motion to

Dismiss because this Opinion and Order equally applies to the Tarriff Motion.


_s/Peter G. Sheridan_____
PETER G. SHERIDAN, U.S.D.J.

June 24, 2008