# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

*DOCUMENT ELECTRONICALLY FILED*

In Re: PAR PHARMACEUTICAL
SECURITIES LITIGATION

This Document Relates To:
ALL ACTIONS.

**Master File No:**
**2:06-cv-03226 (PGS - ES)**

**CLASS ACTION**

## MEMORANDUM OF LAW IN SUPPORT
## OF DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFFS'
## SECOND CONSOLIDATED AMENDED COMPLAINT

**GREENBERG TRAURIG, LLP**
Eric S. Aronson
200 Park Avenue, P. O. Box 677
Florham Park, New Jersey 07932-0677
Telephone: (973) 360-7900
Facsimile: (973) 301-8410

**GREENBERG TRAURIG, LLP**
Richard A. Edlin (admitted in NJ)
Ronald D. Lefton (admitted *pro hac*)
Toby S. Soli (admitted *pro hac*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400

*Attorneys for Defendants Par Pharmaceutical Companies, Inc.,*
*Kenneth Sawyer, and Dennis J. O'Connor*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

FACTUAL BACKGROUND ................................................................. 2

ARGUMENT ................................................................. 3

I.     Plaintiffs Failed To Adequately Plead Scienter ............................................. 3

     A.     Plaintiffs Improperly Rely Upon Group Pleading................................ 5

     B.     The "New" Allegations of Stock Sales Are
           Insufficient ........................................................................... 6

     C.     The Confidential Informants Do Not Create A
           Cogent Inference of Scienter ............................................... 10

           1.     *CI 1, CI 2, And CI 3 Do Not Allege Facts That*
               *Support An Inference That Defendants "Manipulat[ed]*
               *Par's Reported Revenues And Accounts Receivable*
               *Reserves* ...................................................................... 13

               a.     *The CIs Have No Personal Knowledge* ......................... 14

               b.     *The Alleged "Daily Reports" Do Not*
                   *Create An Inference of Scienter* ...................................... 19

           2.     *CI 4- CI 8 Do Not Allege Facts That Support An*
               *Inference That "Defendant's Knowing[ly]Fail[ed] to*
               *Write-Off Obsolescent Inventories"* ........................................... 22

II.     Plaintiffs Have Failed to Plead Loss Causation............................................. 27

III.     Many Of The Alleged Misstatements Are True, Mere Puffery, Or
       Protected Forward Looking Statements......................................................... 29

i

IV.   Plaintiffs Have Failed to Allege Violations Of Section 20(a) Of
      The Exchange Act Against The Individual Defendants ............................... 31

CONCLUSION ....................................................................................................... 32

## TABLE OF AUTHORITIES

Federal Cases

*Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.,*
   394 F.3d 126 (3d Cir. 2004)...................................................................... 10, 11, 20

*City of Brockton Retirement Sys. v. The Shaw Group, In*c.,
   540 F. Supp. 2d 464 (S.D.N.Y. 2008) ................................................................ 14

*Dura Pharm., Inc. v. Broudo,*
   544 U.S. 336 (2005)............................................................................................ 27

*Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc.,*
   343 F.3d 189 (2d Cir. 2003)................................................................................ 27

*Globis Capital Partners, L.P. v. Stonepath Group, Inc.,*
   No. 06-2560, 2007 WL 1977236 (3d Cir. July 10, 2007) ..................................... 3

*Higginbotham v. Baxter Int'l Inc.,*
   495 F.3d 753 (7th Cir. 2007) .......................................................................... 3, 10

*Israeli v. Team Telecome Int'l, Ltd.,*
   No. 04-4305, 2006 U.S. Dist. LEXIS 73552 (D.N.J. Oct. 6, 2006) ................. 4, 5

*In re Advanta Corp. Sec. Litig.,*
   180 F.3d 534 (3d. Cir. 1999)................................................................................. 4

*In re Astea Intern. Inc. Sec. Litig.,*
   No. 06-1467, 2007 WL 2306586 (E.D. Pa. Aug. 9, 2007)..................................... 7

*In re Cybershop.com Sec. Litig.,*
   189 F.Supp.2d 214 (D.N.J. 2002)........................................................................ 31

*In re Intelligroup Sec. Litig.,*
   468 F. Supp. 2d 670 (D.N.J. 2006)...................................................................... 27

*In re NAHC, Inc. Sec. Litig.,*
   306 F.3d 1314 (3d Cir. 2002)................................................................................. 2

iii

*In re Party City Sec. Litig.*,
    147 F. Supp. 2d 282 (D.N.J. 2001) ....................................................... 31

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir.2001)................................................................... 20

*Key Equity Investors, Inc. v. Sel-Leb Marketing, Inc.*,
    No. 06-1052, 2007 WL 2510385 (3d Cir. Sept. 6, 2007) ...................... 3

*Semerenko v. Cendant Corp.*,
    223 F.3d 165 (3d Cir. 2000)................................................................ 27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    __ U.S. __, 127 S. Ct. 2499 (2007)................................................... 3, 4

*Tripp v. Indymac Financial, Inc.*,
    No. CV07-1635- GW (VBKx), 2007 WL 4591930 (C.D. Cal. Nov. 29, 2007) ... 7

*Winer Family Trust v. Queen*,
    503 F. 3d 319 (3d Cir. 2007)......................................................... 3, 5, 6

Federal Statutes

15 U.S.C. § 78t(a)................................................................................ 31

15 U.S.C. § 78u-4(b)(1)......................................................................... 4

15 U.S.C. § 78u-4(b)(2)......................................................................... 4

# **PRELIMINARY STATEMENT**

This Court dismissed the Lead Plaintiffs' Consolidated Amended Complaint (the "First Complaint") because plaintiffs failed to adequately plead scienter pursuant to Rule 9(b) and the PSLRA. Lead Plaintiffs' Second Consolidated Amended Complaint ("Second Complaint") fails for the same reasons, and should be dismissed, with prejudice. Specifically, Plaintiffs ignore this Court's June 24, 2008 decision (the "Decision") [Doc. 132], and continue to rely on group pleading to establish scienter. They made no changes to the allegations regarding the signing of SEC forms, SOX certifications, GAAP or internal control violations. Thus, what was insufficient before remains insufficient.

