**LITE DEPALMA GREENBERG & RIVAS, LLC**
Joseph J. DePalma
Two Gateway Center, 12th Floor
Newark, NJ 07102-5003
Telephone: (973) 623-3000
Facsimile: (973) 623-0858

*Liaison Counsel for Plaintiffs*

[Additional counsel appear on signature page]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
_____
*DOCUMENT ELECTRONICALLY FILED*

| | | |
|---|---|---|
| In re PAR PHARMACEUTICAL | ) | Master File No. |
| SECURITIES LITIGATION | ) | 2:06-cv-03226-PGS-RJH |
| _____ | ) | |
| | ) | |
| This Document Relates To: | ) | |
| | ) | |
|     ALL ACTIONS. | ) | |
| _____ | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS
PAR PHARMACEUTICAL COMPANIES, INC., SCOTT L. TARRIFF,
DENNIS J. O'CONNER AND KENNETH SAWYER'S MOTION
TO DISMISS SECOND CONSOLIDATED AMENDED COMPLAINT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………….......... ii

I.    PRELIMINARY STATEMENT…………………………….    1

II.   SUMMARY OF THE FACTUAL ALLEGATIONS…………….    5

III.  RULE 9(B) AND PSLRA PLEADING REQUIREMENTS……..    7

IV.   PLAINTIFFS HAVE ALLEGED A STRONG INFERENCE OF
      SCIENTER……………………………………………………..    9

      A.    Plaintiffs' Confidential Source Information Alone Supports a
            Strong Inference of Scienter……………………………….    9

      1.    CI 1, CI 2 and CI 3 are Sufficiently Identified and Support
            a Strong Inference that Defendants knew or Recklessly
            Disregarded that Par's Accounts Receivable Reserves
            were Understated………………………………………..    13

      2.    CI 1, CI 4, CI 5, CI 6, CI 7, and CI 8 are Sufficiently Identified
            and Support a Strong Inference that Defendants Knew or
            Recklessly Disregarded that Par's Obsolete Inventory Was
            Not Being Timely Written Off……………………………..    16

      3.    Plaintiffs' Confidential Source Allegations Undermine the
            Veracity of Defendants' Statements and Strongly Suggest
            Their Knowledge or Recklessness…………………………    22

      B.    Par's Pervasive Accounting Violations, the Magnitude of
            the Restatement, Par's Significant Control Deficiencies
            and O'Connor, Sawyer and Tarriff's Sarbanes Oxley
            Certifications Support a Strong Inference of Scienter…….    31

      C.    Defendants' Stock Sales Support a Strong Inference of
            Scienter……………………………………………………….    33

V.      DEFENDANTS' MISREPRESENTATIONS ARE
        MATERIAL………………………………………………….      35

VI.     PLAINTIFFS HAVE ALLEGED LOSS CAUSATION………….      36

VII.    PLAINTIFFS HAVE STATED CLAIMS FOR CONTROL
        PERSON LIABILITY………………………………………….      39

VIII.   CONCLUSION………………………………………………      40

# TABLE OF AUTHORITIES

## Cases

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
  512 F.3d 46 (1st Cir. 2008) ....................................................................9

*Acito v. IMCERA Group, Inc.*,
  47 F.3d 47 (2nd Cir. 1995). ................................................................... 34

*Aldridge v. A.T. Cross Corp.*,
  284 F.3d 72 (1st Cir. 2002) .................................................................... 26

*Asher v. Baxter Int'l, Inc.*,
  2005 WL 331572 (N.D. Ill. Feb. 3, 2005) ............................................. 29

*Atlantic City Associates LLC v. Carter & Burgess Consultants, Inc.*,
  2007 WL 2705149 (D.N.J. Sept. 14, 2007). .......................................... 31

*Barrie v. Intervoice-Brite, Inc.*,
  397 F.3d 249 (5th Cir. 2005), *modified on other grounds*, 409 F.3d 653 (5th Cir.
  2005) ....................................................................................................... 12

*California Public Employees Retirement System v. Chubb Corp.*,
  394 F. 3d 126 (3rd Cir. 2004) ...................................................... 10, 11, 28

*Communications Workers of America Plan for Employees'
  Pensions and Death Benefits v. CSK Auto Corp.*,
  525 F.Supp.2d 1116 ( D. Ariz. 2007) ......................................................9

*Croker v. Carrier Access Corp.*, 2006 WL 2038011
  (D. Colo. July 18, 2006) ........................................................................ 32

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336 (2005) ............................................................................... 36

*Florida State Bd. of Admin v. Green Tree Fin. Corp.*
  270 F.3d 645 (8th Cir. 2001) ................................................................. 30

*Higginbotham v. Baxter, Int'l, Inc.,*
495 F.3d 753 (7th Cir. 2007) ................................................................. 10

*In re Able Labs. Sec. Litig.,*
2008 WL 1967509 (D. N.J. March 24, 2008 .................................... 10, 12, 25, 39

*In re Adaptive Broadband Sec. Litig.,*
2002 WL 989478 (N.D. Cal. April 2, 2002) .................................. 33, 39

*In re Advanta Corp. Sec. Litig.,*
180 F.3d 525 (3d Cir.1999) ................................................................. 24

*In re Alpharma, Inc. Sec. Litig.*
372 F.3d 137 (3rd Cir. 2004) ........................................................ 8, 39

*In re American Italian Pasta Co., Sec. Litig.*
2006 WL 1715168 (W.D. Mo. June 19, 2006) .................................. 32

*In re Atlas Air Worldwide, Inc. Sec. Litig.*
324 F. Supp. 2d 474 (S.D.N.Y. 2004) ................................................. 13

*In re Bio-Tech. Gen. Corp. Sec. Litig.*
380 F.Supp.2d 574 (D.N.J. 2005) .........................................................9

*In re Bradley Pharma, Inc. Sec. Litig.*
421 F. Supp. 2d 822 (D.N.J. 2006) .............................................. 36, 37, 38, 39

*In re Burlington Coat Factory Sec. Litig.*
114 F.3d at 1410 (3d Cir. 1997) ................................................. 34, 35

*In re Cabletron Sys., Inc.,*
311 F.3d 11(1st Cir. 2002) ................................................................. 12

*In re Campbell Soup Co. Sec. Litig.*
145 F.Supp. 574 (D.N.J. 2001) .............................................. 39, 40

*In re Cardinal Health Inc. Sec. Litig.*
426 F. Supp. 2d 688 (S.D. Oh. 2006). ............................................... 38

*In re Daou Systems, Inc.*
411 F. 3d 1006 (9th Cir. 2005) .............................................. 12, 37

*In re Dura Pharmaceuticals, Inc.,*
    452 F. Supp. 2d 1005 (S.D. Cal. 2006). ................................................................. 39

*In re ECVI Colleges Holding Corp. Sec. Litig.*
    469 F.Supp.2d 88 (S.D.N.Y. 2006) .................................................................... 27

*In re Enron Corp. Sec. Deriv. & ERISA Litig*
    439 F. Supp. 2d at 692 (S.D. Tex. 2006) ........................................................... 36

*In re Hypercom Corp. Sec. Litig.*
    2006 WL1836181 (D.Ariz. July 5, 2006) ........................................................... 32

*In re Intelligroup Sec. Litig.*
    527 F.Supp.2d 262 (D.N.J. 2007) ...................................................................... 32

*In re K-Tel Intern., Inc. Sec. Litig.*
    300 F.3d 881 (8th Cir. 2002) ............................................................................ 29

*In re Lattice Semiconductor Corp. Sec. Litig.*
    2006 WL 538756 (D. Ore. Jan. 3, 2006) ........................................................... 32

*In re LDK Solar Sec. Litig.*
    2008 WL 2242185 (N.D. Cal. May 29, 2008). ........................................... 26, 28

*In re Majesco Sec. Litig.*
    2006 WL 2846281 (D.N.J. Sept. 29, 2006) .......................................... 11, 26, 28

*In re McKesson HBOC, Inc. Sec. Litig.*
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ............................................................. 33

*In re Mercator Software, Inc. Sec. Litig.*
    161 F.Supp. 2d 143 (D.Conn. 2001) ................................................................. 33

*In re MobileMedia, Sec. Litig.*
    28 F. Supp. 2d 901 (D.N.J. 1998) ..................................................................... 39

*In re Motorola Sec. Litig.*
    2007 WL 487738 (D. Ill. Feb. 8, 2007) ............................................................. 37

*In re Nash Finch Co., Sec. Litig.*
    2007 WL 1266658 (D. Minn. May 1, 2007)................................................. 30, 33

*In re NUI Sec. Litig.*
    314 F.Supp.2d 388 (D.N.J. 2004) ....................................................................... 40

*In re Oxford Health Plans, Inc.*
    187 F.R.D. 133 (S.D.N.Y. 1999) ....................................................................... 35

*In re Par Pharmaceutical Sec. Litig.*
    2008 WL 2559362 (D.N.J. June 24, 2008) .................................................... 2, 32

*In re PMA Capital Corp. Sec. Litig.*
    2005 WL 1806503 (E.D. Pa. 2005) .................................................................... 40

