# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

*DOCUMENT ELECTRONICALLY FILED*

| | |
|---|---|
| In Re: PAR PHARMACEUTICAL SECURITIES LITIGATION  ―――――――――――――――――― This Document Relates To: ALL ACTIONS. | Master File No: 2:06-cv-03226 (PGS - ES)  **CLASS ACTION** |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFFS' SECOND CONSOLIDATED AMENDED COMPLAINT

**GREENBERG TRAURIG, LLP**
Eric S. Aronson
200 Park Avenue
P. O. Box 677
Florham Park, NJ  07932
Tel.:  (973) 360-7900
Fax:  (973) 301-8410

**GREENBERG TRAURIG, LLP**
Richard A. Edlin (admitted in NJ)
Ronald D. Lefton (admitted *pro hac vice*)
Toby S. Soli (admitted *pro hac vice*)
200 Park Avenue
New York, NY  10166
Tel.:  (212) 801-9200
Fax:  (212) 801-6400

*Attorneys for Defendants Par Pharmaceutical Companies, Inc. Kenneth Sawyer and Dennis J. O'Connor*

**PEPPER HAMILTON LLP**
Frank C. Razzano (admitted in NJ)
Hamilton Square
600 14th Street, NW
Suite 500
Washington, DC  20005
Tel.  (202) 220-1286
Fax:  (202) 220-1665

*Attorneys for Scott L. Tarriff*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ii

PRELIMINARY STATEMENT ..........................................................................................1

ARGUMENT .........................................................................................................................4

I.   Plaintiffs Misunderstand Their Pleading Burden ...............................................4

II.  The Confidential Informants Do Not
     Create A Cogent Inference Of Scienter.............................................................4

     A.  CI 1 − CI 3 Do Not Allege Facts That Support
         An Inference That Defendants "Manipulated"
         Par's Accounts Receivable Reserves ........................................................5

         *1.  The CIs Do Not Adequately Allege The Distinction
              Between The Excel Spreadsheets And The GTN* ........................9

         *2.  The CIs Do Not Adequately Allege How The
              GTN Results Compared With The Excel Results* .....................10

         *3.  The CIs Do Not Adequately Describe The
              Content Of The Daily Flash Reports* .........................................13

     B.  CI 4 – CI 8 Do Not Allege Facts That Support An
         Inference That Defendants "Knowingly Failed"
         To Write-Off Inventories ........................................................................14

CONCLUSION.....................................................................................................................16

# TABLE OF AUTHORITIES

*Aldridge v. A.T. Cross, Corp.*,
   284 F.3d 72 (1st Cir. 2002) ................................................................................ 8

*In re LDK Solar Sec. Litig.*,
   No. C 07-05182, 2008 WL 2242185 (N.D. Cal. May 29, 2008) ..................... 8

*In re Majesco Sec. Litig.*,
   No. 05CV-3557, 2006 WL 2846281 (D.N.J. Sept. 29, 2006) ......................... 8

## **PRELIMINARY STATEMENT**

Instead of pleading facts from which a cogent inference of scienter could be drawn, Plaintiffs simply rely upon peripheral statements by a confidential informant (CI 2) who is at least three-persons-removed from any of the Individual Defendants, and does not provide any description of the supposed securities fraud relating to the accounts receivable reserve. Plaintiffs then heap unfounded assumption upon unfounded assumption concerning a gross-to-net ("GTN") computer report of daily sales to conclude that Par's two most senior officers knew that the company's audited financial statements were false and misleading. These unfounded assumptions fall of their own weight and do not establish a cogent inference of scienter.[1] Plaintiffs suggest that because (1) Par admitted that its financial statements were false and misleading (an inference drawn from the restatement itself), and (2) the GTN report varied from the Excel spreadsheets used in the Finance Department for accounting and financial reporting purposes, Defendants must have known at least as of "late 2004" when the GTN system first was completed by CI 2 that its financial reporting was false and misleading. It is only Plaintiffs unwarranted inferences that are reckless.

---

[1] Defendants Par, Sawyer, and O'Conner, have also filed a November 20, 2008 Motion Pursuant to Federal Rule of Civil Procedure Rule 11(c) to Strike Allegations from the Second Complaint and for Counsel Fees and Costs ("Rule 11 Motion"), which the parties have stipulated should be considered at the same time as this Motion to Dismiss. Gabrielle Wolfson, the individual identified in the Second Complaint as CI 1, and the actual supervisor of CI 2, has submitted a Declaration in support of the Rule 11 Motion. [Doc. 148, Wolfson Decl., ¶ 3.]

