**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **In re PAR PHARMACEUTICAL SECURITIES LITIGATION** | Civil Action No.: 06-cv-3226 (PGS) <br><br> **OPINION** |

This is a securities class action brought on behalf of purchasers of Par common stock between July 23, 2001 and July 5, 2006 (the "Class Period"). Plaintiffs Snow Capital Investment Partners and WR Capital Management, LP (collectively, "Plaintiffs") allege that during the Class Period, defendants Par Pharmaceuticals Companies, Inc. ("Par" or the "Company"), Kenneth Sawyer, Dennis O'Connor, and Scott Tarriff's (collectively, "Defendants") made numerous fraudulent statements, resulting in losses for shareholders that are actionable pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. On June 24, 2008, the Court opined and granted Defendants' motion to dismiss Plaintiffs' consolidated amended complaint ("FAC") with leave to file an amended complaint within 30 days. Thereafter, on July 23, 2008, Plaintiffs filed a second consolidated amended complaint ("SAC").

Currently before the Court are three related motions:

1.    Defendants' motion to dismiss Plaintiffs' SAC for failure to state a claim, which focuses particularly on Defendants' alleged lack of scienter, an element necessary to state a claim under Sections 10(b) and 20(a) of the Exchange Act;

2.      Defendants' motion to strike paragraphs 47-62 and 64-66 of the SAC and for counsel

fees and costs; and

3.      Plaintiffs' motion to strike a declaration (the Wolfson Declaration) filed by

Defendants' in support of their motion to strike.

Given the relatedness of these motions, the Court will first discuss Defendants' motion to dismiss.

For the reasons set forth below, Defendants' motion to dismiss is granted in part and denied in part,

Defendants' motion to strike paragraphs 47-62 and 64-66 of the SAC and for counsel fees and costs

is denied, and Plaintiffs' motion to strike the Wolfson Declaration is granted.

## I.    BACKGROUND

In its June 24, 2008 opinion, the Court set forth the facts of this case at length.  Those facts

are incorporated in this opinion as if set forth at length.  For purposes of the present motions, the

Court will limit its discussion primarily to the SAC, which includes assertions from numerous

confidential informants.

Par is a Delaware corporation, which maintains executives offices in New Jersey.

Defendants Kenneth Sawyer ("Sawyer") was Par's Chairman of the Board, Chief Executive Officer,

and President until July 2003; Scott Tarriff ("Tarriff") was Par's President and Chief Executive

Officer from September 2003 to 2006, and Executive Vice President from January 1998 to

September 2003; and Dennis O'Connor ("O'Connor") was Par's Vice President and Chief Financial

Officer from 1996 to March 2006 (collectively, the "Individual Defendants").  Mark Auerbach, a

defendant in the FAC and Executive Chairman of the Board until September 2006, was not named

as a defendant in the SAC, and as such, the case is dismissed against him.

Defendant Par engages in the manufacture and distribution of generic and branded drugs in

the United States. (SAC ¶ 30.) After what had apparently been several years of positive financial news, on July 5, 2006, Par announced that, as a result of "accounting errors," its financial statements for the periods 2004 to first quarter 2006 "should no longer be relied upon." (*Id.* ¶ 35.) Financial and legal fallout shortly ensued. The Company's stock price declined from $18.25 to $13.47 (*id.* ¶ 36); the Company announced that its Audit Committee had engaged the law firm Nixon Peabody to conduct an independent investigation (*id.* ¶ 155); the Securities and Exchange Commission ("SEC") informed the Company that it was conducting an informal investigation (*id.* ¶ 155); and on September 26, 2006, at the request of the board of directors, Defendant Tarriff resigned as President and CEO (*id.* at ¶ 156).

On March 13, 2007, Par filed an amended 2005 10-K with the SEC, which further disclosed its accounting errors. Among other things, the Company stated that its (a) Accounts Receivable Reserves and Revenues, and (b) its Inventory Valuation Existence, were misstated. (*Id.* ¶ 38.) As a result of these misstatements, the Company's operating results and enterprise value during the Class Period were overstated. (*Id.* ¶ 45.) In total, these restatements, stretching from 2001 through the end of the first quarter of 2006, revealed that par had understated its accounts receivable reserves by more than $83.5 million and overvalued its inventories by greater than $9.9 million. (*Id.* ¶ 9.)