Instead, Plaintiffs merely dressed up their First Complaint by adding allegations regarding corporate officer stock sales, and new confidential informants. As before, the "new" allegations remain entirely conclusory. Plaintiffs do not add "the requisite contextual evidence needed to properly frame the argument that the stock sales here were 'unusual in scope or timing' in accordance with Third Circuit standards," to address this Court's specific concerns. [Doc. 132, p. 23.] The new confidential informants have no relevant personal knowledge, and plaintiffs make no connection between the information provided by the confidential informants and the alleged fraud. Simply stated, neither the

stock sales nor the informants provide any facts or circumstances that support an inference of scienter.

The Second Complaint also entirely ignores the Court's prior decision by continuing to ignore damages and loss causation – fatal flaws in and of themselves – and the fact that many of the alleged misstatements are true, mere puffery, or protected forward-looking statements. Thus, the Second Complaint is as deficient as the First, and should be dismissed *with prejudice* for the reasons set forth previously and below.

## **FACTUAL BACKGROUND**

A detailed recitation of the relevant facts was provided in Par's first motion to dismiss, and was included in this Court's June 24th Decision. [Doc. 132.] Par incorporates those facts by reference.[1]

---

[1]    A black-line comparing the First Complaint to the Second Complaint is attached as Exhibit A to the Declaration of Richard Edlin, dated September 17, 2008 ("2008 Edlin Decl."). Par's Form 10-Q/A for the first quarter of 2006 is attached as Exhibit B to the 2008 Edlin Declaration. The other relevant portions of Par's SEC filings, Par's stock price chart, and other public filings (which this Court is permitted to consider on a motion to dismiss, *see In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002)), are attached as Exhibits to the Declaration of Richard Edlin, dated July 13, 2007, which was submitted in support of Defendants' first motion to dismiss, and which is incorporated herein by reference ("2007 Edlin Decl."). [Doc. 109.]

2

## ARGUMENT

### I.    Plaintiffs Failed To Adequately Plead Scienter.

A securities complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference once could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, __ U.S. __, 127 S. Ct. 2499, 2510 (2007). The Third Circuit has applied *Tellabs* on at least three occasions since 2007, and recently stated:

> The Supreme Court has mandated a uniform construction of the strong inference standard in light of the objectives of the PSLRA. *Tellabs*, [citation omitted]; *see Key Equity Investors, Inc. v. Sel-Leb Marketing, Inc.*, No. 06-1052, 2007 WL 2510385 (3d Cir. Sept. 6, 2007 (applying the pleading standard laid out by *Tellabs*); *Globis Capital Partners, L.P. v. Stonepath Group, Inc.*, No. 06-2560, 2007 WL 1977236, at *3 (3d Cir. July 10, 2007) ("The Court's *Tellabs* decisions removes any doubt the PSLRA's scienter pleading requirement is a significant bar to litigation..."). ...One of the purposes of the PSLRA's heightened pleading requirements is to limit abusive securities class-action suits. [Citations omitted.]

*The Winer Family Trust v. Queen*, 503 F. 3d 319, 326 (3d Cir. 2007).

Simply put, Plaintiffs must allege the "who, what, when, where and how" of the alleged fraud, and the inferences of scienter to be drawn from those alleged details must be "at least as compelling as any non-culpable inference." *The Winer Family Trust*, 503 F. 3d at 329 (citing *Higginbothan v. Baxter Intern, Inc.*, 495 F.3d 753, 759 (7th Cir. 2007)).

3

Here, this Court already held that Plaintiffs "must prove that the defendants acted with a particular state of mind. This requires that 'the complaint shall, with respect to each act or omission alleged . . . state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind.'" [Doc. 132, p. 18, quoting *Israeli v. Team Telecom Int'l, Ltd*, No. 04-4305, 2006 U.S. Dist. LEXIS 73552, at *12 (D.N.J. Oct. 6, 2006) (quoting 15 U.S.C. § 78u-4(b)(2)).] As the PSLRA mandates, Plaintiffs must establish a cogent and compelling inference of scienter by stating either "(1) facts which show that defendants had both motive and opportunity to commit fraud"; or (2) "by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior." [*Id.*, citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 534-35.] Plaintiffs' must specify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity the facts on which that belief is formed." [*Id.*, citing 15 U.S.C. § 78u-4(b)(1).]

Plaintiffs' Second Complaint does not satisfy Rule 9(b) or the PSLRA's heightened pleading standard as interpreted by the Supreme Court, the Third Circuit, and this Court.

4

**A.    Plaintiffs Improperly Rely Upon Group Pleading.**

Group pleading "is no longer viable in private securities actions after the enactment of the PSLRA." *The Winer Family Trust*, 503 F.3d at 337 (3d Cir. 2007). [*See also* Doc. 132, p. 19, citing *Israeli v. Team Telecom Int'l, Ltd.*, No. 04-4305, 2006 U.S. Dist. LEXIS 73552, at *15.]

This Court found the allegations in ¶¶ 17, 18, 20, 21, 22, and 160 of the First Complaint to be "insufficient to provide evidence of scienter...." [Doc. 132, pp. 19-21.] Specifically, this Court held that "generalized claims that each individual defendant, 'by virtue of his high-level position with the Company, directly participated in the management of the Company' or 'was privy to confidential proprietary information concerning the Company are not sufficient to give rise to a strong inference that he acted with the required state of mind." [Doc. 132, p. 19 quoting *Israeli*.]

Plaintiffs made no changes to the paragraphs this Court expressly held were insufficient as a matter of law. (*Compare* First Complaint ¶¶ 17, 18, 20, 21, 22, and 160 *with* Second Complaint ¶¶ 18, 19, 21, 22, 23, and 185.) Indeed, Plaintiffs thumb their nose at this Court by repeating the explicit allegation that "[i]t is appropriate to treat the Individual Defendants as a group for pleading purposes...." (Second Compl. ¶ 19.) This Court previously found this allegation to be improper as a matter of law. [Doc. 132, p. 19.] As Plaintiffs have simply renewed their

flawed allegations, this Court should renew its decision that the complaint is "insufficient to the extent that it relies on group pleading and generalized allegations of knowledge or participation based on a Defendant's position at the company and the like." [*Id.*, p. 20.] Thus, the allegations in ¶¶ 18, 19, 21, 22, 23, and 185 of the Second Complaint are "insufficient to provide evidence of scienter." [*See id.*, pp. 18-21.]