*In re Rent-Way Sec. Litig.*
    209 F.Supp.2d 493 (W.D. Pa. 2002) .................................................................. 32

*In re Rockefeller Ctr., Properties, Inc. Sec. Litig.,*
    311 F.3d 198 (3d Cir. 2002) .............................................................................. 30

*In re Royal Dutch/Shell Transport Sec. Litig.*
    380 F.Supp.2d 509 (D.N.J. 2005). ..................................................................... 13

*In re Secure Computing Corp. Sec. Litig.*
    184 F.Supp.2d 980 (N.D. Cal. 2001) ................................................................. 11

*In re Sipex Corp. Sec. Litig.*
    2005 WL 3096178 (N.D. Cal. Nov. 17, 2005) ................................................... 33

*In re Suprema Specialties, Inc. Sec. Litig.*
    438 F.3d 256 (3rd Cir. 2006).................................................................... 8, 34, 39

*In re Tellium, Inc. Sec. Litig.*
    2005 WL 1677467 (D.N.J. June 30, 2005) ........................................................ 29

*In re Tommy Hilfiger Sec. Litig.*
    2007 WL 5581705 (S.D.N.Y. July 20, 2004). ............................................. 36, 38

*In re Wet Seal, Inc. Sec. Litig.*
    518 F.Supp.2d 1148 (C.D. Cal. 2007) ............................................................... 10

*Isreali v. Team Telecom Int'l Ltd.*
  2006 WL 2883237 (D.N.J. Oct. 10, 2006)............................................ 11

*Jones v. Intelli-Check, Inc.*,
  274 F.Supp.2d 615 (D.N.J. 2003) ....................................................... 40

*Kaltman v. Key Energy Serv., Inc.*
  447 F. Supp. 2d 648 (W.D. Tex. 2006)..................................................9

*Lefkoe v. Jos. A. Bank Clothiers,*
  No. WMN-06-1892 (D. Md. Sept. 10, 2007)................................. 11, 27

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*
  513 F.3d 702 (7th Cir. 2008)................................................................. 10

*Marsden v. Select Medical Corp.*
  2006 WL 891445 (E.D. Pa. April 6, 2006).................................... 12, 30

*Novak v. Kasaks*
   216 F.3d 300 (2d Cir. 2000)......................................................... 11, 12

*P. Schoenfeld Asset Mgmt., LLC v. Cendant Corp.*
  142 F.Supp.2d 589 (D.N.J. 2001). ...................................................... 32

*Pathfinder Mgmt., Inc. v. Mayne Pharma Pty*
  2008 WL 3192563 (D.N.J. Aug. 5, 2008) .................................... 10, 24

*Rosenbaum Capital LLC v. McNulty*
  549 F.Supp.2d 1185 (N.D. Cal. 2008) ......................................... 10, 25

*Schnall v. Annuity and Life Re (Holdings), Ltd.*
  2004 WL 231439 (D. Conn. Feb. 4, 2004) ......................................... 40

*South Ferry LP No. 2 v. Killinger*
  399 F.Supp.2d 1121 (W.D. Wash. 2007)............................................ 11

*Steiner v. Medquist, Inc.*
  2006 WL 2827740 (D.N.J. Sept. 29, 2006) ....................................... 36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
    ____ U.S. _____, 127 S.Ct. 2499 (2007)................................................. 8, 10, 24

*The City of Hialeah Employees Retirement System and*
*Laborers Pension Trust Funds for Northern California v. Toll Brothers, Inc.*
    2008 WL 4058690 (E.D. Pa. Aug. 29, 2008). ........................................9

*Weiss v. Mentor Graphics Corp.*
    1999 WL 985141 (D. Ore. Oct. 6, 1999) ........................................... 30

## Statutes and Rules

15 U.S.C.§78 U-4(b)(1)…………………………………………………………….8
F.R.C.P. 9(b)…………………………………………………………………………….8
F.R.C.P.10(c)…..………………………………………………………………...31, 36
F.R.C.P 8(a)…………………………………………………………………………36

Lead Plaintiffs ("Lead Plaintiffs" or "Plaintiffs") submit this Opposition to the Motion to Dismiss filed by Defendants Par Pharmaceutical Companies, Inc., Scott L. Tarriff, Dennis J. O'Connor and Kenneth Sawyer.

## I.     PRELIMINARY STATEMENT

This is a securities class action brought on behalf of purchasers of Par Pharmaceutical Companies, Inc. ("Par" or "the Company") securities during the period from July 23, 2001 through July 5, 2006 (the "Class Period") seeking remedies under Sections 10(b) and 20(a) of the Securities Exchange Act and SEC Rule 10b-5. Named as Defendants are Par; Par's former Chief Executive Officer ("CEO") and President Scott L. Tarriff ("Tarriff"); Par's former Chief Financial Officer ("CFO") Dennis J. O'Connor ("O'Connor"); and Par's former CEO Kenneth Sawyer ("Sawyer"). ¶¶16-17.[1] Plaintiffs allege that Defendants misrepresented Par's financial results, for a period spanning more than five years, principally as a result of: (1) understating accounts receivable reserves and thereby overstating net revenues; and (2) failing to timely write off excessive and obsolete inventory. When Par announced that it would restate its financial statements as a result of these accounting irregularities, Par's shares lost 26% of their value resulting in hundreds of millions of dollars in losses to Class Period investors. ¶5.

---

[1] Paragraphs of Lead Plaintiffs' Second Consolidated Amended Complaint ("Second Complaint") are referenced as "¶_____" or "¶¶_____."

On June 24, 2008, the Court dismissed Plaintiffs' Consolidated Amended Complaint ("First Complaint") for failure to plead a strong inference of scienter under the PLSRA. *In re Par Pharmaceutical Sec. Litig.*, 2008 WL 2559362 (D.N.J. June 24, 2008) (Dkt. Nos. 131-32). Plaintiffs filed their Second Consolidated Amended Complaint ("Second Complaint") on July 23, 2008 (Dkt. No. 133).

Defendants suggest that Plaintiffs' Second Complaint is little changed from the First Complaint and should be dismissed for the same reasons. Defendants are wrong. The Second Complaint sets forth 29 paragraphs (covering 14 pages) of primarily new factually specific allegations provided by confidential informants. ¶¶48-77. According to these informants, former Par employees with knowledge:

- In late 2004 Defendants O'Connor and Tarriff, and other high ranking members of management, were informed that the accounting applications underlying Par's "net revenues" and "accounts receivable reserves" were producing inflated financial results, yet Defendants continued to mislead the investing public by directing that the inflated revenues be reported in Par's published financial statements during the Class Period, *see* ¶¶48-62; and

- Beginning in 2001, and repeatedly during approximately May through October 2004, high ranking members of Par's management, including Defendants Tarriff and O'Connor, were informed of existing and increasing amounts of obsolescent inventory in Par's warehouse, yet they ignored this information and failed to lower the value of Par's inventories reported to the investing public in Par's Class Period financial statements. *See* ¶¶63-77.

For instance, Confidential Informant ("CI") 2, a former Vice President of Information Systems who developed an automated "gross to net" ("GTN") application intended to replace the Excel spreadsheets utilized by Par in calculating

its accounts receivable reserves, said that the GTN was rejected by Par's management because it consistently produced higher accounts receivable reserves, and lower net sales numbers, than those being publicly reported by Par based on the manually adjusted spreadsheets. ¶¶48, 50, 57-59. GTN ran in parallel with the Excel spreadsheets from July through December 2004 when CI 2 was terminated. CI 2 stated that his superiors, Par's Director of Finance, who maintained the Excel spreadsheets, and Par's Vice President of Information Systems, were unhappy with the numbers that GTN generated. ¶59.  During the term of the GTN project, CI 2 provided regular status reports to CI 1, Par's former Chief Information Officer who regularly interacted with Tarriff and O'Connor, who in turn reported the results to O'Connor. ¶¶48, 51-52, 61. CI 1 confirmed that the GTN was never implemented, but at the direction of Defendant O'Connor remained in a "developmental stage." ¶61.  CI 1 explained that beginning in late 2004 GTN was used to produce daily reports, which compared the GTN data with the data produced by the Excel spreadsheets that Par continued to utilize for reporting purposes, and these reports were distributed to Par's management, including Defendant CEO Tarriff. ¶62. CI 3 confirmed that in 2006 Tarriff was still receiving the reports. ¶62.

During 2003 and 2004 Par convened a "Materials Review Board" that was tasked with addressing Par's "increasing and worsening inventory problem." ¶¶67-72. This Board, which included Par Finance Department personnel, reported to

Par's senior management that significant amounts of obsolete inventory needed to be written off. ¶¶67, 70, 73.  CI 5, Par's former Associate Director of Planning and Inventory Control,  reported that by late 2004, as much as 25% of the inventory in Par's warehouse was short-dated or otherwise obsolete, but that Par was not timely writing it off. ¶¶48, 77.  CI 5 stated that from 2001 through 2003 she provided inventory reports to Tarriff that detailed Par's accumulating excess and obsolete inventories. ¶¶74, 76.  The pace of her communications concerning Par's inventory situation increased during the last part of her tenure, approximately May through October 2004, CI 5 said, as she communicated, in person, by telephone and/or by email, with Defendants O'Connor and Tarriff, and other senior management, that Par was accumulating excess inventory leading to significant obsolete inventory. ¶¶74, 76.  Beginning in 2003, CI 1 said, a regular topic at bi-weekly meetings attended by her, and other senior management, including Sawyer, Tarriff and O'Connor, was that the "warehouse was full [of inventory]." ¶64.