Plaintiffs allege that the purpose of the GTN was to automate certain sales and revenue information previously maintained on a "manually adjusted" Excel spreadsheet. All assumptions that went into writing the GTN software program came from the Finance Department and were also included in the Excel spreadsheets (with the exception of certain price protection adjustments discussed *infra.*). Plaintiffs further allege that the results did not match. But Plaintiffs failed to plead the parameters of what the GTN report showed or how it was utilized. Like any computer program or model, the GTN necessarily relied upon certain assumptions. It was those very assumptions − included in both the GTN and the Excel spreadsheets − that were incorrect and necessitated Par's restatement.

As Par disclosed, the restatement resulted from the failure to include certain assumptions or components in the accounts receivable reserve estimation methodology, including "processing time lags." [Doc. 109, 2007 Edlin Decl. Ex. O, pp. F-8, F-27.] The GTN did no more than automate the same assumptions that were included in the Excel spreadsheets. Neither CI 2 nor any other CI even hint those assumptions were known to be incorrect.

The variance between the GTN and the Excel spreadsheets does not support any inference of scienter. Plaintiffs say the variance was "consistently" 5-10%, but Par's restatement makes plain that adjustments for 2001 through the first quarter of 2006 were not uniform and seldom in the range of 5-10%. More importantly, the

2

restatement reflected a host of issues, none of which Plaintiffs link to the GTN. Plaintiffs allege nothing more than the GTN was different than the Excel spreadsheets, and therefore Defendants acted with scienter.  At most, Defendants might have learned that the GTN differed from the Excel spreadsheets prior to monthly reconciliation for actual events and other accounting adjustments. This is a far cry from knowledge of circumstances from which any inference of scienter could be drawn, much less a cogent one.

Statements by the other CIs that Par had a lot of inventory that "needed to be" written off do not provide any inference of scienter.  None of the CIs ever identifies any inventory that was not written off that should have been.  Par wrote off very large quantities of inventory in every accounting period.  The issue is not that there were large quantities of obsolete inventory; instead, the issue is whether any of the Defendants knew or had reason to know that Par's methodology for calculating write offs for obsolete inventory was incorrect.  None of the CIs even suggest that this latter essential issue was ever brought to Defendants' attention.  In fact, when the correct methodology was applied in the restatement, the inventory values increased during 2001 through 2004.  Plaintiffs fail to allege facts, as distinguished from argumentative surmise, that remotely suggest an inference of scienter at least as compelling as the conclusion reached by independent counsel that the restatement was necessitated by "inadvertent" errors.

# ARGUMENT

## I. Plaintiffs Misunderstand Their Pleading Burden.

In their opposition brief, Plaintiffs complain that they "cannot be expected to tell the story seamlessly without the benefit of discovery." (Opp. Br. 30.) They have it backwards. Plaintiffs should not be given the opportunity to conduct discovery unless they satisfy their burden to plead that each Defendant engaged in securities fraud, with scienter, which caused the Plaintiffs' loss. They have not.

In dismissing Plaintiffs' First Complaint, this Court correctly determined Plaintiffs had not met their pleading burden: "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." [Doc. 132, p. 16.] Plaintiffs' Second Complaint contains the same "bald assertions, unsupported conclusions, unwarranted inferences, and sweeping legal conclusions" this Court previously rejected, and again relies upon group pleading and mere speculation. Plaintiffs cannot proceed to discovery because they have failed, yet again, to satisfy their pleading burden under the PSLRA and Rule 9(b).

## II. The CIs Do Not Create a Cogent Inference Of Scienter.

None of the CIs provides sufficient facts to support an inference that they were in a position to have personal knowledge of Par's accounting or financial disclosures, much less a securities fraud. Indeed, although Plaintiffs principally

4

rely upon CI 2, he never interacted with any of the Individual Defendants, and plainly was not involved with any aspect of accounting or financial reporting.

### A.     CI 1 − CI 3 Do Not Allege Facts That Support An Inference That Defendants "Manipulated" Par's Accounts Receivable Reserves.

Plaintiffs allege "in late 2004, Defendants were informed" that the Excel spreadsheets used to calculate the "'net revenues' and 'accounts receivable reserves' were producing inflated results that could not be reconciled to the Company's original business records, yet Defendants continued to" report inflated revenues.  (Second Compl. ¶ 47.)[2]  Plaintiffs purport to base this "summary" allegation on the statements of CI 1, CI 2, and CI 3, but these CIs do not provide factual information that would support Plaintiffs' conclusory allegation.