Plaintiffs allege that Par's misstatements were the result of Defendants' intentional or reckless conduct in violation of securities laws. As evidence of Defendants' fraud, Plaintiffs point to, among other things, the magnitude of the restatements, the Company's significant internal control deficiencies, the Company's GAAP violations, the investigations which followed, and the numerous press releases touting the Company's financial success during the Class Period. (*Id.* ¶ 44; slip opinion at 7-14 (summarizing quarterly press releases); Pl. Br. at 31-33.)

3

Plaintiffs also point to Individual Defendants stock sales during the Class Period, which they deem "highly suspicious." (SAC ¶ 188.) According to the SAC, a high percentage of Individual Defendants' total shares were allegedly sold during the Class Period at great financial benefit to Individual Defendants. (*Id.* ¶ 187.) Plaintiffs even include the stock sales of Mark Auerbach and Arie Gutman who are not defendants in the SAC.

Finally, and most relevant for the present motions, Plaintiffs provide circumstantial evidence allegedly supplied by eight confidential informants. Plaintiffs' FAC contained two confidential informants. (slip opinion at 5-6.) But following the Court's dismissal of the FAC, Plaintiffs obtained information from additional confidential informants. Through these additional confidential informants come allegations that Individual Defendants received reports on both the Company's accounts receivable and inventory issues, which support the inference that Individuals knew or consciously disregarded the Company's misstatements. With respect to accounts receivable, these reports were generated as part of a program to develop new accounting software. With respect to inventory, these reports were prepared by a Materials Review Board created to address the increasing and worsening inventory problems.

CI-1 (subsequently identified in Defendants' November 20, 2008 motion to strike as Gabrielle Wolfson) is a former senior executive of Par employed from early 2002 until late 2007. (*Id.* ¶ 48.) She began her career at Par as Vice President of Information Systems and by 2004 was promoted to Chief Information Officer. (*Id.*) CI-1 reported directly to Par's CEO throughout her tenure, had regular interactions with each of the Individual Defendants, and regularly attended senior management meetings with Individual Defendants. (*Id.*) She also supervised CI-2's design of an automated "gross-to-net" ("GTN") application intended to replace the outdated excel spreadsheets

that Par used to calculate the accounts receivable reserves directly at issue in this case. (*Id.*)

CI-2 is a former Associate Director of Information Systems and was employed by Par from November 2002 to December 2004. (*Id.*) CI-1 oversaw at least some of CI-2's work on the GTN and confirmed that he was assigned to lead the design of the GTN. (*Id.* ¶ 52.) CI-2 reported to the Director of Finance, Lisa Pepe ("Pepe"), who reported to the Vice President of Information Systems, Joe Schott ("Schott"), who reported to the Chief Financial Officer, Defendant O'Connor. (*Id.* ¶ 48.) Some of CI-2's allegations were also "confirmed and corroborated" by CI-1. (*Id.* ¶ 54.)

CI-3 is a former Sales and Marketing Systems Manager employed by Par from March 2006 until December 2006. (*Id.* ¶ 48.) CI-3's responsibilities included maintenance of the GTN application and other responsibilities relating to Par's business and sales IT systems. (*Id.*) CI-3 reported to a business systems directors, who reported to CI-1. (*Id.*)

CI-4 was employed by Par from 1997 through early 2007, and held various positions in the operations group, including Manager of Packing, Production Manager and Associate Director of Operations and Plan. (*Id.* ¶ 63.)

CI-5 is a former Associate Director of Planning and Inventory for Par who was employed from April 1995 to October 2004. (*Id.*) In his position as Associate Director of Planning and Inventory, CI-5 monitored and participated in the manufacturing and scheduling processes to ensure timely production of products. (*Id.*) He was also charged with ensuring that Par did not have either excessive or too little inventory. (*Id.*)

CI-6 is a former Cost Accountant, Inventory Control Supervisor, and Cost Savings Manager who was employed at Par from 1996 through early 2007. (*Id.*) In 2002, CI-6 was an Inventory Control Supervisor wherein he was responsible for inventory counts, creating inventory reports, and

coordinating the disposal of obsolete inventory. (*Id.*) In his position as Inventory Control Supervisor, CI-6 reported to CI-5. (*Id.*)