### B.    The "New" Allegations of Stock Sales Are Insufficient.

In dismissing the First Complaint, this Court refused to "infer fraudulent intent from the mere fact that some officers sold stock." [Doc. 132, p. 23.] Plaintiffs ignore the Decision, and reallege the same sales for Mark Auerbach, Arie Gutman, Dennis O'Connor, Kenneth Sawyer, and Scott Tariff. (Second Compl. ¶ 186.) This time, though, Plaintiffs dress up these allegations with a picture, and conclusory assertions that the size and timing of the stock sales were "highly unusual" and "suspicious." (*Id.* at ¶¶ 187-190.) Once again, Plaintiffs have failed to allege what this Court found to be lacking before:   the "requisite contextual evidence needed to properly frame the argument that the stock sales here were 'unusual in scope or timing' in accordance with the Third Circuit Standards." [Doc 132, p. 23, citing *In re Advanta*, 180 F.3d at 540.]

Indeed, Plaintiffs' allegations in the Second Complaint are *less* compelling as a matter of law, than those previously rejected by this Court. Two of the five

executives whose sales are listed are not defendants in this action – Mark Auerbach[2] and Arie Gutman[3]. Plaintiffs cannot rely upon sales of non-defendants to infer scienter against the Individual Defendants. *See In re Astea Intern. Inc. Sec. Litig.*, No. 06-1467, 2007 WL 2306586, *13 (E.D. Pa. Aug. 9, 2007) (finding no inference of scienter based on stock sales, in part because plaintiff included stock sales of non-defendants); *see also Tripp v. Indymac Financial, Inc.*, No. CV07-1635- GW (VBKx), 2007 WL 4591930, *n.1 (C.D. Cal. Nov. 29, 2007) ("Any sales by a non-defendant are irrelevant.")

Plaintiffs make no attempt to connect the "timing" of the relevant sales, *i.e.* those made by the Individual Defendants, to the alleged fraud. For example, not one of the Individual Defendants is alleged to have sold after November 2003, whereas the bulk of the alleged fraud occurred in 2004 and 2005. According to Plaintiffs, the bulk of the fraud did not occur until March 2004, when Par filed its

---

[2]    In the First Complaint, Plaintiffs named Mark Auerbach, a former member of Par's Board from 1990-2003 and the Chairman of the Board from 2003 until September 2006, as an individual defendant in this action. In the Second Complaint, Plaintiffs have dropped any claims against Mark Auerbach. (*Compare* First Compl. ¶ 16(d) and (e) *with* Second Compl. ¶ 17(d) (defining Defendants Sawyer, Tarriff, and O'Connor as the "Individual Defendants").) Thus, Plaintiffs can no longer rely upon any sales made by Auerbach.

[3]    Arie Gutman, one of Par's directors, is not and never has been named as a defendant. Plaintiffs do not allege Gutman had any involvement in the restatement or any connection to the Individual Defendants. Plaintiffs make no attempt whatsoever to explain why Gutman's stock sales should be used to infer scienter against any of the Individual Defendants.

10-K for its fiscal YE 2003 that reported overstated net earnings for that year. (*See* Second Compl. ¶ 9.) But, Plaintiffs complain of sales by Sawyer, O'Connor, and Tarriff that mostly occurred in 2002 and early 2003. (Second Compl. ¶ 186.) As made plain by the Restatement, the 2002 year end net income results reported in March 2003 were understated. (*See* Second Compl. ¶ 9.) Accordingly, Plaintiffs complain of sales when the stock price would have been deflated, negating any inference of scienter.

Not only did the Individual Defendants not sell any Par stock after November 2003, both Tarriff and O'Conner *purchased* Par's stock on the open-market during 2004 and 2005. Tarriff purchased over 33,000 shares at an average price of $33.53 per share between June 2004 and September 2005 and O'Conner purchased 4,000 shares at over $36 per share in September 2004. (*See* 2007 Edlin Decl. Ex. S.) Thus, the Individual Defendants sold stock before the alleged fraud manifested and bought stock when, according to Plaintiffs, the alleged fraud was at its height (2004-2005). This does not allow any inference of scienter, much less a compelling one.

The Second Complaint's deficiencies are compounded by the Plaintiffs' improper inclusion of sales of stock options to artificially inflate the Defendants' actual stock sales. The Third Circuit has declined to infer scienter from the sale of stock options, recognizing that stock options are an important part of compensation

8

packages for many of today's corporate executives. *See, e.g., In re Advanta*, 180 F.3d at 541 ("Although the profits realized by the defendants were significant relative to their base salaries, the proceeds were the result of accumulated stock options and were an intended part of their overall compensation package.") It is impossible from Plaintiffs' allegations to parse which "sales" are actually "sales of stock options."

Typical of Plaintiffs' manipulations is their comparison of the sales during the alleged Class Period to the size of the sales that occurred before the alleged Class Period, without including any sales that occurred "just prior to the start of the Class Period." (*See* Second Compl ¶ 187 n. 16 & 17.) Plaintiffs cannot include some sales and ignore others to manipulate the percentages.

Finally, many of the sales are explained by non-fraudulent reasons that are apparent from Par's public disclosures. For example, Sawyer was retiring in July 2003, and therefore it makes sense that he would sell some or even all of his stock when he retired. Most of Sawyer's sales occurred between April 2003 and July 2003. (*See* Second Compl. ¶ 186.) In this regard, the thrust of Plaintiffs' new allegations pertain to information from confidential informants in 2004 – after the alleged stock sales and after Sawyer had left Par. (*See* Second Compl. ¶ 188.) This too rebuts any inference of scienter attendant to the 2003 sales.