Thus,  contrary  to  Defendants'  suggestion  Plaintiffs  have  alleged  with particularity a strong inference of scienter, directly and/or indirectly, as to each Defendant.  Plaintiffs have also sufficiently alleged control person liability claims against each of the Individual Defendants.  Finally, as evidenced by the significant drop in the price of Par's common stock when Par's Class Period accounting irregularities were revealed, Plaintiffs have sufficiently alleged loss causation.

## II.    SUMMARY OF THE FACTUAL ALLEGATIONS

In March 2006 Defendant O'Connor resigned as Par's CFO. ¶17(c). On July 5, 2006 Par announced it would restate its financial statements for fiscal years 2004, 2005 and the first quarter of 2006 to correct "an understatement of accounts receivable reserves which resulted primarily from delays in recognizing customer credits and uncollectible customer deductions." ¶¶4, 35, 44, 153. Par reported that the effect of the restatement over the reported periods would be $55 million; that the Company would also write down $15 million in inventory; and that its prior financial statements "should not be relied upon." ¶¶4, 153. In response to this news the price of Par common stock plummeted 26% from $18.25 to $13.47 per share on very heavy trading volume. ¶¶5, 36, 154.

Par's Board of Directors' Audit Committee and the SEC opened investigations into the matter. ¶¶6, 155. On September 26, 2006, on the heels of the Audit Committee's and SEC's investigations, Par's Board of Directors demanded and received the resignation of Defendant Tarriff. ¶¶7, 17(b), 156.

On December 14, 2006, Par announced it would expand its restatement to include periods prior to 2004 and that the restatement would now require the Company to reduce previously reported revenues and earnings by at least $84 million through the first quarter 2006. ¶¶8, 157. On March 13, 2007, Par filed an Amended Annual Report on Form 10-K/A for fiscal year 2005 which included

restated financial statements for 2001, 2002, 2003, 2004 and 2005 and Par's admission of a host of accounting and internal control deficiencies. ¶¶9, 158.  On July 10, 2007, Par filed an amended Form 10-Q for the first quarter of 2006, the period ended April 1, 2006, which restated the Company's first quarter 2006 financial statements. ¶¶9, 158. The Company's annual and quarterly restated financial statements revealed that Par had understated its accounts receivable reserves by more than $83.5 million and overvalued its inventories by more than $9.9 million. ¶¶9, 158. Set forth at ¶¶9; 38; 41; 162-78; and 182-83 of the Second Complaint, respectively, are: (1) tables illustrating the magnitude of the restatement; (2) the improper accounting practices that Par disclosed were utilized during the restatement period; (3) the numerous generally accepted accounting principles ("GAAP") that were violated; (4) the effect on various line items of Par's financial statements; and (5) Par's admitted internal control deficiencies.

Before Par disclosed the truth about its improper accounting, Sawyer, Tarriff and O'Connor sold 96%, 100% and 86%, respectively, of their personally held Par common stock for proceeds of more than $54 million. ¶186.

The duration and magnitude of Par's financial misstatements and multiplicity of Par's improper accounting practices, ¶¶9, 38, 41, 162-78; the executive management "resignations," ¶¶7, 17(b-c), 156; the admitted internal control deficiencies, ¶¶158, 182; the false Sarbanes-Oxley certifications, ¶¶179-

84; the SEC investigation, ¶¶6, 155; the Defendants' insider stock sales, ¶¶185-90; the Company's acquisition of capital through public and private securities offerings, ¶191; **and particularly the information provided by Plaintiffs' confidential informants,** ¶¶47-80, indicate Par's improper financial reporting was not simply due to record keeping errors. Rather, the factual allegations of the Second Complaint, **indeed the confidential source information alone**, strongly suggest the accounting irregularities and control deficiencies alleged here were known, or at a minimum recklessly disregarded, by Defendants.

Despite their awareness, or reckless disregard, of Par's ongoing accounting irregularities each of the Individual Defendants signed SEC filings during the Class Period containing false and misleading financial information:

- 8/14/01, 11/13/01, 5/15/02, 8/14/02, 11/14/02, 5/14/03 Forms 10-Q (Sawyer and O'Connor) (¶¶ 82, 88, 96, 97, 99, 100, 101, 103, 104, 109, 110, 111);
- 8/11/03, 11/12/03, 5/14/04, 8/13/04, 11/12/04, 5/13/05, 8/12/05, 11/15/05 Forms 10-Q (Tarriff and O'Connor) (¶¶ 113, 114, 116, 117, 124-126, 128, 129, 131, 132, 137, 138, 140, 141, 143, 144, 146);
- 5/12/06 Form 10-Q (Tariff) (¶¶ 150, 151);
- 8/24/01, 9/5/01, 1/25/02 Registration Statements (Sawyer and O'Connor) (¶¶ 84, 90);
- 4/1/02, 3/28/03 Forms 10-K (Sawyer and O'Connor) (¶¶ 93, 106);
- 3/15/04, 3/16/05, 3/15/06 Forms 10-K (Tarriff and O'Connor) (¶¶ 120, 121, 134, 146, 147).

## III.   RULE 9(B) AND PSLRA PLEADING REQUIREMENTS

A §10(b) plaintiff must meet the pleading requirements of Fed. R. Civ. P. 9(b) by pleading the "who, what, when, and where" of the conduct alleged. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3rd Cir. 2006). Under the PSLRA the plaintiff must also "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading" and plead the required state of mind, or scienter, with particularity. 15 U.S.C. § 78u-4(b)(1) and (2); *In re: Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 147 (3rd Cir. 2004).

When faced with a motion to dismiss a §10(b) action, the court must consider the complaint in its entirety. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, ____ U.S. _____, 127 S.Ct. 2499, 2509 (2007). The inquiry is whether **all** the facts alleged, taken collectively give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. *Id.* Finally, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. *Id.*

The inference that the defendant acted with scienter need not be irrefutable, *i.e.* that of the "'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 2510. The complaint will survive if a reasonable person would deem the inference of scienter cogent and as compelling as any opposing inference one could draw from the facts alleged. *Id.* at 2511. "[W]here there are equally strong inferences for and against scienter, *Tellabs*…awards the draw to the

plaintiff." *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008); *Communications Workers of America Plan for Employees' Pensions and Death Benefits v. CSK Auto Corp.*, 525 F.Supp.2d 1116, 1119-20, 1123-24 (D. Ariz. 2007); s*ee, e.g., The City of Hialeah Employees Retirement System and Laborers Pension Trust Funds for Northern California v. Toll Brothers, Inc.,* 2008 WL 4058690 at *4 (E.D. Pa. Aug. 29, 2008).

## IV.    PLAINTIFFS HAVE ALLEGED A STRONG INFERENCE OF SCIENTER

Defendants do not contest that they materially misrepresented Par's published financial results.  They cannot. The fact that financial results were restated is a sufficient basis for pleading that those statements were false when made.  *In re Bio-Tech. Gen. Corp. Sec. Litig.*, 380 F.Supp.2d 574, 584, 586 (D.N.J. 2005); *Kaltman v. Key Energy Serv., Inc.,* 447 F. Supp. 2d 648, 658 (W.D. Tex. 2006).  Moreover, a restatement of historical financial results for any period is by definition material.  *See* Accounting Principles Board("APB") Opinion No. 20, *Accounting Changes;* Regulation S-X (17 C.F.R. §210.4-01(a)(1)(2008)).  Instead, Defendants argue that Plaintiffs have failed to allege a strong inference of scienter.

### A.    Plaintiffs' Confidential Source Information Alone Supports a Strong  Inference of Scienter

The information provided by Plaintiffs' eight confidential informants, ¶¶48-77, demonstrates that Par's highest levels of management, including specifically

Defendants Tarriff and O'Connor, but also Sawyer, were aware, or at a minimum recklessly disregarded, that Par's net revenues and inventory were overstated yet continued to publish financial results based on these inflated numbers.