The CIs do not state that the Excel spreadsheets could not "reconciled to the Company's original business records."  At best, drawing all reasonable inferences in favor of Plaintiffs, these CIs, all from the IT Department, allege "facts" that the GTN, which was an "automated" program newly-created by a member of the IT Department, could not be reconciled with the Excel spreadsheets, which had been "manually adjusted" by the Finance Department for years.  (¶¶ 58-59 ("CI 2

---

[2]  Plaintiffs use of the collective term "Defendants" underscores their inability to meet their burden to allege specific actions by each Defendant.  Defendant Sawyer retired in July 2003.  Whatever information may have been shared in "late 2004" cannot be used to infer that Sawyer acted with scienter because he was not even an officer at that time.  Moreover, when Sawyer was the CEO, inventory was understated.  Thus, there is no basis whatsoever to infer that Sawyer acted with scienter, and all claims against him must be dismissed, and this time with prejudice.

attempted to reconcile the two systems" and CI 2's employment was terminated because of "the discrepancy between the Excel spreadsheet and the GTN"").)

The CIs say nothing that would support an inference that the GTN was accurate, or the equivalent of the "Company's original business records," or should have been used for accounting or financial reporting. The CIs do not make these statements because they were not in a position to know; they were members of the IT Department, not the Finance Department.

Plaintiffs argue it is enough that they have pled that "the accounts receivable reserves were understated and its net revenues overstated, a result predicted by the GTN." (Opp. Br. 24-25.) Plaintiffs even go so far as to argue that Defendants have admitted the GTN predicted the "precise result." (Opp. Br. 26.) Defendants have admitted no such thing. The GTN did not predict the restatements or its magnitude. Plaintiffs' allegations about the discrepancies between the GTN and the Excel spreadsheet have anything to do with why Par's results needed to be restated − it is like comparing apples to oranges. *Both* the GTN *and* the Excel spreadsheets were wrong because neither included all the components necessary to calculate the reserve; and, therefore, neither predicted the restated results.

On the one hand, Plaintiffs allege, based upon the conclusory allegations of CI 2, that the GTN and the Excel spreadsheets differed because of certain monthly manual adjustments made by the Finance Department, which were included in the

6

Excel spreadsheets but not the GTN. (*See* Second Compl. ¶ 56.) CI 2 "speculates" that there may have been improper manual adjustments. (*Id.* ¶ 60.)[3] On the other hand, based upon Par's detailed 2005 10-K/A, the restated accounts receivable reserve and the previously disclosed reserve differed because Par's methodology for calculating the chargebacks, rebates, and returns, did not take into account "all necessary components," including the "processing time lags" or the "date of product return due to product expiration." [Doc. 109, 2007 Edlin Decl. Ex. O, F-8.] Thus, the Excel spreadsheets, either before or after the "manual adjustments," were wrong because they were based upon a methodology that did not take into account these components. CI 2 does not allege that the GTN applied a methodology that "correctly" considered "processing time lags" or the "date of product return due to product expiration" or any of the other missing components necessary to of estimate the accounts receivable reserve. The Second Complaint is devoid of any such specificity, and there are no facts to infer any of the Defendants had prior knowledge of the specific missing components.

Plaintiffs argue that, even though CI 2 could not articulate *why*, CI 2 "believed the GTN was accurate." (Opp. Br. 24.) Defendants argue that it is more reasonable to infer that Defendants believed the Excel spreadsheets were accurate

---

[3]   Wolfson declares that the GTN and Excel spreadsheets did not match *before* any monthly manual adjustments made by the Finance Department. [Doc. 148, Wolfson Decl., ¶ 16.] Par's management, auditors, and internal control and conversion consultants, and everyone in Par's Finance Department believed that the Excel spreadsheets were accurate and reliable. [*Id.*, ¶ 12.]