CI-7 is a former Director of Supply Chain and Logistics Management employed by Par from early 2004 to mid-2004. (*Id.*) CI-7 was responsible for planning, implementing, and controlling all operations related to Par's supply chain, and spent a significant time at the Company's warehouse/distribution facility. (*Id.*) CI-7 was approximately three levels of supervision removed from Defendant Tariff. (*Id.*)

CI-8 is a former Master Scheduler employed by Par from February 5, 2005 to April 2006. (*Id.*) CI-8 was responsible for creating comprehensive production plans for the Company's manufacturing facility in Spring Valley, New Jersey. (*Id.*) He worked with, among others, CI-6, and his duties included monitoring existing inventory levels and preparing Backorder Reports, which contained information on products' expiration dates and timeliness. (*Id.*)

It is the new allegations allegedly supplied by confidential informants, which the Court evaluates to determine whether the SAC survives a motion to dismiss. The new allegations set forth two principal bases for fraud: knowledge or reckless disregard of misstatements of (a) accounts receivable and (b) inventory. (Pl. Br. at 1.)

### A.    Accounts Receivable

The first principal basis for Plaintiffs' complaint is that Defendants knew or recklessly disregarded the Company's understatement of accounts receivable. According to the SAC, in 2001, Par was utilizing what Plaintiffs characterize as an "archaic and convoluted process" (*Id.* ¶ 48-49) to calculate accounts receivable with Excel spreadsheets, which were maintained and manipulated by members of its finance department (*id.* ¶ 49). The spreadsheets utilized an algorithm that would

6

automatically adjust gross revenue to net revenue by calculating the effects of terms such as charge-backs, rebates, discounts, and shelf stocks.  (*Id.* ¶ 53.)  Once the spreadsheets were generated, finance personnel would then make manual adjustments, known as "price protection," which were adjustments of aggregate sales using a combination of customer history and experience.  (*Id.* ¶ 55.)  Defendants explain that price protection was intended to accurately estimate of how much revenue a sale would actually produce while Plaintiffs allude that it was nothing more than a tool to inflate revenue.  Moreover, the Excel spreadsheets were "totally not locked down," meaning there were no controls or records on who made adjustments.  (*Id.* ¶ 54.)

Beginning in 2002, based on CI-1's recommendation, the Company approved the development of a new automated accounting method (*id.* ¶ 49) which eventually became the GTN application (*Id.* ¶¶ 50, 53).  CI-2 was assigned to lead the project, for which he reported to Pepe.  (*Id.* ¶¶ 48, 52.)  CI-2 also apparently generated "daily reports," which were distributed to Par's senior executives, including Defendant Tarriff and O'Connor.  (SAC ¶¶ 57, 61-62.)  The original "go-live date" for the GTN application was July 2004.  (*Id.* ¶ 57.)  Nonetheless, as of late 2004, the application remained in a "development stage."  (*Id.* ¶ 61.)

From late 2004, Par ran the GTN application in parallel with the Excel spreadsheets.  (*Id.* ¶ 53.)  The numbers produced by the two applications, however, did not match.  (*Id.* ¶ 57.)  Plaintiffs estimate that the revenue figures produced by the Excel application were consistently five to ten percent higher than those produced by the new GTN application.  (*Id.*)  Believing that the GTN application was accurate, CI-2 attempted to reconcile the two systems, but was unsuccessful.  (*Id.* ¶ 58.)  In December 2004, CI-2 was terminated as of result of his superiors' dissatisfaction with the numbers generated by the GTN application.  (*Id.* ¶ 59.)

### B.    Inventory

The second principal basis for Plaintiffs' complaint is Defendants' alleged knowledge or reckless disregard for incorrectly accounted for inventory.  From 2003 through mid-2004, Par's senior management became aware that the Company had "significant levels of inventory that needed to be written off."  (*Id.* ¶ 67.)  The cause for the Company's inventory problems was its build-to-stock manufacturing model, which is common in the pharmaceutical industry.  (*Id.* ¶ 69.)  Under this model, products are created and warehoused in anticipation of demand.  (*Id.*)  If the demand is overestimated or product launches are delayed (as was the case for Par with the drugs Buspirone and Ribavirin), inventory will accumulate and may become obsolete.  (*Id.* ¶ 75.)  Par, it is further alleged, maintained a "very aggressive" manufacturing strategy whereby the Company often produced more products than demand warranted.  (*Id.* ¶ 69.)  As a result, by late 2004, CI-5 estimated that as much as 25 percent of inventory was short-dated or obsolete.  (*Id.* ¶ 77.)