### C.    The Confidential Informants Do Not Create
### A Cogent Inference of Scienter.

Plaintiffs now rely upon eight confidential informants to allege scienter. The First Complaint offered only two; one of whom has been dropped by the Plaintiffs, and both of whom were rejected by this Court. [Doc. 132, p. 23 citing *Cal. Pub. Emples'. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004) ("*CALPERS*")].

Allegations based upon confidential informants are inherently unreliable and untrustworthy. As Chief Judge Easterbrook in the Seventh Circuit recently stated, "One upshot of the approach that *Tellabs* announced is that we must discount allegations that the complaint attributes to…'confidential witnesses'…. Usually that discount will be steep." *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756-757 (7th Cir. 2007).

> It is hard to see how information from anonymous sources could be deemed "compelling" or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist.

*Higginbotham*, 495 F.3d at 757. This Court similarly should give little to no weight to the allegations of confidential informants or any inferences to be drawn from their statements.

The Third Circuit explained that any complaint based on confidential informants must disclose: (1) the time period that the confidential source worked

10

at the defendant-company; (2) the dates on which the relevant information was acquired; and (3) the facts detailing how the source obtained access to the information. *See CALPERS*, 394 F.3d 126, 146. Plaintiffs must also allege the basis for the source's personal knowledge and provide supporting details. *Id.* When relying upon documents, plaintiffs also must allege details such as its author, the date it was created, who reviewed it, and its conclusions and support. *Id.* None of the "new" confidential informants creates a cogent inference of scienter, and none of the alleged documents is described with sufficient particularity. Significantly, not only are the "new" confidential informants insufficient to establish a cogent inference of scienter, they describe a different theory of "fraud" than was presented in the First Complaint.

As this Court knows, on July 5, 2006, Par disclosed the need to restate 2004 through the first quarter of 2006 to correct "an understatement of accounts receivable reserves[4] which resulted primarily from delays in recognizing customer

---

[4]    As disclosed in Par's public filings, Par manufacturers and distributes dozens of generic and branded drugs that wholesalers purchase from Par at invoice price and then resell to literally hundreds of healthcare providers at a price negotiated between Par and *the providers*. (*See, e.g.*, 2007 Edlin Decl. Ex. E at 22.) The wholesaler submits a chargeback credit to Par for the difference, and Par's customers are also entitled to certain rebates and rights of return. Thus, there may be a significant difference between the original invoice price, and Par's net selling price. As is standard in the pharmaceutical industry, Par recognizes revenue for product sales when title and risk of loss pass and collectability is reasonably assured. Par simultaneously records estimates for sales allowances

credits and uncollectible customer deductions," and that Par would need to write-down inventory. Plaintiffs' First Complaint theorized that these failures were intentional because "Par concentrated its sales to just a few large wholesale customers." [Doc 132, pp. 4-5.] Plaintiffs complained that Par's three biggest customers were responsible for approximately 36-41 % of Par's revenue, and those customers only made "sporadic" payments, thus implying that Par should have been able to correctly calculate the accounts receivable reserve. Plaintiffs relied on information provided by two confidential informants, whom this Court correctly found to be implausible, and insufficient as a matter of law.

In their Second Amended Complaint, plaintiffs have dropped one confidential informant[5] and have deleted certain references to "payments" for sales concentrated to Par's four largest customers. (*See* 2008 Edlin Decl. Ex. A at p. 19.) Plaintiffs now theorize that the Defendants "manipulated" the accounts receivable reserve by making manual adjustments on Excel spreadsheets during the month-end reconciliation, and that they knowingly failed "to write-off obsolescent inventories." (Second Compl. ¶ 47.)

---

with corresponding adjustments to accounts receivable. Par estimates the amount of such sales allowances for which it needs to create a reserve. (*Id.*)

[5] The confidential informant referred to in the First Complaint as CI 2 remains, and is referred to as CI 2 in the Second Complaint.

To support this new theory, the Plaintiffs added seven new confidential informants in the Second Complaint. However, as set forth in more detail below, the new confidential informants are no better than the first, and were not in a position to know anything about accounting or Par's financial reporting because the confidential informants are all former employees from the Information Systems ("IS") department or Par's warehouse. Not one of the confidential informants was employed in Par's Finance Department, which was responsible for preparing Par's financial statements and interacting with Par's auditors.

### 1. CI 1, CI 2, And CI 3 Do Not Allege Facts That Support An Inference That Defendants "Manipulat[ed] Par's Reported Revenues and Accounts Receivable Reserves."

Plaintiffs distort the supposed statements of three (3) confidential informants ("CI's") to allege that the Defendants intentionally manipulated Par's revenue and accounts receivable reserve.[6] When analyzing the allegations, it is important to distinguish between what the informants actually said and inferences that Plaintiffs attempt to draw from those statements. None of the confidential informants describe any "fraud" that actually occurred, nor would any of them be in a position to possess that type of knowledge. (Second Compl. ¶¶ 47-62.)

---

[6]    As a preliminary matter, Plaintiffs have essentially conceded that they allege no facts that support their claim of scienter for the alleged misstatements related to Par's revenues and the accounts receivable reserve prior to "late 2004." Accordingly, any claim that any of the Defendants falsified the accounts receivable reserve with scienter before "late 2004" should be dismissed.

### a.    The CIs Have No Personal Knowledge.

CI 1, CI 2, and CI 3 are all in the IS Department. (*See* Second Compl. ¶ 48.) None of them is alleged to be a member of Par's Finance Department. None had personal knowledge of the accounting relating to Par's net revenues and accounts receivable reserve. None had relevant connections to the Individual Defendants. Even CI 1, Par's Chief Information Officer, claims only that although she communicated with some/all of the Individual Defendants, they discussed only "business operations and strategy," not accounting practices which were outside her area of responsibility. (Second Compl. ¶ 48.)[7]  Plaintiffs do not allege that CI 1 ever worked on financial statement reporting or communicated with either the auditors or the Audit Committee. CI 1  stated that only the Finance Department made manual adjustments to the Excel spreadsheets as appropriate for periodic financial reporting. (*See* Second Compl. ¶¶ 54, 62.) CI 1 is thereby conceding that she is not in a position to know.