Citing *Higginbotham v. Baxter, Int'l, Inc.,* 495 F.3d 753, 756-57 (7th Cir. 2007), Defendants argue that the information from Plaintiffs' confidential informants should be "give[n] little or no weight" because their names are not disclosed.[2] Such, however, is neither the law of this Circuit, *see California Public Employees Retirement System v. Chubb Corp.,* 394 F. 3d 126, 146-47 (3rd Cir. 2004); *In re Able Labs. Sec. Litig.,* 2008 WL 1967509 at *2 and n. 14 (D. N.J. March 24, 2008); *Pathfinder Mgmt., Inc. v. Mayne Pharma Pty,* 2008 WL 3192563 at *11 and n. 8 (D.N.J. Aug. 5, 2008), nor consistent with the principles enunciated in *Tellabs*.[3] Faced with a motion to dismiss a §10(b) action, courts must accept all factual allegations in the complaint as true. *Tellabs*, 127 S.Ct. at 2509. "At this

---

[2] The Seventh Circuit recently held that ***Higginbotham* presented a unique situation**: in *Higginbotham* "the confidential sources [were], described merely as three ex-employees of Baxter and two consultants," and were insufficient to show scienter, in contrast to the case before it where the confidential sources were numerous and consisted of persons whom from the description of their jobs were in a position to have knowledge of the information of which they testified. *Makor Issues & Rights, Ltd. v. Tellabs Inc.,* 513 F.3d 702, 711-712 (7th Cir. 2008).

[3] For similar reasons the court in *In re Wet Seal, Inc. Sec. Litig.,* 518 F.Supp.2d 1148, 1170 n. 7 (C.D. Cal. 2007) declined defendants' invitation to apply *Higginbotham. See also Rosenbaum Capital LLC v. McNulty,* 549 F.Supp.2d 1185, 1192 (N.D. Cal. 2008) (same).

stage in the litigation … factual issues concerning the credibility and weight of the employee statements will be construed in favor of Plaintiff." *Lefkoe v. Jos. A. Bank Clothiers,* No. WMN-06-1892, slip op. at 13 (D. Md. Sept. 10, 2007), attached to Declaration of William B. Federman at Exhibit 1.

The PSLRA rejects any notion that confidential sources must be named as a general matter. *Chubb,* 394 F. 3d at 146 (quoting and adopting *Novak v. Kasaks,* 216 F.3d 300, 314 at n.1 (2d Cir. 2000)). Rather, assessing the particularity of the allegations that rely on confidential sources "entails an examination of the detail provided by the confidential sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *In re Majesco Sec. Litig.,* 2006 WL 2846281 at *8 (D.N.J. Sept. 29, 2006) (quoting *Chubb,* 394 F.3d at 147); *Isreali v. Team Telecom Int'l Ltd.*, 2006 WL 2883237 at *6 (D.N.J. Oct. 10, 2006) (same). The fact-specific nature of the analysis means that "[t]he precise amount of detail required in describing confidential witnesses varies based on the circumstances of the case." *South Ferry LP No. 2 v. Killinger,* 399 F.Supp.2d 1121, 1141-42 (W.D. Wash. 2007), *remanded on other grounds,* 542 F.3d 776 (W.D. Wash. 2008); *In re Secure Computing Corp. Sec. Litig.,* 184 F.Supp.2d 980, 988 (N.D. Cal. 2001). Nevertheless, as long as the witness is described with "sufficient particularity to support the probability that a person in the position occupied by the source would

possess the information alleged," *see Novak,* 216 F.3d at 314; *Chubb*, 394 F.3d at 146-47 (adopting *Novak*); *Able Labs,* 2008 WL 1967509 at *2 n. 14, the court must simply accept the information provided by that source as true.

Plaintiffs have provided more than sufficient descriptions of their sources to support the probability they would possess the information alleged.  As set forth in the Second Complaint, these witnesses' accounts are consistent and sufficiently detailed: (1) each witness worked at Par during the Class Period and stated he or she had knowledge of the information provided, (2) each witness' job title and responsibilities support his or her knowledge of the information provided, (3) the witnesses corroborate one another, and (4) the witness' accounts are corroborated by other facts. *See* ¶¶48-77.  Courts have accepted as reliable factual information related to a witness' job responsibilities, *In re Daou Systems, Inc.,* 411 F. 3d 1006, 1016 (9th Cir. 2005), *cert. denied*, 546 U.S. 1172 (2006), facts a witness learned from another employee, *Marsden v. Select Medical Corp.,* 2006 WL 891445 at *13 (E.D. Pa. April 6, 2006) (testimony based on "second-hand" knowledge is permissible) *vacated on other grounds* 2007 WL 518556 (E.D. Pa. Feb. 12, 2007); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 31 (1st Cir. 2002), or facts based on internal documents or other sources of information the witness received.  *Barrie v. Intervoice-Brite, Inc.,* 397 F.3d 249, 259 (5th Cir. 2005), *modified on other grounds*, 409 F.3d 653 (5th Cir. 2005).  Plaintiffs have alleged corroborating detail

indicating the reliability of their allegations. *Cabletron,* 311 F.3d at 33; *In re Atlas Air Worldwide, Inc. Sec. Litig.,* 324 F. Supp. 2d 474, 493 n. 10 (S.D.N.Y. 2004). Plaintiffs have identified when and in what capacity the witnesses were employed by Par and how they gained access to the information pled, *see* ¶¶48, 63; accordingly Plaintiffs' confidential source allegations are sufficiently particularized. *See In re Royal Dutch/Shell Transport Sec. Litig.,* 380 F.Supp.2d 509, 560 (D.N.J. 2005).

1.    **CI 1, CI 2 and CI 3 are Sufficiently Identified and Support a Strong Inference that Defendants knew or Recklessly Disregarded that Par's Accounts Receivable Reserves were Understated**

Par has admitted that "[t]he accounts receivable reserves and related revenue errors [which necessitated Par's restatement of its financial statements] resulted, in part, from the utilization of methodologies that did not contemplate all necessary components to estimate reserves that impacted the accuracy of recorded amounts for chargebacks, rebates, product returns and other accounts receivable reserves." ¶¶38, 79.  Par relegated the critical control over financial reporting for these hundreds of millions of dollars in rebates, promotional programs, chargebacks and product returns to a set of Excel spreadsheets that were manually maintained by members of Par's finance group. ¶49.  CI 1, the former Chief Information Officer, described the Excel spreadsheet manual adjustment system as an "archaic and convoluted process." ¶¶48-49.

13

Beginning in 2002, CI 1 approached O'Connor about ways in which the existing manual Excel spreadsheet system could be improved and automated. ¶49. On CI 1's recommendation, Par approved a project to develop an IT system that would automate and thus facilitate the existing processes. ¶49. As confirmed by CI 1, CI 2, the former Vice President of Information Systems, was assigned to lead the project, which began in 2002, and specifically was delegated the responsibility to program/write an application that could handle and improve the existing manual processes. ¶¶48, 52. During the project's term, CI 2 reported to Director of Finance Lisa Pepe ("Pepe") who reported to Joe Schott ("Schott"), the Vice President of Information Systems, who in turn reported to O'Connor, the CFO. ¶¶48, 52.

The automated system developed to replace Par's manually adjusted Excel spreadsheets was known as the GTN application. ¶¶50, 53. Development of GTN was completed in late 2004; however, according to CI 1, at the direction of Defendant O'Connor, GTN was never implemented. ¶50. According to the GTN developer, CI 2, GTN was rejected as a replacement for Par's Excel spreadsheets because it consistently produced lower net sales results and higher accounts receivable reserves than those that were being publicly reported by Par based on the Excel spreadsheets. ¶50.

Specifically, CI 2 said the original go-live date for the GTN application was July 2004 and Par ran the GTN application in parallel with the Excel spreadsheets

from about July 2004 to December 2004, when CI 2 was terminated. ¶57.  The net revenue numbers that GTN produced did not match the manually adjusted Excel spreadsheet numbers. ¶57.  In fact, the new application consistently indicated Par needed to increase its accounts receivable reserves during the months tested. ¶57. CI 2 recalled that an input of $100 in gross revenue to GTN produced a net revenue figure of about $50, while the Excel spreadsheets produced a figure of about $55. ¶57.  That is, Par's net revenue figures produced by the manually adjusted Excel spreadsheets indicated that Par's net revenues were about 5% to 10% higher than the figures produced by GTN. ¶57.

CI 2 attempted to reconcile the two systems -- rechecking the programming and troubleshooting for about six months with Director of Finance Pepe -- but could not do so.  ¶58.  Nevertheless, CI 2 believed that the GTN was accurate. ¶58. In December 2004, CI 2 stated, he was "called on the carpet" by his superiors Pepe, and Schott and terminated. ¶59.  Pepe and Schott were unhappy with the GTN and the net revenue numbers it generated and held CI 2 responsible. ¶59.

CI 1 confirmed that CI 2 worked on GTN for the duration of CI 2's tenure, and that GTN was not implemented. ¶61. During the term of the project CI 2 provided regular status reports to CI 1, who in turn reported the results of the project to O'Connor. ¶61.  CI 1 stated that in late 2004, O'Connor directed that GTN remain in a "developmental stage." ¶61.  According to CI 1, all calculations

and methodologies which determined Par's reported net sales remained exclusively within the purview of Schott and Finance Director Pepe. ¶61.

CI 1 explained that beginning in late 2004 the GTN application was used to produce daily reports which were distributed to Par's senior executives, including specifically Tarriff. ¶62. CI 3, a former Manager of Sales and Marketing Systems who was responsible for maintaining the GTN, confirmed that Par's senior management, specifically Tarriff received daily reports from GTN throughout 2006. ¶¶48, 62.  The distributed reports contained data relating to what Par's "proposed" net sales were, and "estimated" accounts receivable reserves "should have been." ¶62. CI 1 stated that the GTN data was compared to the information in the Excel spreadsheets that Pepe maintained but was not utilized for public reporting purposes. ¶62. Instead, Par continued to rely on the Excel spreadsheets maintained by Director of Finance Pepe to estimate accounts receivable reserves and to publicly report net sales. ¶62.