7

based upon years of historical use and approval by Par's Finance Department and outside auditors. (Opp. Br. 26.)[4] Plaintiffs attempt to dodge the issue by arguing that whether the GTN or the Excel spreadsheet is more accurate is a question of fact, not to be decided on this motion to dismiss. (*Id.*) Plaintiffs miss the point. Based upon the disclosures in Par's restatement (which this Court is permitted to consider on a motion to dismiss), the GTN and the Excel Spreadsheets were *both wrong* because neither included the appropriate methodology for calculating all of the components of the accounts receivable reserve based upon chargebacks,

---

[4] Plaintiffs argue that the unqualified opinions of Par's auditors do not shield the officers from liability and cite three cases in support of their position. (Opp. Br. 26, fn. 5.) The cases are distinguishable. First, *In re LDK Solar Sec. Litig.*, No. C 07-05182, 2008 WL 2242185, at *2-5 (N.D. Cal. May 29, 2008), the company's auditors had identified a control deficiency, the company had hired an accountant to address that specific deficiency, and that accountant continued to warn the Company about that deficiency before its audited financial statements were issued. Here, neither Par's auditors nor any of its internal accountants ever warned Defendants about any deficiencies. Second, in *Aldridge v. A.T. Cross, Corp.*, 284 F.3d 72, 83-84 (1st Cir. 2002), the issue was whether defendants timely disclosed their revenue recognition policy, which included price protection reserves, not whether that policy was in compliance with GAAP. The Court found plaintiffs adequately alleged defendants engaged in price protection before they disclosed it. Conversely, in this case, Par disclosed its revenue recognition policy. The issue here is whether anyone knew the methodology used to calculate the reserve was wrong. Finally, in *In re Majesco Sec. Litig.*, No. 05CV-3557 PGS, 2006 WL 2846281, at *5-6 (D.N.J. Sept. 29, 2006), this Court held that plaintiffs had adequately alleged defendants knew of the GAAP violations and misrepresentations regarding the company's ability to sell frontline videogame titles because defendants had received weekly reports and attended weekly meetings that allegedly made clear that Majesco's customers were experiencing a build up of inventory and would seek price protection and/or return of the products, yet Defendants lowered their price protection reserve from 11% of revenue to 5.5% of revenue, when the industry average was 13%. This Court held that plaintiffs had adequately alleged scienter based upon the allegations of confidential informants who were in a position to know about the transactions involved and the identities of customers or employees involved in the transactions. *Id.*, * 7. By contrast here, Plaintiffs have not alleged that the confidential informants are in a position to know about Par's accounting and financial disclosures, and they do not identify any specific transactions.

8

rebates, product returns, and other accounts receivable reserves.  CI 2 does not state otherwise, and, therefore, Plaintiffs fail to satisfy their pleading burden.

> 1. *The CIs Do Not Adequately Allege The Distinction Between The Excel Spreadsheets And The GTN.*

Plaintiffs describe the Excel spreadsheets as follows: "There was one spreadsheet for each month and a line for each product." (Second Compl. ¶ 53.) The spreadsheets were "updated daily by a computerized feed" that included "what the customers were ordering, and what the customers had in stock." (*Id.*) Presumably, some part of this information was utilized to calculate gross sales. The Excel spreadsheets then applied a "rather sophisticated algorithm," which incorporated "the terms of the contracts that Par had with its customers" (including wholesalers and retailers), and calculated the accounts receivable reserve, which is an estimate of the future "effects of charge-backs, rebates, discounts, credits and shelf stock." (*Id.*)  The Excel spreadsheets were then adjusted, on a monthly basis, "manually by finance personnel." (*Id.* ¶¶ 54-55.)  The "manual" adjustments to the Excel spreadsheets included "adjustments relating to promotional programs and discounts," as well as a "price protection adjustment." (*Id.*)

Plaintiffs describe the GTN as follows: "The GTN application was to serve as an automated replacement for the series of Excel spreadsheets that Par had been using…." (Second Comp. ¶ 53.) "The GTN application incorporated the terms of Par's customer contracts," but it did not "incorporate the price protection

9

adjustment as well." (*Id.* ¶ 56.) (*Id.*) CI 2 is the alleged creator of the GTN, and an apparent "source" for Plaintiffs, but the Second Complaint contains no other allegations describing the GTN. Plaintiffs did not allege how the GTN worked, what factors it considered, what assumptions it was based upon, or what results it reflected. Indeed, Plaintiffs do not even attempt to explain how, when, or if the GTN was considered by Par's Finance Department, or Par's outside auditors when preparing Par's reported financial statements, or why a decision may have been made to utilize the Excel spreadsheets, which they had be using for years.

>    2.   *The CIs Do Not Adequately Allege How The GTN Results Compared With The Excel Spreadsheet Results.*

Plaintiffs argue that net revenue numbers produced by the GTN did not match the numbers produced by the manually-adjusted Excel spreadsheet. (Opp. Br. 15.) But so what? None of the CIs have personal knowledge of *how* the results differed, and, in any event, both the GTN and the Excel spreadsheets failed to include a component for "processing time lags" (and other missing components), which caused the restatement. The Second Complaint does not allege otherwise.