In response to these inventory issues, according to CI-6, the former Inventory Control Supervisor, a group of employees known as the Materials Review Board, which were "primarily comprised of the Planning, Financing, and Warehouse departments (including Schott and Mike McHugh, a cost accountant), began holding meetings on a monthly basis to address the increasing and worsening inventory problems."  (*Id.* ¶ 68.)  From these meetings and through the normal course of his duties, CI-6 "regularly prepared several inventory reports," which were distributed monthly to Par's senior management, including SVP of Operations Graves."  (*Id.* ¶ 70.)  The Materials Review Board also "reported its findings to CI-4, CI-6, Graves and other members of Par's senior management."  (*Id.*)  Nonetheless, according to Plaintiffs, no immediate action was taken to resolve inventory issues.  (*Id.* ¶ 72.)  Plaintiffs further speculate that since Graves "regularly consulted with

8

Defendant O'Connor," "it was likely O'Connor would have made a final decision as to how obsolete inventory would be accounted for." (*Id.*)

In addition to CI-6's alleged efforts to report inventory issues to senior management, CI-7 also states that "he brought the excessive/obsolete inventory issue to the intention of Campbell and Par's Director of Finance (whose name he could not recall)." (*Id.* ¶ 73.)  Initially, the Director of Finance apparently agreed with CI-7 that a "substantial amount of inventory should be written off," but Campbell disagreed. (*Id.*)  Likewise, CI-5 "confirmed and corroborated that Par's senior management and Defendants Tarriff and O'Connor were informed that increasing amounts of obsolete inventory, unavailable for resale customers, was held at the Company's warehouse and had not been written-off in a timely manner." (*Id.* ¶ 74.)

## II.    STANDARD

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 (3d Cir. 1994).  A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. *Iqbal*, 129 S. Ct. at 1950.  A court will not, however, accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Iqbal*, 129 S. Ct. at 1949; *Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3d Cir.1997).  The Supreme Court has recently held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation

to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements." *Twombly*, 550 U.S. at 555. Meaning, "factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

## III.    DISCUSSION

Plaintiffs complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder. In order to assert a claim pursuant to Section 10(b) and Rule 10b-5, a plaintiff must satisfy the following elements: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'; (5) economic loss; and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006) (*quoting Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005)). Section 20(a) does not have separate requirements, but rather creates a cause of action against individuals who exercise control over a "controlled person" such as a corporation that has committed a violation of Section 10(b). *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009) (citing 15 U.S.C. § 78t(a)).

The pleading requirements for a claim brought pursuant to Sections 10(b) and 20(a) of the Exchange Act are governed by the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure. In many ways, the PSLRA replicates or expands upon the particularity requirements of Rule 9(b). *See Avaya*, 564 F.3d at 252 ("Rule 9(b)'s particularity requirement 'is comparable to and effectively subsumed by the requirements of the PSLRA"). "Rule 9(b) requires a plaintiff to plead (1) a specific false representation or omission of

material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage." *Suprema Specialties*, 438 F.3d at 276 (quotations and alterations omitted). Often this requirement is characterized as "the first paragraph of any newspaper story," "the who, what, when where, and how." *Avaya*, 564 F.3d at 253 (internal quotations omitted).

In addition to the stringent requirements of Rule 9(b), the PSLRA provides "two distinct pleading requirements." *Id.* First, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *Avaya*, 564 F.3d at 253. Second, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *Avaya*, 564 F.3d at 253. The required state of mind for claims brought pursuant to Section 10(b) of the Exchange Act is scienter. *See id.*

### A.    Scienter

Defendants' primary argument in support of their motion is Plaintiffs' failure to plead a "strong inference" of scienter. A strong inference of scienter can be established by demonstrating either of the following: "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Suprema Specialties*, 438 F.3d at 276 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)) (internal quotations

omitted).  Given this considerable threshold, Defendants call into question Plaintiffs' usage of group

pleading, a tactic previously rejected by this Court, as well as the particularity (and even veracity)

of the information supplied by Plaintiffs' confidential informants.  Nonetheless, the Court is cautious

not to scrutinize statements in isolation, but rather evaluate the allegations of the complaint on the

whole.  *See Avaya*, 564 F.3d at 272 ("We are the judge whether '*all* of the facts alleged, taken

collectively, give rise to a strong inference of scienter, not whether any individual allegation,

scrutinized in isolation, meets that standard." (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*,

127 S. Ct. 2499, 2509 (2007))).

    The usage of confidential informants is an acceptable mechanism to plead a Section 10(b)

claim in the Third Circuit subject to the following factors: (1) "the detail provided by the confidential

sources;" (2) "the sources' basis of knowledge;" (3) "the reliability of the sources;" (4) "the

corroborative nature of other facts alleged, including from other sources;" and (5) "the coherence and

plausibility of the allegations, and similar indicia."  564 F.3d at 263 (internal quotations omitted).