CI 2 was a low-level employee, also in Par's IS department. As previously recognized by this Court, the connection between CI 2 and O'Connor is "tenuous at best" and there "appears to be no connection at all" between either Sawyer or

---

[7]    Plaintiffs also allege in paragraph 48 that Tarriff was "very much hands on." But being "hands on" in and of itself is a meaningless statement of no evidentiary value and certainly is not sufficient to infer knowledge under the heighted pleading standards of Rule 9(b) and the PSLRA. *City of Brockton Retirement Sys. v. The Shaw Group, Inc.*, 540 F. Supp. 2d 464 (S.D.N.Y. 2008).

Tarriff and CI 2. Moreover, *CI 2 expressly admits that he "did not know* whether Par or its executives deliberately used manual adjustments to the Excel spreadsheet system...." (Second Compl. ¶ 60.)

CI 3 does not appear to have any connection to any of the Individual Defendants at all. Indeed, the only allegation in the Second Complaint related to CI 3's position at Par is that she "reported to Business Systems Director" who, in turn, "reported to CI 1." (Second Compl. ¶ 48.) As set forth above, CI 1's connection to the Individual Defendants does not put her in a position to know about Par's financial reporting, so it is impossible that CI 3, who is several steps removed from CI 1, would be in a position to know.

For example, none of the confidential informants said or could say, as actually alleged by the Plaintiffs, that "Par essentially ran two sets of accounting records." (Second Compl. ¶ 51.) Instead, CI 1 and CI 2 said only that Par's Finance Department, not the IS department, maintained monthly Excel spreadsheets that reflected gross sales revenue on a line-item basis for each product, and used a "rather sophisticated algorithm" to incorporate the terms of the contracts that Par had with its customers to adjust gross revenue down to net revenue by calculating the effects of charge-backs, rebates, etc. (*Id.* at ¶ 53.) Then, according to CI 2, on a monthly basis, the Finance Department made manual adjustments, including "price protection" adjustments, that were estimated by the

15

Finance Department based on "experience and market knowledge." (*Id.* at ¶¶ 55-56.) These Excel spreadsheets were the only "accounting records" utilized by Par during this period, and they were maintained by the Finance Department, which used them for financial reporting purposes. (*Id.* at ¶ 62.)

Similarly, CI 1 supposedly stated that the "Excel spreadsheet manual adjustment system was an 'archaic and convoluted process,'" and on her recommendation, Par approved a project whereby it would "begin developing an IT system that would automate and thus facilitate the existing processes." (Second Compl. ¶¶ 49, 50.) This system came to be known as the "GTN." (*Id.*) GTN was merely a computer program that took gross sales and applied a percentage against each to calculate a net number. The GTN application "was to serve as an automated replacement" for the Excel spreadsheets, but, because the "numbers that the GTN produced did not match the manually adjusted Excel spreadsheet numbers," in late 2004, O'Connor directed that GTN "remain in a 'development stage.'" (Second Compl. ¶ 61.). There is no allegation from which this Court (or anyone else) can infer that GTN was more correct than the Excel spreadsheets used by Par. To put a finer point on this, even if the Excel spreadsheets took longer to prepare than a more advanced program might permit, new technology does not in any way correlate to improved accuracy. It is most reasonable to infer that Par continued to use the methodology previously used and approved by Par's auditors

16

until its new program could match the old system in terms of accuracy. Anyone who has ever done a computer "upgrade" knows how many problems are involved. To infer that anything fraudulent was occurring simply because Par was attempting to upgrade its technology is preposterous.

CI 1's statements do not imply that the Excel spreadsheets, or the manual adjustments made by the Finance Department, were inaccurate or inappropriate in any way. Arthur Andersen LLP and Deloitte & Touche LLP gave Par clean audit opinions throughout the alleged Class Period. As directly stated by CI 1, as part of the IS department, she merely suggested that Par "evaluate the existing Excel spreadsheet system and determine whether – and in what way – the existing manual system could be improved and automated." (Second Compl. ¶49.) It is unreasonable for Plaintiffs to infer from this information that Par maintained "two sets of accounting records."

CI 2 offers nothing more than the unsupported opinion that the "GTN was rejected as a replacement for Par's Excel spreadsheets because it consistently produced lower net sales results and higher accounts receivable reserves than were being publicly reported by Par based on the Excel spreadsheets." (Second Compl. ¶ 50.) He provides no information that would make this a reliable statement and, in fact, it is perfectly plausible that the GTN system was consistently inaccurately producing lower sales results and higher reserves.

Similarly, Plaintiffs' allegation that the GTN "consistently" showed that the net revenues were 5-10% lower than reflected in the Excel spreadsheets is unsubstantiated and unreliable. First, CI 2 only gave one example, making it impossible to determine consistency. Second, the actual restatement showed that the reserve was understated by less than 5%. The restatement adjustments on total revenues for 2004 through the first quarter of 2006 (the only period in which Plaintiffs even attempt to allege scienter) was approximately $53.6 million – only 4.12% of the $1.3 billion of original reported revenue. Indeed, for each of year end 2005 and the first quarter of 2006, the restated revenue adjustment was less than 1% (0.2% for 2005 and 0.9% for Q1-2006). (*See* Chart set forth below on p. 29.)

No details are provided regarding any conversations CI 2 had with any of the Individual Defendants or anyone from the Finance Department indicating why the GTN was not implemented in late 2004. Also, it appears that CI 2 has no information at all about whether the auditors or internal control consultants (Amper Politziner, & Mattia) reviewed or considered whether it was appropriate to implement a new program that was producing allegedly inconsistent results. More problematic for the Plaintiffs, CI 1 did not corroborate CI 2's "belief" – she stated that O'Connor directed that the GTN remain in "development stage." (Second Compl. ¶ 61.) CI 2 admitted that he did not have personal knowledge of the "price protection" or other manual adjustments that were estimated monthly by the

18

Finance Department. (Second Compl. ¶ 54.) "CI 2 stated that the only people who had the access and knowledge to make 'price protection' or other manual adjustments were Pepe and Schott." (Second Compl. ¶ 55.) According to CI 2, the GTN application incorporated the terms of Par's customer contracts, but it did not "incorporate the price protection adjustment," or apparently any of the other monthly manual adjustments for that matter. Thus, based on CI 2's own allegations comparing the GTN to the Excel spreadsheet was like comparing apples to oranges.