In short, from late 2004 forward Par essentially ran two sets of accounting records: the Excel spreadsheets which included "manually adjusted" sales and reserve figures used for external reporting purposes and the GTN which was used by Par's senior management to monitor the Company's "actual" results. ¶51.

**2.     CI 1, CI 4, CI 5, CI 6, CI 7, and CI 8 are Sufficiently Identified and Support a Strong Inference that Defendants Knew or Recklessly Disregarded that Par's Obsolete Inventory Was Not Being Timely Written Off**

16

Par has admitted that it incorrectly accounted for inventory during the Class Period and has restated its financial statements to "correct errors in accounting for inventory . . . associated with the accounting of excess inventory. . . ." ¶¶38, 78.

CI 1, the former Chief Information Officer, stated that beginning in 2003 a regular topic at her regular biweekly meetings with Defendants Sawyer, Tarriff and O'Connor and other senior Par executives, was Par's inventory assets and the fact that "the warehouse was full [of inventory]." ¶48, 64. The Confidential Informants, including CI 4, a former Director of Operations and Plant Manager; CI 5, a former Director of Planning and Inventory; and CI 6, a former Inventory Control Supervisor, stated that Par utilized a build-to-stock manufacturing model. ¶¶63, 69. This meant that Par created products and warehoused them in anticipation of demand, including anticipation of FDA approval of temporary (usually six months) exclusive licenses to sell certain new generic products. ¶69.  CI 6 stated that a significant portion of Par's finished goods inventory regularly exceeded actual customer demand. ¶69.  This was confirmed by CI 5 and CI 4. ¶69.  Moreover, CI 4 said, Par was commonly delayed, or altogether prevented, from selling new products due to regulatory issues where the FDA would not timely grant licenses to Par, if at all. ¶69. CI 4 said that Par's aggressive build plans and recurring FDA challenges caused Par to accumulate excessive and obsolete inventory. ¶69.  Par's customers also commonly returned a high volume of products, CIs 4-6 said. ¶69.

These factors, among others, led to the accumulation of increasing amounts of obsolete inventory during 2002 through 2006. ¶69.

In 2003 Par began the process of implementing a JD Edwards ("JDE") enterprise resource planning system ("ERP") to replace Par's existing ERP "BPECS" and certain stand-alone inventory applications used to manage its inventories and warehouse operations. ¶64.    The JDE implementation and conversion was scheduled to take place during mid-2004. ¶65.    Members of the conversion team included Par's Business Systems Project Manager Tracey Kozdemba ("Kozdemba"); Par's VP of Information Systems Schott, who reported directly to O'Connor; Par's Finance Director Pepe; and CI 4, among others. ¶65. According to CI 1, the implementation process involved reviewing, "cleaning" and organizing "raw data" from the BPECS system, so that it could be properly entered into the new JDE system, and multiple and repetitive cycles of data validation and cross-referencing. ¶66.    CI 1 said the data was reviewed by Pepe and O'Connor, among others, who "signed off" on the reconciled financial information. ¶66.

During this same timeframe – 2003 through mid-2004 -- Par formed a "Materials Review Board" to address the "increasing and worsening inventory problems." ¶¶67-68. The Materials Review Board found and reported to Par's senior management that Par had significant levels of inventory that needed to be written off. ¶67.    Specifically, CI 6, the former Inventory Control Supervisor,

18

stated that in mid-2004, the Materials Review Board, a group comprised of Planning, Financing, and Warehouse department employees, began holding meetings on a monthly basis to address Par's inventory problems. ¶68. Regular participants in these meetings included CI 6, Vice President of Information Systems Schott, Mike McHugh, a cost accounting supervisor and several others. ¶68. During these meetings the high levels of obsolete inventory, and business practices that led to it, were discussed, both CI 5 and CI 6 said. ¶68. CI 6 stated that at the time the Materials Review Board began meeting "as much as 25% of the warehouse floor contained inventory that was obsolete." ¶69.

The Materials Review Board reviewed and discussed several monthly inventory reports that were prepared by CI 6, including reports prepared in 2004 that were designed to specifically evaluate how much obsolete or soon-to-be obsolete inventory Par needed to write off. ¶¶70-71. This was confirmed by CI 4 and CI 7, a former Director of Supply Chain and Logistics Management. ¶¶63, 72. Reports prepared by CI 6 included the On-Hand Inventory and Safety Stock reports and the Short-Dated Goods report, a report which tracked all inventory which was within 18 months of its expiration date.[4] ¶¶70-71. These reports were

---

[4] CI 6 explained that the majority of Par's products had a shelf-life of about 24 months; Par effectively had a six month window to sell its products to wholesalers and distributors who required time to distribute the products to retail entities; once this window had past Par considered any finished goods on-hand inventory to be

distributed monthly to Par's senior management, including SVP of Operations Michael Graves ("Graves"). ¶70.   The Materials Review Board reported its findings to CI 4, CI 6, Graves and other members of senior management. ¶70.

Despite the efforts of the Materials Review Board and the fact that it had determined that there was significant obsolete inventory in the warehouse no immediate action was taken to resolve the problem. ¶72. CI 4 stated that on more than one occasion during this mid-to-late 2004 timeframe the "VP's" – whom CI 4 explained included VP of Operations Jim Schwier, Graves, and other high ranking personnel – were stalling on making a decision on how to treat this excess/obsolete inventory, in terms of both physically disposing of it and accounting for it. ¶72. According to CI 4, Graves would have "made the ultimate decision" in terms of how much excessive inventory to hold or dispose of, but Graves regularly consulted with Defendant O'Connor, and it was likely O'Connor would have made the final decision as to how obsolete inventory would be accounted for. ¶72.

CI 7 stated that the inventory reports reviewed by the Materials Review Board indicated that "tens of millions of dollars" of obsolete inventory, manufactured as early as 2002, should have been written-off but was not. ¶73.  CI 7 said he brought the excessive/obsolete inventory issue to the attention of both Kevin Campbell, Par's Director of Sales and Operations, and Par's Director of

---

short-dated; and any products that remained at the Par warehouse after 12 months from the time of manufacture were considered obsolete. ¶71.

Finance. ¶73. The Director of Finance agreed that a substantial amount of inventory needed to be written off, CI 7 said, but Campbell informed the Director of Finance and CI 7 that the inventory would not at that time be written off. ¶73.

CI 5 confirmed and corroborated that Par's senior management and Tarriff and O'Connor were informed that increasing amounts of obsolete inventory were held at Par's warehouse that had not been timely written-off. ¶74.  In particular, CI 5 stated, throughout 2001-2003 CI 5 provided inventory reports to Tarriff which detailed excessive and obsolete product inventories. ¶76.  CI 5 recalled that Tarriff would essentially respond by saying, "Let me look into it, and see what I can find out." ¶76.  However, to CI 5's knowledge, Tarriff would and did not take further action or even acknowledge such issues in future interactions. ¶76. CI 5, who left Par in October 2004, stated that her communications with various high-ranking Par personnel concerning Par's excessive and obsolete inventory increased during the last six months of her tenure. ¶76. Specifically, through in-person and telephone discussions and/or email, CI 5 said she communicated individually with Graves, Vice President of Sales Nick DiMaio, O'Connor and Tarriff. ¶76. In these communications CI 5 explained that Par was experiencing a problem with excessive accumulation of inventory, which was leading to a significant amount of obsolete inventory. ¶76.

By late 2004, CI 5 estimated, as much as 25% of all inventory in the warehouse was short-dated or otherwise obsolete. ¶77.  However, CI 5 said Par was not timely writing off this inventory and continued to account for it as active inventory. ¶77. CI 8, a former Master Scheduler who worked at Par from February 2005 until April 2006, stated that for the duration of his tenure, Par's warehouse was full of unusable or otherwise unsaleable inventory which took up as much as 25% of Par's entire warehouse. ¶¶63, 77.

### 3.    Plaintiffs' Confidential Source Allegations Undermine the Veracity of Defendants' Statements and Strongly Suggest their Knowledge or Recklessness

Defendants assert that Plaintiffs' confidential informants' testimony is unreliable, should otherwise be disregarded by the Court and/or does not support a strong inference of scienter.