Plaintiffs argue that Par's net revenues produced by the manually adjusted Excel spreadsheets were about 5-10% higher than the figures produced by the GTN, which is "within the range" of the amount that the actual restatement. (Opp. Br. 27.) This is a quantitative measure (5-10%), not a qualitative one (explaining *how* the amounts differ). The GTN did not predict the magnitude of the

10

restatement — restated revenue was not 5-10% higher.[5] More importantly, Plaintiffs did not allege any factual information that would connect the GTN to the restated numbers, or any factual information that explains why the Excel spreadsheets were incorrect.

Plaintiffs do not adequately allege a description of the price protection adjustment (apparently because CI 2 did not understand the adjustment). (*See* Second Compl. ¶ 55.) Par has disclosed price protection in its public filings, explaining that, in addition to chargebacks, rebates and incentive programs, returns, discounts, and other sales allowances, Par may, under certain circumstances issue a price protection credit to a customer:

> As is common in the industry, [Par] issues price protection credits to its customers, which [it] refers to as shelf-stock adjustments, when [it] expects significant price erosion through an increase in competition.

---

[5]   The following chart (using the revenue before and after the restatement as reflected on page 29 of Defendants' brief) demonstrates that the restatement resulted in a total revenue adjustment of over 5% only once:

- 2001:  271,035 - 262,376 =   8,659 and   8,659 / 262,376 = 3.30% adjustment
- 2002:  381,603 - 379,013 =   2,590 and   2,590 / 379,013 = 0.68% adjustment
- 2003:  659,460 - 632,024 = 27,436 and 27,436 / 632,024 = 4.34% adjustment
- 2004:  689,107 - 647,975 = 41,132 and 41,132 / 647,975 = 6.34% adjustment
- 2005:  443,194 - 432,253 = 10,941 and 10,941 / 432,253 = 2.53% adjustment
- 1Q06: 173,832 - 172,318 =   1,514 and   1,514 / 172,318 = 0.87% adjustment

Because of a rounding difference, the parties have different aggregate adjustments for 2004 through the first quarter of 2006. (Compare Moving Br. 18, 29 with Opp. Br. p. 27 n. 6.) The point, however, is that Plaintiffs' claims regarding the GTN are unfounded − if the GTN consistently produced a 5-10% variance it was even more wrong than the restated numbers reflected above.

[Doc. 109, 2007 Edlin Aff. Ex. O p. F-27.] CI 2 implies that the "price protection adjustment" might explain *how* the results differed because the GTN did not incorporate this adjustment. (Second Compl. ¶ 56.) CI 2 claims that he asked about price protection, and Pepe and Schott told him that it was based upon "experience and market knowledge and that CI 2 should not be concerned with it." (*Id.*) But, the price protection adjustment does not explain the discrepancy.

Neither the discrepancy between the GTN and the Excel spreadsheets, nor the need for the restatement, was the result of price protection adjustments. Based upon CI 2's own statements, members of the Finance Department knew that the GTN did not include the price protection adjustment, yet CI 2 was still "called on the carpet" for his failure to reconcile these two technologies. (Second Comp. ¶¶ 57-59.) Also, CI 2 alleges that even though he had his systems developers check and recheck the math and programming, and spent six months trouble shooting and addressing the issues with his manager, he was never able to determine what components of the GTN system were causing the disparity with the Excel spreadsheet. (*Id.*) Although CI 2 may have believed that his numbers were correct, and the Excel spreadsheet numbers were wrong, he has never explained why. Despite months of his best efforts, he simply never could determine what components were causing the discrepancy between the GTN and Excel. (*Id.*)

Par has explained the reason for the restatement as the failure in its methodology to take into account certain missing components, which resulted in Par's reserve assumptions being incorrect. [Doc. 109, 2007 Edlin Decl. Ex. O, pp. F-8, F-27.] C12 has not and cannot allege that the GTN predicted the need for the restatement because the methodology used in the GTN did not take into account those missing components.