*Avaya*, 564 F.3d at 263; *Cal. Pub. Employees' Retirement Sys. v. Chubb Corp.*, 394 F.3d 126, 148

(3d Cir. 2004).  If anonymous source allegations fail to satisfy these factors then they must be

"steeply" discounted.  *Avaya*, 564 F.3d at 263.

    Plaintiffs provide sufficient detail regarding the source of the confidential informants'

allegations.  Among other things, Plaintiffs provide job titles, years of employment, and job

responsibilities for a number of individuals who would likely have worked in collaboration and

acquired similar information.  As Defendants characterize it, however, the issue is whether the

confidential informants have a basis for their knowledge; that is, whether they posses expertise

qualifying them to make the allegations put forth, or whether they are simply speculating.  *See id.*

at 262.

## 1. Accounts Receivable

Plaintiffs' primary means of pleading scienter with regard to Par's misstatement of accounts receivable is new information provided by CI-2 and CI-1. As stated, CI-2 is a former Associate Director of Information Systems employed by Par from November 2002 to December 2004. CI-2 supervised the design of GTN, which was intended to replace the Excel spreadsheets Par used to calculate accounts receivable reserves. CI-2 believes that the numbers generated from the GTN, although consistently lower, were more accurate, and that the conflicting figures provided in the Excel spreadsheets were manipulated by Individual Defendants. From late 2004 forward, Par ran both sets of accounting records and produced "daily reports," which were distributed to Par's senior executives, including Defendant Tarriff. (SAC ¶ 62.) Par, however, elected to continue using the Excel spreadsheets, and it directed that the GTN application remain in the "development stage." (*Id.* ¶ 61.) Furthermore, CI-2 was allegedly terminated because of the discrepancy between the Excel spreadsheets and the GTN application. (*Id.* ¶ 59.)

Based on the allegations put forth by CI-2, Plaintiffs have alleged facts that constitute either knowledge of the fraud or strong circumstantial evidence of conscious misbehavior or recklessness on the part of Defendants Tarriff and O'Connor. When Defendants Tarriff and O'Connor received daily reports regarding the GTN application, they should have at least investigated whether the Company needed to increase its accounts receivable reserves. (*Id.* ¶ 57.) Instead, Defendants Tarriff and O'Connor continued with the Company's existing more profitable, outdated Excel spreadsheet methodology to the detriment of shareholders, and allegedly fired CI-2 for his GTN work. Thus, when combined with the remaining allegations discussed below, Plaintiffs' have pled a strong

13

inference of scienter against Defendants Tarriff and O'Connor.[1]

Plaintiffs' have not, however, alleged facts showing either motive and opportunity or conscious misbehavior or recklessness on the part of Defendant Sawyer based on accounts receivable misstatements. By Plaintiffs' own admission, Defendant Sawyer retired from the Company in July 2003. At and before this period, there are insufficient allegations demonstrating that Sawyer manipulated the Excel spreadsheets or consciously disregarded information indicating that the Company's accounts receivable reserves were incorrect. At best, before July 2003 O'Connor but not Sawyer thought the existing system could be improved and automated. (*Id.* ¶ 49.) Moreover, Plaintiffs' group pleading allegations are insufficient to tie in Sawyer. *Winer Family Trust v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007) ("[T]he group pleading doctrine is no longer viable in private securities actions after the enactment of the PSLRA."). Thus, Plaintiffs have failed to plead scienter against Defendant Sawyer.

Defendants argue that CI-2's allegations are conclusory because he was too far removed from Individual Defendants. While it is true that CI-2 was in some respects three steps removed from Defendant O'Connor, CI-2 was supervised by Director of Finance Pepe and CI-1. CI-1 reported directly to Individual Defendants throughout her tenure and regularly attended senior management meetings. Thus, CI-2 is in sufficient proximity to Individual Defendants to circumstantially allege their scienter. *Compare Chubb*, 394 F.3d at 152.