The more compelling inference to be drawn from all of this information is that Par believed the Excel spreadsheets were accurate and the GTN numbers did not match the Excel spreadsheets, so Par believed the GTN was wrong and therefore should not be implemented for financial reporting purposes until development was complete.

> b.    *The Alleged "Daily Reports" Do Not*
> *Create An Inference Of Scienter.*

Plaintiffs also appear to be claiming that "daily reports" from the GTN provide evidence of "fraud" but the confidential informants do not adequately plead a factual predicate to support this inference. Plaintiffs do not sufficiently identify the report, who "authored" or prepared it, when it was prepared, who reviewed it, what date the conclusions were based upon, and how firm the numbers

19

were.  *See CALPERS*, 394 F.3d at 147 (citing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001)).

Plaintiffs do not adequately describe the content of the report over the alleged Class Period or "what data or conclusions it was based upon." *See id.*  In fact, Plaintiffs have two conflicting allegations about the reports.  In paragraph 51 of the Second Complaint, Plaintiffs claim that the GTN was "used by Par's senior management to monitor the Company's 'actual' results," but in paragraph 62, Plaintiffs allege that the reports from GTN "contained data relating to what the Company's 'proposed' net sales were, and 'estimated' [what] accounts receivable reserves 'should have been.'"  Not only are these allegations confusing and conflicting, they do not specify with any detail what these supposed daily reports looked like.  Were they multi-page reports?  Did they have several columns?  Did they show the numbers on a per product basis or an aggregate basis?  All of this information must be pled with particularity, but Plaintiffs have failed to do so.

Plaintiffs also fail to adequately allege who and when these supposed reports were "authored" or prepared.  CI 2 is alleged to be the developer of the GTN application, but he does not claim that he "authored" any daily reports. Presumably, a variety of different reports could have been run from the GTN, but plaintiffs do not allege what information was chosen to be included in these daily reports and by whom.  Also, CI 2's employment was terminated in December

20

2004, when the GTN was still in the "development stage," and CI 3 was not employed until March 2006. There is no confidential witness that covers the gap between December 2004 and March 2006, so it is impossible to tell who "authored" any daily reports during this fourteen-month period. Did different people run different reports? Did the report change over time?

Plaintiffs also do not adequately specify who reviewed the daily reports. Plaintiffs allege that "Par's senior executives, including Defendant Tarriff received" daily reports. (Second Compl. ¶ 51.) Defendant O'Connor is a senior executive, but the fact that he is not identified by name makes it reasonable to infer that he did not receive the reports and some other senior executives did (such as sales executives who wanted to know what products were being sold on a daily basis). Defendant Sawyer already had retired by "late 2004" when these GTN daily reports supposedly began, so obviously he did not receive the reports. Also, Plaintiffs choice of the word "received" versus "reviewed" is telling. Defendant Tarriff was the CEO of the Company and it is highly unlikely that he reviewed the GTN "flash reports" in any detail for accounting and financial reporting purposes on a daily basis.

Indeed, the fact that these reports were allegedly prepared daily means the numbers were not "firm." CI 2 himself alleges that the GTN did not take into account certain monthly adjustments, such as the price protection adjustment. The

Finance Department apparently created Excel spreadsheets monthly, with manual adjustments, and those spreadsheets were used to prepare the quarterly and yearly financial statements that were then reviewed or audited prior to filing the financials with the SEC. It is simply unreasonable to infer that the supposed GTN daily reports create an inference of scienter, much less a cogent or compelling one.

### 2. CI 4 - CI 8 Do Not Allege Facts That Support An Inference That "Defendants' Knowing[ly] Fail[ed] To Write-Off Obsolescent Inventories."

Plaintiffs allege that "as early as 2001, Defendants were informed of existing and increasing amounts of obsolete inventories in the Company's warehouse but failed to lower the value of Par's inventories reported to shareholders." (Second Compl. ¶ 47.) Plaintiffs rely upon five (5) confidential informants to support these allegations. Again, none of the confidential informants had personal knowledge or was in a position to know anything about Par's accounting and financial reporting.

First, as the Court is aware, a company like Par always has inventory going bad in warehouses. That is the nature of the generic drug business. The point is to try to make an accurate estimate of how much is going bad, and when. Plaintiffs concede that CI 4, CI 5, CI 6, CI 7, and CI 8 were all employees associated with Par's warehouse and production plant. None of them was a member of Par's Finance Department, and there are no allegations that any of them was either involved in the financial reporting process, or had any communications with the

22

Audit Committee or Par's auditors. None has any personal knowledge of the accounting relating to Par's inventory. (Second Compl. ¶ 63.)

Moreover, according to CI 4, the Vice President Supply Chain, Michael Graves, was the person who would have "made the ultimate decision" in terms of "how much excessive inventory to hold, and how much would be disposed of" and that Graves "regularly consulted with Defendant O'Connor" who would have "made a final decision as to how obsolete inventory would be accounted for." (Second Compl. ¶ 72.) There are no allegations regarding any communications by Graves to O'Connor that would lead to an inference that the Individual Defendants acted with scienter or that Graves and O'Connor did anything other than make their best estimates. In sum, and as a legal matter, the connection between the Individual Defendants and CI 4-CI 8 is "tenuous at best."[8]

Moreover, the confidential informants do not provide information that explains how any supposed "fraud" relating to inventories occurred. Indeed, for the most part the confidential informants merely allege that Par's warehouse was "full of inventory" and at certain times as much as 25% of the inventory was

_____

[8]    CI 7 alleges that inventory reports show that "tens of millions of dollars" should have been written-off and was not, and that he brought this to the attention of Campbell and Par's Director of Finance (whose name he could not recall). (Second Compl. ¶ 73.) CI 7 does not state "why" the inventory was not written off, or if the reasoning was ever communicated to him. Regardless, this information does not provide a sufficient connection to the Individual Defendants to allow this Court to infer that they acted with scienter.

obsolete. However, there are no details about whether Par actually did write-off 25% of its inventory, or some smaller or larger amount.