First, Defendants contend that the confidential witnesses were not in a position to know anything about Par's **admitted accounting irregularities** because they were not employed by Par's Finance Department.  CI 1 and CI 2's testimony, however, is clear that they worked closely with and/or reported to Par's Finance Department, in connection with the project to develop the GTN. ¶¶48-49, 52, 59, 61. CI 2, **the developer of the GTN** who reported to Finance Director Pepe**,** was in a particularly good position to know the net revenues calculated by the GTN and how those results compared to those calculated by the Excel

spreadsheets utilized by Par for SEC reporting purposes.  CI 2 was familiar with the Excel spreadsheets and how they worked because of his responsibility for developing the GTN. ¶¶53-56.    Moreover, CI 2 regularly provided reports concerning the GTN to CI 1 during the project's term. ¶61.  CI 1, who originally proposed the GTN project to CFO O'Connor, passed those results along to O'Connor.  ¶¶49, 61. CI 1 also regularly met with O'Connor and Tarriff. ¶48.  It is likely that CI 1 and CI 2, from their titles, job descriptions and interactions with Finance Department personnel, had access to and knowledge of the information they provided, in particular matters pertaining to the GTN, how the results of the GTN compared to the results of the Excel spreadsheets (less favorably), and who in upper management, including O'Connor and Tarriff, were the recipients of reports (including the "daily reports") concerning same.  Moreover, CI 3 was responsible for maintaining the GTN and would likely have been aware of the recipients of the daily reports, *e.g.*, Tarriff. ¶¶48, 62.

CIs 4-8 were each intimately involved in Par's operations, particularly inventory management and control, and were absolutely in positions to know the amount of obsolete inventory Par had at any given time. *See, e.g.,* ¶63. It is clear from the details of their testimony that they were aware of the activities of the "Materials Review Board" (a title used by the confidential witnesses to describe the committee that was charged with addressing Par's "continuing and worsening

inventory problem"), the reports it generated and and/or reviewed and to whom those reports were distributed.  In fact CI 6 sat on this board with, among others, Par's Finance Department personnel. ¶¶67-68. Each of these witnesses' testimony was consistent: throughout the Class Period, but particularly in late 2004, large amounts of obsolete inventory were accumulating in Par's warehouse, and Par's upper management was made aware of it. *See* ¶¶63-77, *generally*.  Moreover, since CI 5 personally communicated Par's excess and obsolete inventory problem to Tarriff, O'Connor and other upper management on multiple occasions, ¶¶74, 76 – she was in a position to know the substance of these communications.  Each confidential witness was in a position to likely know the information of which he or she testified and can reasonably be relied upon.

Second, Defendants contend that the confidential informants did not specifically say "Par essentially ran two sets of accounting records."  To demonstrate a strong inference of scienter plaintiff need not produce or allege the proverbial "smoking gun."  *Tellabs,* 127 S.Ct. at 2510.  Scienter can be established inferentially by "setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior." *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534-35 (3d Cir.1999)(citation omitted); *Pathfinder Mgmt., Inc. v. Mayne Pharma PTY,* 2008 WL 3192563 at *12 (D.N.J. Aug. 5, 2008).

It is undisputed Par's Class Period accounts receivable reserves were understated and its net revenues overstated, a result predicted by the GTN. CI 1 received status reports during the GTN project's tenure; those results were passed on by CI 1 to O'Connor. ¶61. Tarriff received daily reports comparing GTN and the Excel spreadsheet results during and throughout the Class Period. ¶¶61-62. There is also no dispute that during the Class Period Par's inventory was overstated. CIs 5 and 7 stated that they specifically made Par's management aware of the problem of accumulation of obsolete inventory (CI 7- Par's Finance Director and Senior Vice President of Operations; CI 5 – Tarriff and O'Connor and other high ranking management personnel). ¶¶73-74, 76. At a minimum, Plaintiffs' factually specific allegations that Defendants continued to report admittedly overstated financial results, despite being alerted of contrary lower results generated by the GTN and accumulating obsolete inventory, is sufficient to demonstrate their deliberate recklessness. *See, e.g., Able Labs,* 2008 WL 1967509 at *17 (fact that defendants knew of the FDA warning letter and failed to take any action to address continuing compliance problems combined with compliance problems disclosed by the recalls allows the court to infer recklessness); *Rosenbaum*, 549 F.Supp.2d at 1192-1193 (confidential sources combined with defendants' statements and press releases, provide adequate corroborating details).

Next, Defendants contend that there is no allegation from which the Court can infer that GTN was more correct than the Excel spreadsheets used by Par. Defendants suggest that it is most reasonable to infer that Par continued to use the Excel spreadsheets until the GTN could match it in terms of accuracy. But CI 2, the GTN's developer, stated that he believed its results were accurate. Moreover, Defendants' arguments ignore the fact that Par has admitted that its Class Period accounts receivable reserves were understated and its net revenues overstated, the precise result predicted by GTN. Although Defendants may ultimately be able to prove that they reasonably believed the GTN generated numbers were incorrect and the spreadsheet generated numbers accurate, this determination involves factual questions that are not appropriately resolved on a motion to dismiss. While exculpatory and inculpatory inferences must be considered at the pleading stage, the PSLRA in no way turns FRCP 12 into a trial-type, papers-only proceeding, much less one in which defendants get the benefit of every conceivable doubt.[5] *In re LDK Solar Sec. Litig.,* 2008 WL 2242185, at *8.

---

[5] Moreover, the fact that Par's auditors gave Par clean audit opinions does not relieve the Defendants from responsibility. It is well-settled that the mere fact that an independent auditor has expressed an unqualified opinion of a company's financial statements does not shield the officers from liability for material misrepresentations contained therein. *See Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 84 (1st Cir. 2002); *LDK Solar Sec. Litig.,* 2008 WL 2242185 at *3, *8; *Majesco,* 2006 WL 2846281.

Pointing to a table on page 29 of their brief, Defendants next contend that the information provided by CI 2 is undermined by the actual adjustments to revenues made by Par in the restatement: "Plaintiffs alleg[e][ ] the GTN 'consistently' showed that the net revenues were 5-10% lower than [the net revenues] reflected in the Excel spreadsheets… [although] the actual restatement showed that the reserve was understated by less than 5%." However, as revealed by Defendants' table, for the period ending 2004, the period in which CI 2 observed the GTN and Excel spreadsheets operating in parallel, Par determined revenues were overstated by 6.3%, a figure within the range alleged by Plaintiffs. For the periods ending 2004 through first quarter 2006 Par determined revenues were overstated by 4.3%, slightly below the range alleged by Plaintiffs.[6]  The percentages of Par's revenues Plaintiffs allege to be overstated are not significantly out of line with those actually determined by Par.  In any event "[a]t this stage in the litigation … factual issues concerning the credibility and weight of the employee statements will be construed in favor of Plaintiff." *Lefkoe,*  slip op. at 13; *see In re ECVI Colleges Holding Corp. Sec. Litig.,* 469 F.Supp.2d 88, 97 (S.D.N.Y. 2006) ("Defendants impugn…[the confidential witnesses'] credibility

---

[6] Defendants' table reveals that the 4.12% figure stated by Defendants for this period is incorrect. Defendants' table also reveals that for the period ending 2005 Par determined that revenues were overstated by 2.5%.  Defendants' statement that revenues for this period were overstated by 0.2% for this period is also incorrect.

by averting to the results of the Audit Committee's investigation, but at the pleading stage the issue is not whether these confidential witnesses are telling the truth. It is whether there is a probability they know what they are talking about."); *LDK,* 2008 WL 2242185 (finding a strong inference of scienter of GAAP violations alleged even though there was no restatement and audit committee found no GAAP violations).

Citing *Chubb,* 394 F.3d at 147, Defendants further contend that the "daily reports" that CI 1 said and CI 3 indicated were provided to Tarriff throughout the Class Period cannot support a strong inference of scienter because Plaintiffs do not sufficiently identify the report, who "authored" or prepared it, when it was prepared, who reviewed it, what data the conclusions were based upon, and how firm the numbers were. However, unlike in *Chubb,* here there is no dispute that Par's reported financial results were false. Moreover, the recipient(s) of the reports were identified -- the fact that Tarriff was provided with the daily reports was corroborated by two witnesses. The dates on which the reports were prepared were also identified – "daily" -- as was the data on which they were based – a comparison of the GTN and the Excel spreadsheet results. The reports, when coupled with the remaining allegations of the Second Complaint, are sufficiently identified and can be relied upon to support a strong inference of scienter. *See id.; Majesco,* 2006 WL 2846281 at * 8 (circumstantial evidence of defendants'

reckless or knowing violations of GAAP stemming from receipt of Product Development Reports and weekly meetings attended by defendants wherein information was disseminated sufficient to support strong inference of scienter).

Defendants also contend that Plaintiffs do not allege that Tarriff "reviewed" the "daily reports" as opposed to having simply "received" them. However, in *In re Tellium, Inc. Sec. Litig.,* 2005 WL 1677467 at *8, **24-25 (D.N.J. June 30, 2005) the court found similar allegations sufficient to support a strong inference of scienter. *Id.* ("Plaintiffs quote the former employee who was [sic] personally developed the model that supported the $144 million revenue estimate for 2001, and the higher percentage growth assumptions for later years. This employee directly reported to Losch, and furnished him with the financial models. … The Court finds that Plaintiffs have sufficiently alleged scienter as to Losch, who is alleged to have personally reviewed the prepared financial models and guidances."). Moreover, officers of a company are responsible for information reasonably available to them. *In re K-Tel Intern., Inc. Sec. Litig.*, 300 F.3d 881, 891 (8th Cir. 2002); s*ee Asher v. Baxter Int'l, Inc.*, 2005 WL 331572 at *8 (N.D. Ill. Feb. 3, 2005) (allegations that the individual defendants "routinely accessed … weekly (and even daily) revenue and financial reports via a computer system," combined with other allegations supported inference of scienter); *Tellium,* 2005 WL 1677467 at *25 ("Plaintiffs have also alleged scienter as to [CEO] Carr, who

would certainly have had access to these guidances by virtue of his position."); *Marsden,* 2006 WL 891445 at *10.) (scienter alleged where plaintiffs "offer[ed] factual allegations that defendants had access to and were provided with information concerning both the general and specific nature of the forthcoming proposal") *vacated on other grounds* 2007 WL 518556 (E.D. Pa. Feb. 12, 2007).