### 3. The CIs Do Not Adequately Describe The Content Of The Daily Flash Reports From The GTN.

Plaintiffs argue that the GTN daily flash reports "compared the GTN data with the data produced by the Excel spreadsheets that Par continued to utilize for reporting purposes." (Opp. Br. 3.) Plaintiffs' argument is fundamentally flawed. The GTN daily flash reports did not include a "comparison" of the GTN numbers to the Excel numbers within the daily report itself. (*See* Second Compl. ¶ 51 ("'daily' reports from GTN").) Plaintiffs cite to ¶ 62, but in that paragraph CI 1 merely stated that "the GTN data was compared to the information in the Excel spreadsheets." (*Id.*, ¶ 62.) Plaintiffs do not allege in the Second Complaint when the data was compared — daily, monthly, quarterly, or yearly — and do not say the "comparison" appeared in the GTN reports. As explained in Defendants' opening brief, the fact that the GTN reports were prepared "daily" means that the numbers were not firm and could not take into account "monthly" adjustments.

13

Plaintiffs also do not allege that each of the Individual Defendants reviewed the GTN reports. Indeed, Plaintiffs do not even try to connect the GTN reports to Sawyer who retired over a year before the reports became available. Moreover, even if any of the Defendants had reviewed the GTN reports, the reports would not support a cogent inference that Defendants knew, at the time the financial statements were issued, that the accounts receivable reserve was understated due to a reserve methodology that did not include all necessary components because the GTN daily reports did not include those components either.

**B.    CI 4 – CI 8 Do Not Allege Facts That Support An Inference That Defendants "Knowingly Failed" To Write-Off Inventory.**

CI 4 − CI 8 state that Par "needed" to write off obsolete inventory, but they never identify any inventory that was in fact not written off when it should have been,[6] or how or why Par's inventory accounting methodologies were incorrect. (*See* Second Compl. ¶¶ 63-78.) It is undisputed that Par wrote off large quantities of inventory in every accounting period. But the issue is whether any of the Defendants knew or should have known that any of the methodologies or underlying assumptions used to determine when inventory should be written-off were incorrect. Plaintiffs make no such allegations.

---

[6]    CI 5 attempts to allege that Buspirone inventory was not written off timely. CI 5 fails to adequately describe how, when, or why it should have been written off earlier, especially if CI 5 believes that it should have been written off in 2001-3, because in those years Par understated its inventory according to the restatement. (*See* Doc. 109, 2007 Edlin Decl. Ex. 0 at F-11.)

14

Plaintiffs cannot make any such allegations because the CIs are not in a position to know. Plaintiffs' argument that they were "absolutely in positions to know the amount of obsolete inventory Par had at any given time" (Opp. Br. 23) miss the point. CI 4 − CI 8 were all employees associated with Par's warehouse and production plant, none of them were members of the Finance Department, and none of them were responsible or involved in accounting or financial reporting.

Similarly, Plaintiffs argue that CI 5 personally communicated Par's excess and obsolete inventory problem to Tarriff and O'Conner, but CI 5 does not allege discussions regarding the accounting or financial reporting for such inventory. (*See* Second Compl. ¶ 76.) Moreover, CI 5 left Par in October 2004 (*Id.* ¶ 63), before Par would have finalized its financial results for that year and before the auditors would have finalized the audited financials. To the extent that CI 5 told Tarriff or O'Conner that inventory needed to be written off in 2001, 2002, or 2003, he apparently was mistaken, or his suggestions were implemented and they should not have been, because the inventory for that period was actually ***understated***.

## CONCLUSION

For all of the foregoing reasons and for all the reasons stated in Par's initial brief and accompanying affirmation and exhibits, Plaintiffs' Second Amended Complaint should be dismissed in its entirety, and this time Plaintiffs should not be given leave to replead.

DATED:  December 22, 2009  **GREENBERG TRAURIG, LLP**

By: /s/  Eric S. Aronson
    Richard A. Edlin
    Eric S. Aronson
    Ronald D. Lefton (admitted *pro hac*)
    Toby S. Soli (admitted *pro hac*)
200 Park Avenue, P.O. Box 677
Florham Park, NJ 07932-0677
Telephone:  (973) 360-7900
Facsimile:  (973) 301-8410

      -and-

200 Park Avenue
New York, New York 10166
Telephone:  (212) 801-9200
Facsimile:  (212) 801-6400

edlinr@gtlaw.com
aronsone@gtlaw.com
leftonr@gtlaw.com
solit@gtlaw.com

*Attorneys for Defendants Par Pharmaceutical Companies, Inc., Kenneth Sawyer, and Dennis J. O'Connor*


**PEPPER HAMILTON LLP**

By: /s/ Frank C. Razzano
    Frank C. Razzano
Hamilton Square
600 14th Street, NW  Suite 500
Washington, DC  20005
Telephone:  (202) 220-1286
Facsimile:  (202) 220-1665
razzanof@pepperlaw.com

*Attorneys for Defendant Scott L. Tarriff*

16