Defendants also make much of the fact that CI-2 was not in the finance department, and

---

[1]

The Court finds less availing Plaintiffs' implications that Defendants' manually manipulated the Excel spreadsheets. (*See id* ¶ 60 ("CI 2 did not know whether Par or its executives deliberately used manual adjustments to the Excel spreadsheet system to inflate Par's net revenues, but he acknowledged that it was possible.").)

14

therefore not qualified to allege the accuracy or inaccuracy of the GTN or the Excel spreadsheets.

From Defendants perspective, CI-2 was merely an information technology employee with no basis

for drawing conclusions regarding what accounting methods were superior for determining accounts

receivable.  Indeed, Defendants concede that neither the GTN nor the Excel spreadsheets predicted

the restated results.  (Def. Reply Br. at 6.)  But CI-2 did not work in isolation.  CI-2 attempted to

build accounting assumptions into his model to the extent he had access to reliable information.

(SAC ¶¶ 53, 61.)  He was also supervised by Pepe, the Director of Finance, during the term of the

project.  (*Id.* ¶ 52.)  Thus, it is not necessary for CI-2 to be a member of the finance department in

order to explain the alleged facts and to reasonably draw conclusions about the inaccuracy of the

accounts receivable.

## 2.    Inventory

Plaintiffs attempt to plead scienter with regard to Defendants' misstatement of inventory

primarily through information obtained from CI-4, CI-5, CI-6 and CI-7.  From 2003 through mid-

2004, Par's senior management became aware that the Company had "significant levels of inventory

that needed to be written off."  (*Id.* ¶ 67.)  In response to these inventory issues, according to CI-6,

the former Inventory Control Supervisor, a group of employees known as the Materials Review

Board began holding meetings on a monthly basis to address the increasing and worsening inventory

problems."  (*Id.* ¶ 68.)  From these meetings and through the normal course of his duties, CI-6

"regularly prepared several inventory reports," which were distributed monthly to Par's senior

management.  (*Id.* ¶ 70.)  The Materials Review Board also "reported its findings to CI-4, CI-6,

Graves and other members of Par's senior management."  (*Id.*)  Likewise, CI-5 "confirmed and

corroborated that Par's senior management and Defendants Tarriff and O'Connor were informed that

increasing amounts of obsolete inventory, unavailable for resale customers, was held at the Company's warehouse and had not been written-off in a timely manner." (*Id.* ¶ 74.) CI-5 quotes Defendant Tarriff as stating "[l]et me look into it, and see what I can find out." (*Id.* ¶ 76.) Nonetheless, according to Plaintiffs, no immediate action was taken to resolve inventory issues. (*Id.* ¶ 72.)

Based on the foregoing, Plaintiffs have alleged further facts that constitute either knowledge of the fraud or strong circumstantial evidence of conscious misbehavior or recklessness on the part of Defendants Tarriff and O'Connor. The establishment of the Materials Review Board and the reports that followed demonstrate that, from at or around 2004 forward, Defendants Tarriff and O'Connor were aware of the Company's inventory issues, but failed to address a methodology they knew or should have known was incorrect. Thus, Plaintiffs have also pled scienter with regard to the Company's inventory misstatements.

With regard to Defendant Sawyer, however, Plaintiffs' allegations again fall short. There no allegations stated with particularity as to what inventory issues Sawyer might have known and when. Indeed, the SAC largely makes only passing, group allegations against him at or around the time of his retirement, stating that beginning in 2003 CI-1 regularly discussed inventory issues with Sawyer and the other Individual Defendants. (SAC ¶ 64; Pl. Br. at 17.) Thus, Plaintiffs have failed to plead scienter against Defendant Sawyer.

Defendants again emphasize that Plaintiffs' confidential informants were not in the finance department, but rather associated with the Company's warehouse and production plant. (Def. Reply Br. at 15.) But this distinction is even less persuasive with regard to Plaintiffs' inventory allegations. The fact is Defendants Tarriff and O'Connor either knew or should have known that their inventory

methodologies were incorrect as a result of the reports prepared by the Materials Review Board. Thus, even if Plaintiffs' confidential informants are characterized as mere warehouse personnel, they nevertheless provided information through the Material Review Board, which called Defendants' SEC representations into serious question.