"CI 6 stated that a significant portion of Par's finished goods inventory exceeded actual customer demand on a regular basis" because Par utilized a build-to-stock manufacturing model, which is common in the generic pharmaceutical industry according to Plaintiffs. (Second Compl. ¶ 69.) Par repeatedly disclosed during the alleged Class Period that it "makes provisions for obsolete and slow-moving inventories as necessary to properly reflect inventory value." (*See, e.g.*, 2007 Edlin Decl. Ex. D at F-8.) So, it is reasonable to infer that writing-off inventory is a regular process that occurs at least every quarter when the financial statements are prepared if not more often. Par had a process in place to write-off inventory "on a regular basis." Thus, the numerous statements by the confidential informants that a lot of inventory needed to be written-off is not helpful in any way in determining whether the Defendants knew *at the time* that their methodology for calculating how much should be written-off was not in compliance with GAAP.[9]

---

[9]    In the restatement, Par disclosed that, among other things, "the Company had not historically adjusted inventory and cost of sales for manufacturing variances;" the Company "recorded manufacturing variances as cost of good sold in the period in which they were generated, which was not in compliance with GAAP." (2007 Edlin Decl. Ex. O at F-9.)   Plaintiffs do not provide any allegations that would support an inference that any of the Defendants knew their GAAP methodologies were incorrect.

In addition to the total lack of substantive facts, none of the confidential informants has relevant connections to the Individual Defendants. Plaintiffs allege that many of the confidential informants were members of a "Materials Review Board," which allegedly reported to "Par's senior management." Plaintiffs do not identify either the members of this "Board" or the relevant "senior management" or when or how such reporting to senior management took place, or even if the "Board" was a formal board or just a nomenclature being used by Plaintiffs' counsel in this case for the purpose of making such group seem more important than they were. Plaintiffs allege only that employees from Par's Finance Department were on the "Material Review Board," and that Joe Schott (who was also responsible for the Excel spreadsheets) was a member. No descriptions are provided of any communications with him, or by him to anyone else.

Plaintiffs also allege a variety of inventory reports, including the Short-Dated Goods, On-Hand Inventory, and Safety Stock reports, that allegedly showed that inventory needed to be written off. Again Plaintiffs do not adequately identify the reports, or allege whether, when, or how Par utilized those reports in making the determination of how much inventory should be written off.

The lack of any connection between the inventory reports and the actual accounting for obsolete inventory is proven by Plaintiffs references to Buspirone. (Second Compl. ¶ 75.) CI 5 alleged that Par expected to launch Buspirone in late

2001 or early 2002, but Par was unable to receive an exclusivity license from the FDA at that time. Although Par was later able to launch Buspirone, by that time much of the inventory had expired and not saleable according to CI 5. (*Id.*) There are no allegations of when Buspirone inventory was not properly accounted for, but it could not have been in 2001 or 2002 or even 2003 because in those years Par actually *understated* its inventory according to the restatement. Indeed, the restated inventory numbers show that Par had actually *understated* its inventory by over $1 million dollars in 2001-2002 (as shown by the 2003 retained earnings), and *understated* its inventory by approximately $72,000 in 2003. In fact, there was no write off of inventory until 2004 (approximately $3 million) and 2005 (approximately $3.6 million) and the first quarter of 2006 (approximately $4.3). (*See* 2007 Edlin Decl. Ex. O at F-11 and 2008 Edlin Decl. Ex. B.)

In sum, Plaintiffs have failed to adequately allege any information from the confidential informants that would support a cogent inference of scienter.

## II.    Plaintiffs Have Failed To Plead Loss Causation.

Plaintiffs have failed to plead any causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff. *See, e.g., Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 338 (2005) ("Dura"); *Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003); *Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000). If plaintiffs fail to

plead that the very misrepresentations at issue proximately caused them an economic loss, the complaint must be dismissed. *Dura*, 544 U.S. at 345. Indeed, as Chief Judge Brown stated:

> [T]he holding of *Dura* makes it clear that, in order to establish loss causation, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, **when disclosed, negatively affected the value of the security.**

*In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670, 678-79 (D.N.J. 2006) (Brown, C. J.) (quotations and citations omitted) (emphasis added).

Plaintiffs only allegation of loss pertains to the July 2006 restatement announcement that was limited to the 2004 and 2005 fiscal years. When the actual restatement came out in March 2007, and even when Par in December 2006 announced a broader scope of restatement than it had realized in July 2006, Par's stock price did not drop − it increased. (*See* 2007 Edlin Decl. Ex. P.) As a matter of law, there is no loss causation prior to YE 2004.

Moreover, the mere fact that Par's market price declined after the July 2006 disclosure of an accounting restatement does not suggest that any fraud caused a loss to plaintiffs.[10] On the contrary, the fact that Par's market price bounced back

---

[10]    Declines in market price after a restatement announcement occur for many reasons unrelated to fraud. For example, typically attendant to a restatement are SEC and internal investigations, class actions and derivative actions, perhaps management changes and other distractions, delayed financial reporting and, of

within only 60 days — ⅓ less time than the PSLRA uses for damage assessment — further suggests that the price decline is by itself not a good indicator of loss causation.[11]

This is particularly true here where Plaintiffs do not adequately identify any statements which were knowingly false and misleading when made. Indeed, the statements Plaintiffs rely upon, to the extent not inactionable puffery and forward looking, are nevertheless not rendered false by the restatement.

## III.    Many Of The Alleged Misstatements Are True, Mere Puffery, Or Protected Forward Looking Statements.

Plaintiffs set forth a litany of alleged misstatements over the five-year Class Period. (Second Compl. ¶¶ 81-152.) As set forth above, the mere fact of a restatement does not establish scienter. Similarly, merely alleging that other statements made by the Individual Defendants were wrong does not satisfy the requirement that the statements were known to be false when made. Indeed, many of the alleged statements are true, even with the restated numbers.

---

course, increased expense. All of these factors, irrespective of whether there is an actual fraud, cause market price to drop.