"One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Florida State Bd. of Admin v. Green Tree Fin. Corp.,* 270 F.3d 645, 665 (8th Cir. 2001); *see Weiss v. Mentor Graphics Corp.,* 1999 WL 985141 at *16 (D. Ore. Oct. 6, 1999). Plaintiffs' particularized confidential source information, alleged in the Second Complaint, undermines the veracity of Defendants' Class Period statements and suggests a strong inference of scienter. The "inquiry is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." *In re Rockefeller Ctr., Properties, Inc. Sec. Litig.,* 311 F.3d 198, 215 (3d Cir. 2002); *In re Nash Finch Co., Sec. Litig.,* 2007 WL 1266658 at *15 (D. Minn. May 1, 2007) Plaintiffs simply cannot be expected to tell the story seamlessly without the benefit of discovery.[7]

---

[7] The fact that Plaintiffs' theory of the alleged fraud varies somewhat from the

**B.    Par's Pervasive Accounting Violations, the Magnitude of the Restatement, Par's Significant Control Deficiencies and O'Connor, Sawyer and Tarriff's Sarbanes Oxley Certifications Support a Strong Inference of Scienter[8]**

Defendants represented Par's financial statements were truthful, reliable and presented in conformity with GAAP when in fact they were not. ¶¶9, 35, 37-42, 93, 106, 120, 134, 147, 155, 157-58.  Defendants signed Sarbanes-Oxley certifications in which they certified that the Forms 10-K and 10-Q signed by them "based on my knowledge" did not contain any false and misleading statements.  ¶¶104, 106, 111, 117, 120, 121, 126, 129, 132, 134, 138, 141, 144, 147, 151, 184.  They attested in these certifications that Par's internal control over financial reporting was effective although Par has now admitted it was not.  ¶¶181-184.

Par's GAAP violations, which materially affected numerous financial statement line items, *see, e.g.,* ¶¶9, 38, 41, continued unabated for more than 5 years; and as a result Par understated accounts receivable reserves and overstated net revenues by more than $80 million, overvalued inventory by $9.9 million and

---

theory set forth in the First Complaint is immaterial.  The allegations of the Second Complaint supersede those of the First. *Atlantic City Associates LLC v. Carter & Burgess Consultants, Inc.,* 2007 WL 2705149 at * 2 (D.N.J. Sept. 14, 2007).

[8] Each of these matters is discussed in greater detail at pages 15-27 of Plaintiffs' Opposition to Defendants Par, O'Connor, Sawyer and Auerbach's Motion to Dismiss filed September 4, 2007 (Dkt. No. 117).  Plaintiffs adopt and incorporate by reference these arguments in their entirety as if fully set forth herein. *See* F.R.C.P. 10(c).

overstated net earnings by more than $55 million. ¶9.  Par's financial results were significantly overstated throughout the Class Period. ¶¶9, 41.

Although a violation of GAAP, alone, will generally not be sufficient to establish fraud, when combined with other circumstances, suggesting fraudulent intent, allegations of improper accounting may support a strong inference of scienter. *Par Pharmaceutical,* 2008 WL 2559362 at *13; *P. Schoenfeld Asset Mgmt., LLC v. Cendant Corp.,* 142 F.Supp.2d 589, 608 (D.N.J. 2001).  GAAP violations or restated financials (both are present here), when coupled with factual allegations that "sufficiently indicate that defendants had clear reasons to doubt the validity of the issuer's financials but, nonetheless, kept turning a blind eye to all such factual 'red flags'" will support a strong inference of scienter. *In re Intelligroup Sec. Litig,* 527 F.Supp.2d 262, 286-87 (D.N.J. 2007); *see P. Schoenfeld,* 142 F.Supp.2d at 608.

A company's lack of internal controls together with other factors is also probative of scienter. *See In re Hypercom Corp. Sec. Litig.*, 2006 WL 1836181, *9 (D. Ariz. July 5, 2006); *In re Rent-Way Sec. Litig.*, 209 F.Supp.2d 493, 508 (W.D. Pa. 2002);  *In re American Italian Pasta Co., Sec. Litig.*, 2006 WL 1715168, *5 n.3 (W.D. Mo. June 19, 2006); *see In re Lattice Semiconductor Corp. Sec. Litig.,* 2006 WL 538756 at *17-19 (D. Ore. Jan. 3, 2006); *Croker v. Carrier Access Corp.,* 2006 WL 2038011 at *11 (D. Colo. July 18, 2006).

The magnitude, duration and scope of the restatement, together with the remaining allegations of the Second Complaint, particularly the confidential source information indicating the existence of numerous "red flags" that were ignored by Defendants, circumstantially support a strong inference of scienter.[9]

### C.  Defendants' Stock Sales Support a Strong Inference of Scienter

During the Class Period the Individual Defendants sold large amounts of their personally held Par common stock: O'Connor 96% for $7,686,144.00; Sawyer 100% for $34,107,931.00; and Tarriff 86% for $12,643,532.00. ¶¶186-187. Tarriff and O'Connor's sales were suspicious because they sold substantial amounts of their shares during the Class Period high and at a time when Tarriff was boasting publicly about Par's record sales and earnings, strong performance, and "continued" "substantial" and "sustained" growth. ¶¶92, 94, 95, 99, 102, 105,

---

[9] Courts have held that the resignation of a CEO and/or CFO during the time when a company is conducting an investigation also supports a strong inference of scienter. *See, e.g.*, *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, *14 N.D. Cal. April 2, 2002); *In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178 at *1 (N.D. Cal. Nov. 17, 2005); *see also In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1274-1276 (N.D. Cal. 2000); *In re Mercator Software, Inc. Sec. Litig.*, 161 F.Supp. 2d 143, 150 (D. Conn. 2001); *In re Nash Finch Co.*, 2007 WL 1266658 at *21 (D. Minn. May 1, 2007). Such circumstances, when combined with an impending restatement and/or a company's implementation of remedial measures, are even more compelling. *See Sipex*, 2005 WL 3096178 at *1. Tarriff and O'Connor's departure, whether requested or voluntary, immediately prior to and after Par's "discovery" of its need to restate its financials and during the course of the investigations, is suspicious and certainly further supports an inference of conscious misbehavior or recklessness.

107, 108, 112, 115, 118, 122, 186-187.  Tarriff's last sale, 70,500 shares at $71.76

for more than $5 million on November 17, 2003, followed Par's October 2003

earnings announcement in which Tarriff boasted "[t]hrough only nine months, we

have already established annual records for both sales and earnings."   ¶187.

Similarly in November 2003 O'Connor sold 75,000 shares at prices above $71 for

$5.5 million. ¶186.  As detailed above, and in the Defendants' trading histories and

table charting Defendants' trading behavior, Defendants' sales were made during a

period of rapid inflation in Par's stock prices caused by Defendants'

misrepresentations.  ¶¶185-191.

"[U]nusual insider trading activity during the class period may permit an

inference of bad faith and scienter." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54

(2nd Cir. 1995).  Courts have found insider sales "unusual" based on a variety of

factors, including the amount of profit from sales, the amount of stock traded, the

portion of stockholdings sold, or the number of insiders involved.  *Suprema*, 438

F.3d at 277.  Plaintiffs must allege that the trades were made at times and in

quantities that were suspicious enough to support a strong inference of scienter.  *In

re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir. 1997).

Courts should ask whether the benefits realized by the executives is "sufficiently

large to constitute evidence of motive" to commit fraud.  *Id*.  Factors to consider

include whether the sales were "normal and routine," and whether the profits "were

substantial relative" to the sellers' ordinary compensation.  *Par,,* 2008 WL 2559362 *at* \*12 n. 12 (quoting *Burlington,* 114 F.3d at 1423).

The Individual Defendants' sales of over 1.3 million shares for proceeds in excess of $54 million is "massive by any measure."[10] *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999).  Tarriff sold no shares of Par stock during the two years – 1999 and 2000 – prior to the Class Period. ¶187.  In the two years preceding the Class Period, Sawyer sold only 17,000 shares and during the period 1999 through 2000, O'Connor sold only 6,666 shares. ¶187 and n.n. 16-17.

The Individual Defendants' massive insider stock sales are suspicious, ¶¶186-90, and further support a strong inference of scienter.