### 3.    Remaining Allegations

In addition, the Court has not scrutinized Plaintiffs' allegations in isolation, but evaluated the SAC on the whole. *See Avaya*, 564 F.3d at 272. Accordingly, the Court considered as part of its analysis Defendant Tarriff's resignation as well as Individual Defendants' stock sales. Neither of these allegations may, on their own, suffice. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("If scienter could be pleaded on [stock sales] alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."). But in combination with Plaintiffs' other allegations, they reinforce the Court's conclusion that the SAC states a claim. *Compare In re Sipex Corp. Sec. Litig.*, No. C 05-00392 WHA, 2005 WL 3096178, at *1 (N.D. Cal. 2005) (concluding that strong remedial measures, including the firing of employees, following the announcement of a restatement establishes a strong inference of scienter) *with In re Great Atlantic & Pacific Tea Co., Inc. Sec. Litig.*, 103 Fed. Appx. 465, 470 (3d Cir. 2004) ("[T]he complaint makes no specific allegations regarding how these employees were involved in the accounting irregularities or whether they knew that the accounting policies violated GAAP before the restatement was issued.").

### B.    Loss Causation

Defendants also argue that dismissal is warranted because Plaintiffs cannot demonstrate loss causation. In order to establish loss causation, "a claim must demonstrate that the fraudulent conduct

proximately caused or substantially contributed to causing plaintiff's economic loss." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 180 n.24 (3d Cir. 2001). Causation usually "becomes most critical at the proof stage. Accordingly, "[w]hether the plaintiff has proven causation is usually reserved for the trier of fact." *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir.2000).

Plaintiffs have sufficiently pled loss causation. As stated in the SAC, on July 5, 2006, Par announced that, as a result of "accounting errors," its financial statements for the periods 2004 to first quarter 2006 "should no longer be relied upon," a period later expanded to 2001. (*Id.* ¶ 35.) By the following day, the Company's stock price had declined from $18.25 to $13.47. (*Id.* ¶ 36.) (Defendants note that the Company's stock price eventually "fully recovered." (Def. Br. at 28 n.11.) But this argument is more appropriate for the proof stage.) Given these allegations, for purposes of a motion to dismiss, any loss Plaintiffs suffered as a result of Par's stock price decline is attributable Defendants' allegedly fraudulent conduct. Thus, dismissal based on loss causation is not warranted.

### C.    Materiality and Safe Harbor

Defendants briefly argue that any misstatements were either not material, or fall into the safe harbor provisions of the PSLRA because they were either forward looking or merely "puffery." According to Defendants, "[m]any of the alleged misstatements -- *e.g.* '[w]e fully expect our growth to continue and that 2004 will become our fourth consecutive record year' -- are forward-looking and fall into the safe harbor of the PSLRA." (Def. Br. at 30.) This argument, however, does not apply to all of the Company's statements, including its public filings that could no longer be relied upon. (SAC ¶ 35.) These filings are not forward looking or puffery because they misrepresented historical facts. *In re NUI Sec. Litig.*, 314 F. Supp. 2d 388, 416 (D.N.J. 2004) ("All of the particularly alleged

false or misleading assertions in these statements pertain to past events and earnings, and therefore are not 'forward-looking.'" (citing 15 U.S.C. § 78u-5(b)(2)(A))). The filings are also material because the misstated information "significantly altered the 'total mix' of information" available to investors, as evidence by the Company's dramatic drop in stock price. *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (Alito, J.) (some internal quotations omitted). Thus, Plaintiffs have sufficiently pled that Defendants' misstatements were material and not covered by the safe harbor provisions of the PSLRA.

### D.    Control Person Liability

Finally, Defendants briefly argue that Plaintiffs have failed to plead (but rather assumed) facts to support a claim against Individual Defendants pursuant to Section 20(a) of the Exchange Act, otherwise known as control person liability. In order to support a claim for control person liability, a plaintiff must plead the following elements: "(1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions." *Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 644-45 (D.N.J. 2003).

Based on the foregoing, Plaintiffs have stated a claim pursuant to Section 10(b) of the Exchange Act against the Company as well as Defendants Tarriff's and O'Connor's control over the Company's actions. (The Court expresses no view on Defendant Sawyer's control over the Company.) Thus, Plaintiffs have satisfied both elements of their control person claim.