[11]    On July 6, 2006, Par's stock price dropped from $18.25 per share to $13.47 per share. However, by the end of July, Par's stock had rebounded to over $15 per share, and by August 28, 2006 — less than 60 days from the restatement announcement — Par's stock price had fully recovered to $18.25 per share. (*See* 2007 Edlin Decl. Ex. P.)

For example, Plaintiffs allege that following the fourth quarter of 2003, Tarriff stated, "2003 represented our Company's third consecutive record year of sales and earnings growth." (Second Compl. ¶ 97.) Even with the restatement, the trend and the fact of record sales were as stated.

The same is true with respect to many of the carefully excerpted statements attributed to certain individuals and alleged to be false. In each case when Plaintiffs seek to allege that the quarterly numbers were incorrect, they cannot rely upon a restatement that only relates to year-end numbers.

The restatement itself also belies any inference of material falsity of general statements of Par's continued growth. The restated revenue for 2001-2004 showed an unrelenting pattern of growth, just like before the restatement.

Before the restatement:

|  | 2001 | 2002 | 2003 | 2004 | 2005 | 1Q2006 |
|---|---|---|---|---|---|---|
| Total Revenue | 271,035 | 381,603 | 659,460 | 689,107 | 443,194 | 173,832 |
| Gross Margin | 109,729 | 183,290 | 283,203 | 248,409 | 175,413 | 55,362 |
| Acquired in-process research & development |  |  |  | 84,000 |  |  |
| Net (loss) income | 53,922 | 79,454 | 122,533 | 29,246 | 8,250 | 8,401 |

After the restatement:

|  | 2001 | 2002 | 2003 | 2004 | 2005 | 1Q2006 |
|---|---|---|---|---|---|---|
| Total Revenue | 262,376 | 379,013 | 632,024 | 647,975 | 432,253 | 172,318 |
| Gross Margin | 99,772 | 184,041 | 256,264 | 211,987 | 154,702 | 49,168 |
| Acquired in-process research & development |  |  |  | 84,000 |  |  |
| Net (loss) income | 47,871 | 80,562 | 106,584 | 7,558 | (15, 309) | 4,514 |

(*See* 2007 Edlin Decl. Ex. F at p. F-14, Ex. O at p. 35; 2008 Edlin Decl. Ex. B

at p. 17.) These charts show 2001 revenue was over $262 million, 2002 revenue was over $379 million, 2003 revenue was over $632 million, and 2004 revenue was over $647 million. Similarly, net income grew from over $47 million in 2001, to over $80 million in 2002, to over $106 million in 2003. (*See* 2007 Edlin Decl. ¶ 11.) Thus, statements about Par's continued growth remain true and do not state a claim for securities fraud. (*See* Second Compl. ¶¶ 68, 73, 76, 78, 79, 82, 85, 86, 88, 89, 91, 94, 100, 119.)

Statements such as Par is "poised for continued success" (Second Compl. ¶ 73) are mere puffery, which is not actionable as a matter of law. *In re Cybershop.com Sec. Litig.*, 189 F.Supp.2d 214, 225, 232 (D.N.J. 2002). (*See also* Second Compl. ¶¶ 68, 73, 76, 79, 82, 85, 88, 91, 94, 97, 100.) Many of the alleged misstatements – *e.g.* "[w]e fully expect our growth to continue and that 2004 will become our fourth consecutive record year" (Second Compl. ¶ 97) – are forward-looking and fall into the safe harbor of the PSLRA, and therefore do not state a claim for securities fraud. (*See also* statements alleged at Second Compl. ¶¶ 68, 73, 76, 79, 85, 88, 91, 94, 97.)

## IV.    Plaintiffs Have Failed To Allege Violations Of Section 20(a) Of The Exchange Act Against The Individual Defendants.

Plaintiffs allege a control person liability claim 15 U.S.C. § 78t(a), against the Individual Defendants. Plaintiffs must establish: "(1) an underlying violation

by a controlled person or entity;" (2) that the Individual Defendants are "controlling persons;" and (3) that the Individual Defendants were "in some meaningful sense culpable participants in the fraud." *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 317 (D.N.J. 2001). If the underlying 10(b) claim fails, as it must, then the control person claim necessarily fails too.

Here, Plaintiffs' control person claim fails because they have assumed rather than pleaded facts that the Individual Defendants were in fact control persons who were culpable participants in the specific accounting mistakes at issues in this case. (*See* Second Compl. ¶¶ 16, 17, 180.) Plaintiffs simply – and impermissibly – group all of the Individual Defendants together and say that by virtue of their high positions in the company they "had the power and authority to cause Par to engage in the wrongful conduct complained of herein." (*Id.* at ¶ 180.) This allegation does not even come close to alleging the actual culpable conduct of each, or any, of the Individual Defendants.

## CONCLUSION

For all of the foregoing reasons, and for all the reasons stated in the 2007 Edlin Declaration [Doc. 109] and the accompanying 2008 Edlin Declaration, Plaintiffs' Amended Complaint should be dismissed in its entirety, with prejudice.

DATED:  September 17, 2008        **GREENBERG TRAURIG, LLP**

By:  /s/ Richard A. Edlin
      Richard A. Edlin
      Eric S. Aronson
      Ronald D. Lefton (admitted *pro hac vice*)
      Toby S. Soli (admitted *pro hac vice*)
200 Park Avenue, P.O. Box 677
Florham Park, NJ 07932-0677
Telephone:  (973) 360-7900
Facsimile:  (973) 301-8410
edlinr@gtlaw.com
aronsone@gtlaw.com

    -and-

200 Park Avenue
New York, New York 10166
Telephone:  (212) 801-9200
Facsimile:  (212) 801-6400
leftonr@gtlaw.com
solit@gtlaw.com

*Attorneys for Defendants Par
Pharmaceutical Companies, Inc.,
Kenneth Sawyer, and Dennis J.
O'Connor*

32

**PEPPER HAMILTON LLP**

By:  /s/ Frank C. Razzano
       Frank C. Razzano (admitted in New Jersey)
600 14th Street, NW
Suite 500
Washington, DC 20005
Telephone:  (202) 220-1286
Facsimile:  (202) 220-1665

*Attorneys for Defendant*
*Scott L. Tarriff*

33