## V.  DEFENDANTS' MISREPRESENTATIONS ARE MATERIAL

Defendants contend that many of their Class Period statements were immaterial puffery or protected forward looking statements.  Clearly the Defendants' misrepresentations of Par's financial results in Forms 10-K and 10-Q filed during the Class Period were material misrepresentations of historical fact and neither forward looking nor puffery.  Moreover, although Par may not have restated each of its quarterly financial statements filed during the Class Period, it

---

[10] According to Par's Proxy Statements for the years 2003 and 2004 Tarriff's combined salary and bonus for 2002 and 2003 were $500,000 and $861,538, respectively; and O'Connor's combined salary and bonus for these years was $286,197 and $458,884, respectively, a mere pittance when compared to the millions of dollars they received from stock sales during these years. ¶190.

has admitted that they can no longer be relied upon.  ¶¶35, 37, 153.  The issues concerning the materiality of the other statements claimed by Defendants to be immaterial are discussed in Plaintiffs' Opposition to Tarriff's Motion to Dismiss (Dkt. No. 118) which Plaintiffs adopt and incorporate herein by reference.  *See* F.R.C.P. 10(c).  Defendants' arguments are without merit and should be rejected.

## VI.  PLAINTIFFS HAVE ALLEGED LOSS CAUSATION

Pleading loss causation requires only a "short, plain statement" showing that "the pleader is entitled to relief."  *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 345 (2005) (*quoting* F.R.C.P.8(a)).  To satisfy Rule 8(a), plaintiffs need only allege "some indication of the loss and the causal connection" to defendants' misstatements and omissions during the class period. *Id.* at 347.  "Whether the plaintiff has proven causation is usually reserved for the trier of fact." *Steiner v. Medquist, Inc.*, 2006 WL 2827740 at *19 (D.N.J. Sept. 29, 2006).

A plaintiff can allege loss causation by pleading that the truth was revealed through a series of corrective disclosures.  *See In re Bradley Pharma, Inc. Sec. Litig.,*  421 F. Supp. 2d 822, 828-29 (D.N.J. 2006); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 439 F. Supp. 2d 692, 701 (S.D. Tex. 2006); *In re Tommy Hilfiger Sec. Litig.,* 2007 WL 5581705 at *3 (S.D.N.Y. July 20, 2004).  To be corrective, a disclosure need only partially disclose the purported fraud. *See Dura*, 544 U.S. at 342. A plaintiff "is not necessarily precluded from establishing

loss causation where a corrective disclosure does not, on its face, specifically identify or explicitly correct a previous representation, or expressly disclose the particular fraudulent scheme plaintiff alleges." *In re Motorola Sec. Litig.*, 505 F.Supp.2d 501, 546 (D. Ill. 2007); *see also Bradley*, 421 F. Supp. 2d at 828. Moreover, "[a]s long as the misrepresentation is one substantial cause of the investments' decline in value, other contributing forces will not bar recovery under the loss causation requirement" but will play a role "in determining recoverable damages." *In re Dauo Systems, Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005).

Here, Plaintiffs allege sufficient facts to show that Defendants' misrepresentations proximately caused Plaintiffs' losses. ¶194. Par's fraudulent financial results presented a misleading picture of Par's financial performance. ¶¶195-196. On the last day of the Class Period, July 5, 2006, Par announced that the restatement of 2004 and 2005 results would wipe away at least $55 million in previously reported earnings due to material understatements of Par's accounts receivable reserves, and that Par would write down inventory. ¶¶153, 197. The next day, July 6, 2006, the price of Par common stock declined 26% to close at $13.47 per share on volume of more than 9 million shares, a decline of $4.78 per share. ¶199-200. During the same period in which Par's stock price fell as much as 26% as a result of Defendants' fraud being revealed, the Standard & Poor's 500 securities index was flat. ¶200.

Defendants' suggestion that Plaintiffs have failed to allege loss causation with respect to the accounting irregularities that occurred in the years 2001 through 2003 because they were not specifically announced until after the Class Period misses the mark. A similar argument was rejected by the court in *Bradley*, 421 F. Supp. 2d at 828-29 (final disclosure after end of Class Period followed by price rise did not negate loss causation as to earlier partial disclosures).[11]  In *Dura* the Supreme Court only suggested that the plaintiffs need to have alleged in some fashion that the truth became known before the share price fell. *Bradley*, 421 F. Supp. 2d at 828-29. *Dura* neither addressed what types of events or disclosures may reveal the truth, nor explained how specific such disclosure must be. *Bradley*, 421 F. Supp. 2d at 828-29.  The July 5, 2006 disclosure revealed that Par was restating its financial statements to correct the understatement of accounts receivable reserves and the overstatement of inventory.  All of the subsequently announced restatements dealt with these same issues and the previous disclosures put the market on notice of the misrepresentations connected to same.  Plaintiffs have sufficiently alleged loss causation with respect to all the financial results that were misrepresented by Defendants during the Class Period.[12] *See, e.g., id; Tommy*

---

[11] *See also Tommy Hilfiger*, 2007 WL 5581705 at *2-3; In re *Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 761 (S.D. Oh. 2006).

[12] The fact that Par's stock price eventually recovered may be relevant to the determination of the amount of damages recoverable by Class members, but is not

*Hilfiger*, 2007 WL 5581705 at *2-3; *In re Dura Pharmaceuticals, Inc.,* 452 F. Supp. 2d 1005, 1023 (S.D. Cal. 2006).

### VII. PLAINTIFFS HAVE STATED CLAIMS FOR CONTROL PERSON LIABILITY

Contrary to Defendants' suggestion the Third Circuit does not require culpable participation, although sufficiently alleged in the Second Complaint, ¶¶48-77, be pled in order to establish control person liability. *Able,* 2008 WL 1967509 at *29; *In re Campbell Soup Co. Sec. Litig.*, 145 F.Supp.2d 574, 600 (D.N.J. 2001). The "**overwhelming trend in this circuit**" is that culpable participation need not be pled in order to survive a motion to dismiss. *Jones v. Intelli-Check, Inc.*, 274 F.Supp.2d 615, 645 (D.N.J. 2003) (emphasis added).

To state a cause of action for control person liability, a plaintiff must allege: (1) a primary violation by a controlled person or entity; and (2) "circumstances establishing control" of a primary violator. *Suprema,* 438 F. 3d at 284; *In re Alpharma Inc., Sec. Litig.,,* 372 F. 3d 137, 153 (D.N.J. 2004); *In re MobileMedia, Sec. Litig.,* 28 F. Supp. 2d 901, 940 (D.N.J. 1998). All that is required "is an allegation, not proof, that these individuals were controlling persons." *Able,* 2008

---

relevant to the loss causation argument asserted by Defendants.  Par's stock price dropped precipitously as a result of the revelation of the truth and remained there for a significant period. Moreover, the mean trading price of Par's stock during the 90 day "bounce-back" period referenced by Defendants was $16.76, significantly below the $18.25 price of Par's stock on the last day of the Class Period.

WL 1967509 at *28. Rule 8 notice pleading applies. *Royal Dutch/Shell,* 380 F. Supp. 2d at 564-65.

Plaintiffs allege that each of the Individual Defendants, **executive officers of Par involved in the day-to-day operations of the Company**, signed SEC filings containing false financial, and other, information, the manner in which they controlled their content, dissemination and circulation and that they attested to their accuracy. ¶¶17-23, 100, 104, 106, 110, 114, 117, 120, 125, 129, 132, 134, 138, 141, 144, 147, 151, 180, 182-84, 208; *In re NUI Sec. Litig.*, 314 F.Supp.2d 388, 417 (D.N.J. 2004); s*ee also Campbell Soup*, 145 F.Supp.2d at 600. Even outside directors can be held liable as control persons when they sign important SEC filings containing misrepresentations and omissions, as Defendants have done here. *Schnall v. Annuity and Life Re (Holdings), Ltd.*, 2004 WL 231439 at *9 (D. Conn. Feb. 4, 2004); s*ee In re PMA Capital Corp. Sec. Litig.,* 2005 WL 1806503 at *20 (E.D. Pa. 2005). Plaintiffs' allegations state a claim for control person liability under Section 20(a) against each of the Individual Defendants.

## VIII.  CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss should be denied in its entirety.  If the Court grants Defendants' Motion, it should be without prejudice and with leave to amend.

**FEDERMAN & SHERWOOD**

/s/ William B. Federman
William B. Federman
Stuart W. Emmons
10205 North Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Facsimile: (405) 239-2112

**COUGHLIN, STOIA, GELLER,
RUDMAN & ROBBINS, LLP**
Samuel H. Rudman
Russell J. Gunyan
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile (631) 367-1173

*Co-Lead Counsel for Plaintiffs*

**LITE DEPALMA GREENBERG & RIVAS,
LLC**
Joseph J. DePalma
Two Gateway Center, 12th Floor
Newark, NJ 07102-5003
Telephone: (973) 623-3000
Facsimile: (973) 623-0858

*Liaison Counsel for Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2008, a true and correct copy of the above and foregoing instrument was filed and served pursuant to the ECF Filing Rules

/s/ William B. Federman
William B. Federman

41