### E.    The Wolfson Declaration

Subsequent to the filing of Defendants' motion to dismiss, but before the motion was fully briefed, Defendants' also filed a motion to strike paragraphs 47-62 and 64-66 of the SAC, and for counsel fees and costs. The allegations contained in these offending paragraphs, Defendants argue,

"overstate, misconstrue, and misrepresent the information provided." (Def. Rule 11 Br. at 3.) As a result, pursuant to Rule 11 of the Federal Rules of Civil Procedure, Defendants conclude, the paragraphs should be stricken. (*Id.*)

Defendants' basis for their motion stems from their unveiling of Plaintiffs' confidential informant, CI-1, now identified as Gabrielle Wolfson. Wolfson submitted a declaration claiming that a private investigator hired by Plaintiffs misquoted her, took information out of context, and ignored other information provided by her in order to make "improper inferences and conclusions." (Wolfson Decl. ¶ 3.) Wolfson therefore disputes many of the allegations attributed to her in the SAC. Furthermore, Wolfson attaches as Exhibit A to her declaration the performance review of CI-2, who she claims was fired by her as a result of his "incompetence" and not because he hindered the perpetration of Defendants' fraud, as Plaintiffs allege. (*Id.* ¶ 20.)

Plaintiffs response to Defendants' Rule 11 motion is two-fold. First, Plaintiffs argue that their inquiry into the allegations surrounding Wolfson was reasonable under the circumstances and in accordance with Rule 11. (*Id.* at 22.) In furtherance of this argument, among other things, Plaintiffs point out that Wolfson "does not deny making any of the statements attributed to her in the Second Complaint." (Pl. Rule 11 Opp. Br. at 1.) Second, Plaintiffs filed a motion to strike the Wolfson Declaration, arguing that Defendants violated the automatic stay provisions of the PSLRA. Alternatively, if the Wolfson Declaration is not struck, Plaintiffs seek particularized discovery.

The PSLRA requires that "all discovery and other proceedings" be stayed pending any motion to dismiss unless a court finds that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party. 15 U.S.C. § 78u-4(b)(3)(B). "The PSLRA's stay of discovery procedures was intended by Congress to protect innocent defendants from having to pay

nuisance settlements in securities fraud actions in which a foundation for the suit cannot be pleaded." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 332 (3d Cir. 2002).

Discovery has been narrowly defined to include "the disclosure in practice or in pretrial procedures by a party to an action of facts or documents which will afford material evidence in determining the rights of a party asking it." *In re Tyco Int'l Ltd. Sec. Litig.*, No. 00-MD-1335-B, 2001 WL 34075721, *2 (D.N.H. Jan. 30, 2001) (quoting Websters Third New Int'l Dictionary 647 (3d ed. 1993)); *accord id.* (It is "data or documents that a party to a legal action is compelled to disclose to another party either prior to or during a proceeding." (quoting The American Heritage Dictionary 401 (2d College ed.1982))). Nonetheless, in the context of the PSLRA, courts have sometimes taken a more practical view of what constitutes "discovery and other proceedings." *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728 (E.D. Mich. 2007). For example, in *Proquest*, the court did not strike an affidavit submitted by the defendants challenging the allegations of a confidential informant on the grounds that it violated the PSLRA's discovery stay. Nor did it impose Rule 11 sanctions for pleading allegations in bad faith. Rather, the court found that "the most appropriate course under the circumstances [wa]s to discount, but not ignore" the confidential informant's allegations. *Id.* at 740.

While not endorsing any rule *per se*, the Court is sympathetic to the *Proquest* court's cautious approach. Moreover, the Court does not want to establish mechanisms whereby discovery must be conducted every time confidential informants are utilized, forcing the Court to reconcile competing facts to determine whether allegations in a complaint should be struck. If, however, discovery in the normal course reveals that factual contentions have indeed been alleged in bad faith, Defendants may renew their Rule 11 motion. They are also permitted, of course, to file a summary judgment motion.

Thus, the Court will deny Defendants' motion to strike paragraphs 47-62 and 64-66 of the SAC and grant Plaintiffs' motion to strike Plaintiffs' motion to strike the Wolfson Declaration.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted against Defendant Sawyer and denied against other Defendants, Defendants' motion to strike paragraphs 47-62 and 64-66 of the SAC and for counsel fees and costs is denied, and Plaintiffs' motion to strike the Wolfson Declaration is granted.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

September 30, 2009